ORIGINAL

1  Lee A. Sherman, Esq. (SBN 172198)
   Robert W. Thompson, Esq. (SBN 106411)
2  Douglas A. Wright, Esq. (SBN 239112)
   **CALLAHAN, McCUNE & WILLIS, APLC**
3  111 Fashion Lane
   Tustin, California 92780-3397
4  Tel.:(714) 730-5700
   Fax:(714) 730-1642
5  E-mail:   Lee_Sherman@cmwlaw.net
             Robert_Thompson@cmwlaw.net
6             Douglas_Wright@cmwlaw.net

7  [Additional Counsel listed on signature page]

8  Attorneys for Plaintiffs

9

10              **UNITED STATES DISTRICT COURT**

11              **CENTRAL DISTRICT OF CALIFORNIA**

12                   **SOUTHERN DIVISION**

13  JOSE L. ACOSTA, JR., ROBERT          ) CASE NO.: CV06-5060 DOC (MLGx)
    RANDALL, and BERTRAM                 ) JUDGE:      David O. Carter
14  ROBISON, individually, and on        ) **CLASS ACTION**
    behalf of all other similarly        )
15  situated,                            )
                                         ) **NOTICE OF MOTION AND MOTION**
16           Plaintiffs,                 ) **FOR AN ORDER GRANTING:**
                                         ) **1.   APPROVAL OF THE**
17      v.                               )      **STIPULATED PLAINTIFF CLASS**
                                         ) **2.   PRELIMINARY APPROVAL OF**
18  TRANS UNION, LLC, and Does 1         )      **CLASS ACTION SETTLEMENT**
    to 10, inclusive                     ) **3.   APPOINTMENT OF CLASS**
19                                       )      **REPRESENTATIVES**
            Defendants.                  ) **4.   APPOINTMENT OF CLASS**
20                                       )      **COUNSEL**
                                         ) **5.   APPROVAL OF NOTICE AND**
21                                       )      **CLAIM FORMS**
                                         ) **6.   SCHEDULING OF THE FINAL**
22                                       )      **FAIRNESS HEARING**
                                         ) **7.   CONSOLIDATION OF** *ACOSTA*
23                                       )      **AND** *PIKE* **FOR SETTLEMENT**
                                         ) **MEMORANDUM OF POINTS AND**
24                                       ) **AUTHORITIES**
                                         )
25                                       )
                                         ) **DATE: January 22, 2007**
26                                       ) **TIME:  8:30 a.m.**
                                         ) **DEPT: Courtroom 9D**
27

28

                                      1



) (filed concurrently with the Affidavits of
) Lee A. Sherman, Robert W. Thompson,
) Peter Recchia, and Ronald Mann; and the
) [Proposed] Order)
)
)
KATHRYN L. PIKE, individually ) CASE NO. SA CV 05-1172 DOC (MLGx)
and on behalf of all others similarly )
situated, )
)
        Plaintiff, )
)
    vs. )
)
EQUIFAX INFORMATION )
SERVICES LLC, and DOES 1 )
through 1000, inclusive, )
)
        Defendants. )

**TO ALL INTERESTED PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on January 22, 2007 at 8:30 a.m., or as soon thereafter as the matter may be heard before the Honorable David O. Carter, in Courtroom 9D of the above-captioned Court, located at 411 West Fourth Street, Santa Ana, California, Plaintiffs, Jose L. Acosta, Jr., Robert Randall, Bertram Robison, and Kathryn L. Pike in the matters of *Acosta et al. v. Trans Union, LLC* (Case No. 06-CV-5060) and *Pike v. Equifax Information Services, LLC* (Case No. 05-CV-1172) jointly, on behalf of themselves, and on behalf of a proposed settlement class comprised of similarly situated consumers, as defined by 15 U.S.C. § 1681a(c), will, and hereby do, move this Court for an Order granting the following:

1. Certification of the stipulated Plaintiff Class;

2. Preliminary approval of the Settlement of this Class Action;

3. Appointment of Jose L. Acosta, Jr., Robert Randall, Bertram Robison

and Kathryn Pike to be Class Representatives;

4. Appointment of Plaintiffs' counsel, Callahan, McCune & Willis, APLC and the Law Offices of Peter Recchia to be Class Counsel;

5. Approval of the Notice of Class Action Settlement and Claim Forms;

6. A Final Fairness Hearing to take place approximately 100 days from the date of the Order granting preliminary approval of the Settlement; and

7. Consolidation of *Acosta* and *Pike* for purposes of settlement.

This motion is brought pursuant to Federal Rules of Civil Procedure; Rule 23(e) on the grounds that the parties, through contentious and arms length negotiations presided over by the Hon. John K. Trotter, Ret., reached a fair, reasonable, adequate and complete settlement of the claims set forth in these matters. The settlement includes identification and stipulation to a proposed class, a comprehensive notice program, substantial injunctive relief in the form of business practice changes by Defendants, TransUnion and Equifax as well as economic relief to qualifying class members.

This Application is based on the Notice; the Memorandum of Points and Authorities in support thereof; the Settlement Agreement, attached as Exhibit A hereto, which includes the proposed Claim Form, Judgment, Long Form Notice, Preliminary Approval Order, Mailed Notice, Publication Notice and Matrix for economic relief; the Affidavits of Lee A. Sherman, Robert W. Thompson, Peter Recchia; and Ronald Mann, the papers and records on file herein; and such other further oral and documentary evidence as may be presented at or before the hearing of this motion.

The parties hereto (Jose L. Acosta, Jr., Robert Randall, Bertram Robison, Kathryn Pike, TransUnion LLC and Equifax Information Services LLC) have met and conferred on this motion and believe the motion is warranted and that the settlement should be approved. The parties have further discussed this motion with

1  counsel for Plaintiffs in the related *White* and *Hernandez* matters and bring this

2  motion in accordance with the schedule adopted in the Joint Motion and Order

3  filed and entered as a result of those discussions.

4  **DATED:** Nov. 17, 2006          **CALLAHAN MCCUNE & WILLIS APLC**

5

6                                                By:   _____

7                                                      LEE A. SHERMAN, ESQ.

8                                                      Attorney for the Plaintiffs and on
                                                       behalf of all others similarly situated

9

10                                                     Peter L. Recchia, Esq. (SBN 77857)
                                                       **LAW OFFICES OF PETER L.**
11                                                     **RECCHIA**
                                                       1605 E. 4th Street, Ste. 250
12                                                     Santa Ana, CA 92701
                                                       Tel: (714) 541-2858
13                                                     Fax: (714) 541-6880
                                                       E-mail:   Attnyrecchia@aol.com

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

# TABLE OF CONTENTS

Page

I.    INTRODUCTION…………………………………………………   5

II.   STATEMENT OF FACTS…………………...………………   6

      a. THE PARTIES…………………………………………………   6

         i.    THE NAMED PLAINTIFFS………....………………   6

         ii.   THE DEFENDANTS…………………...…………………   6

         iii.  THE PLAINTIFF CLASS………………………….…….   7

      b. THE LITIGATION…………………………….................   7

         i.    *Acosta v. Trans Union, LLC* litigation……………………   7

         ii.   *Pike v. Equifax Information Services, LLC* litigation……...   10

III.  CASE HISTORY BASED ON CURRENT PRACTICES…………   12

IV.   TERMS OF THE SETTLEMENT AGREEMENT…………………   13

      a. INJUNCTIVE RELIEF…………………………………………...   13

         i.    FUTURE CHAPTER 7 DISCHARGE ORDERS…………   13

         ii.   REINVESTIGATION PROCEDURES…………………   14

         iii.  UPDATING CURRENT DATA……………………………   15

      b. ECONOMIC RELIEF…………………………………………….   16

V.    CLASS CERTIFICATION AND PRELIMINARY APPROVAL OF
      SETTLEMENT AGREEMENT……………………………………...   16

      a. A WELL DEFINED CLASS OF PERSONS EXISTS…………..   16

         i.    NUMEROSITY…………………………………………   17

         ii.   COMMONALITY…………………………………………   17

         iii.  TYPICALITY……………………………………………   18

         iv.   ADEQUACY OF REPRESENTATION…………………   19

         v.    RULE 23(B)(3)…………………………………………   19

      b. THE PROPOSED SETTLEMENT IS FAIR ADEQUATE AND
      REASONABLE……………………………………………………...   20

i

      i.     STRENGTH OF PLAINTIFFS' CASE.......................... 21

      ii.    RISK, EXPENSE, COMPLEXITY AND DURATION OF FUTURE LITIGATION............................................. 23

      iii.   THE RISK OF MAINTAINING CLASS ACTION STATUS THROUGHOUT THE TRIAL...................... 24

      iv.   THE AMOUNT OFFERED IN SETTLEMENT............. 24

      v.    THE EXTENT OF DISCOVERY COMPLETED AND THE STAGE OF THE PROCEEDING......................... 26

      vi.   EXPERIENCE AND VIEWS OF COUNSEL................ 26

VI.   APPOINTMENT OF CLASS REPRESENTATIVE.................... 27

    a.  APPOINTMENT OF CLASS REPRESENTATIVES.............. 27

    b.  CLASS REPRESENTATIVE ENHANCEMENTS AND ATTORNEYS FEES......................................................... 27

VII.  APPOINTMENT OF COUNSEL........................................... 27

VIII. APPROVAL OF NOTICE AND CLAIM FORMS..................... 28

    a.  NOTICE TO CLASS MEMBERS.................................... 28

      i.     NOTICE TO RULE 23(B)(3) INJUNCTIVE AND MONETARY RELIEF CLASS MEMBERS................. 28

      ii.    RULE 23(B)(2) INJUNCTIVE RELIEF ONLY CLASS MEMBERS......................................................... 29

IX.   CONCLUSION.................................................................. 29

## TABLE OF AUTHORITIES

### CASES

Page

*Amchem Prods. Inc. v. Windsor,*
521 U.S. 591, 117 S. Ct. 2231.................................................. 16, 27

*Armstrong v. Bd. Of Sch. Dirs. Of the City of Milwaukee,*
616 F.2d 305 (7th Cir. 1980)............................................ 20

*Brown v. Ticor Title Ins.,*
982 F.2d 386 (9th Cir. 1992)............................................ 19

*City of Detroit v. Grinnell Corp.,*
495 F.2d 448 (2d Cir. 1974)............................................ 21, 25

*Class Plaintiffs v. City of Seattle,*
955 F.2d 1268 (9th Cir. 1992)............................................ 20

*Colesberry v. Ruiz Food Products, Inc.,*
2006 U.S. Dist. LEXIS 45024 (E.D. Cal. 2006)............................ 17

*Cotton v. Hinton,*
559 F.2d 1326 (5th Cir. 1977)............................................ 26

*Eisen v. Carlisle & Jacquelin,*
417 U.S. 156, 94 S. Ct. 2140 (1974)...................................... 28

*Felsen v. Andreas,*
134 F.3d 873 (7th Cir. 1998)............................................ 20

*Gay v. Waiters' & Dairy Lunchmen's Union,*
549 F.2d 1330 (9th Cir. 1997)............................................ 17

*Hammond v. Powell,*
462 F.2d 1053 (4th Cir. 1972)............................................ 29

*Hanlon v. Chrysler Corp.,*
150 F.3d 1011 (9th Cir. 1998)............................................ 17

*Hanrahan v. Britt,*
174 F.R.D. 356 (E.D. Pa. 1997)......................................... 26

*In re Cherry's Petition to Intervene,*
164 F.R.D. 630 (E.D. Mich. 1996)....................................... 29

*In re Irby,*
337 B.R. 293 (N.D. Ohio 2005)......................................... 22

*In re Mego Fin. Corp. Sec. Litig.,*
213 F.3d 454 (9th Cir. 2000)........................................... 26

*In re Pacific Enters. Sec. Litig.,*
47 F.3d 373 (9th Cir. 1995)............................................ 20, 26

*In re Paine Webber Ltd. P'ships Litig.,*
171 F.R.D. 104 (S.D.N.Y. 1997)......................................... 26

iii

*In re Prudential Ins. Co. America Sales Practice Litigation,*
  148 F.3d 283 (3rd Cir. 1998)…………………………………… 24

*In re School Asbestos Litigation,*
  789 F.2d 1011 (3rd. Cir. 1986)…………………………………… 24

*In re Trans Union Corp. Privacy Litigation,*
  211 F.R.D. 328 (N.D. Ill. 2002)…………………………………… 23

*Linney v. Cellular Alask P'ship,*
  151 F.3d 1234 (9th Cir. 1998)…………………………………… 21, 25

*Livingston v. Toyota Motor Sales USA, Inc.,*
  1995 U.S. Dist. LEXIS 21757 (N.D. Cal. 1995)………………… 18, 22

*Marshall v. Holiday Magic,*
  550 F.2d 1173 (9th Cir. 1977)…………………………………… 28

*Mullen v. Treasure Chest Casino, LLC,*
  186 F.3d 620 (5th Cir. 1990)…………………………………… 17

*National Rural Telecommunications Cooperative v. Directv, Inc.,*
  221 F.R.D. 523 (C.D. Cal. 2004)……………………………… 21, 23, 25

*Officers for Justice v. Civil Service Comm'n of the City and County of San Francisco,*
  688 F.2d 615 (9th Cir. 1982)…………………………………… 21, 25

*Oppenlander v. Standard Oil Co.,*
  64 F.R.D. 597 (D. Colo. 1974)…………………………………… 23

*Ratner v. Bennett,*
  1996 U.S. Dist. LEXIS 6259 (E.D. Pa. 1996)…………………… 26

*Sorensen v. Household Fin. Corp.,*
  2006 Cal.App. Unpub. LEXIS 10091…………………………… 22

*Staton v. Boeing Co.,*
  327 F.3d 938 (9th Cir. 2003)…………………………………… 16

*Torrisi v. Tucson Elec. Power Co.,*
  8 F.3d 1370 (9th Cir. 1993)…………………………………… 21

*Washington v. CSC Credit Services, Inc.,*
  199 F.3d 263 (5th Cir. 2000)…………………………………… 23

*Weinberger v. Kendrick,*
  6989 F.2d 61 (2nd Cir. 1983)…………………………………… 28

*White v. National Football League,*
  41 F.3d 402 (8th Cir. 1994)…………………………………… 28

*Williams v. Vukovich,*
  720 F.2d 909 (6th Cir. 1983)…………………………………… 25

*Yeagley v. Wells Fargo & Co.,*
  No. C 05-03403, 2006 WL 193257 (N.D. Cal. 2006)……………… 23

iv

1
2

## RULES/STATUTES

3   15 U.S.C. § 1681a(d)...........................................................   7

4   15 U.S.C. § 1681a(f)...........................................................   6

5   Fair and Accurate Credit Transactions Act of 2003, 117 Stat. 1952
6       (Dec. 4, 2003)...........................................................   16

7   Fed. R. Civ. P. 23 (a)...........................................................   16, 17

    Fed. R. Civ. P. 23 (a) (1)...........................................................   17
8
    Fed. R. Civ. P. 23 (a) (3)...........................................................   18
9
    Fed. R. Civ. P. 23 (a) (4)...........................................................   19
10
    Fed. R. Civ. P. 23 (b)...........................................................   19
11
    Fed. R. Civ. P. 23 (b) (3)...........................................................   19
12
    Fed. R. Civ. P. 23 (e)...........................................................   16

13

## TREATISES

14
15  2 Newberg & Conte, *Newberg on Class Actions*
        (3rd Ed. 1992)...........................................................   18, 23
16
    5 Moore Federal Practice
17       (Matthew Bender 3d ed.)...........................................................   19

    *Manual for Complex Litigation,*
18       Second Ed. (1985)...........................................................   26, 28

19
20
21
22
23
24
25
26
27
28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

The named plaintiffs, Jose L. Acosta, Jr., Robert Randall, Bertram Robison and Kathryn Pike in the matters of *Acosta et al. v. Trans Union, LLC* (Case No. 06-CV-5060) and *Pike v. Equifax Information Services, LLC* (Case No. 05-CV-1172) jointly bring this motion for an Order seeking certification of the stipulated plaintiff settlement class and preliminary approval of the Class Action Settlement[1] for claims arising out of Defendants Trans Union, LLC ("Trans Union") and Equifax Information Services, LLC's ("Equifax") credit reporting procedures with respect to credit accounts discharged through Chapter 7 bankruptcy proceedings pursuant to Title 11 of the United States Code.[2]

The proposed Settlement is the product of lengthy investigations and arms-length negotiations through mediation.  The parties have also reached agreement as to content and form of the Notices and Claim Form, as well as selection of Class Counsel and identification of the named plaintiffs to represent the plaintiff settlement class as its Representative Plaintiffs.

The plaintiffs believe and the parties hereto agree that the settlement is fair, reasonable, adequate and completely resolves the claims of the proposed settlement class.  In particular, the proposed settlement includes a comprehensive notice program involving mailed notice to all consumers eligible for economic relief subclasses along with publication notice, an internet site as well as a "piggy back" notice in correspondence to consumers by the defendants.  The settlement also addresses the key issues raised in the Complaints both in a forward looking and retroactive manner.  Specifically, the settlement not only provides for substantial business practice changes on the part of the defendants that will alleviate these

---

[1] See Stipulation And Agreement Of Settlement, attached hereto as Exhibit A
[2] See Complaints, attached jointly hereto as Exhibit B

5

types of claims going forward, but also includes the defendants' commitment to review existing data and remedy certain reporting that has already occurred. Finally, the settlement also provides various categories of economic relief to those class members eligible to submit a claim ranging from receipt of a free credit report and score (valued at $15.00 to $20.00) up to a free credit report and score plus $450.00.

## II.    STATEMENT OF FACTS

### a. THE PARTIES

#### i.  THE NAMED PLAINTIFFS

Plaintiff Jose L. Acosta, Jr.'s debts were discharged in January 2002. Plaintiff Robert Randall's debts were discharged in May 2003. Plaintiff Bertram Robison's debts were discharged in September 2004. Plaintiff Kathryn Pike's debts were discharged in 2002. Each of these individuals sought a "Fresh Start" post bankruptcy discharge, but each was adversely affected by the continued reporting of certain tradelines on their credit report as "charged off", in collection, or some other less derogatory notation. Consequently, each sought to dispute what they deemed to be inaccurate reporting of these post-bankruptcy tradelines by way of Defendants' reinvestigation process[3]. However, each found the reinvestigation process used by Defendants to favor the creditors and each was denied correction of certain tradelines.

#### ii.  THE DEFENDANTS

Defendants, Trans Union and Equifax are each a "consumer credit reporting agency" within the meaning of the FCRA, 15 U.S.C. § 1681a(f) and regularly engage in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined

---

[3] Both TransUnion and Equifax utilize a standardized reinvestigation process. Dec. Recchia, ¶ 5.

6

in 15 U.S.C. § 1681a(d), to third parties.  Moreover, as noted above, Defendants utilize a similar reporting and reinvestigation system, which Plaintiffs contend favors the creditor by failing to update certain accounts that have been discharged in bankruptcy and then taking the word of the creditors during the reinvestigation process.  Plaintiffs believe this settlement fairly addresses this problem.

### iii.  THE PLAINTIFF CLASS

Plaintiffs Jose L. Acosta, Jr., Robert Randall, Bertram Robison and Kathryn Pike seek to represent a Plaintiff Class of individuals as defined by Section 1.31 of the Settlement Agreement attached as Exhibit A.  Two subclasses have been created and described in Sections 1.6 and 1.19 of the Settlement Agreement.  See Exhibit A.

### b.  THE LITIGATION

#### i.  *Acosta v. Trans Union, LLC* litigation

Plaintiff Acosta originally filed this lawsuit against Trans Union LLC as a class action in Orange County Superior Court on May 12, 2003, and later filed the First Amended Class Action Complaint on May 14, 2004.  Dec. Sherman ¶ 5.  The *Acosta* Complaint alleges violations of California's Consumer Credit Reporting Agencies Act for its reporting practices involving accounts and/or debts legally discharged in a Chapter 7 bankruptcy.  *Id*; see also *Acosta* State Court Complaint, a true copy of which is attached hereto as Exhibit C.

During the course of the litigation, Acosta conducted extensive discovery regarding Trans Union's credit reporting practices.  This discovery included, among other things, multiple sets of written discovery, multiple sets of requests for production of documents, multiple depositions as well as reviewing thousands of pages of consumer data and interviewing numerous consumers.  Dec. Recchia, ¶ 19; Dec. Sherman ¶ 6.  Through this intensive investigation, Acosta was also able to interview former Trans Union employees regarding Trans Union's reporting practices with respect to accounts and/or debts discharged in a Chapter 7

7

1    bankruptcy. *Id.*

2        Likewise, during the course of litigation in this matter, Trans Union also

3    conducted extensive discovery with Acosta including written discovery and

4    depositions of Acosta and six of the twenty-six individuals who submitted

5    declarations in support of Acosta's fully briefed Motion for Class Certification.[4]

6    Dec. Sherman ¶ 7.

7        On or about October 18, 2005, the parties attended a status conference in the

8    Orange County Superior Court.  The court then expressed its concerns over the

9    stagnation of settlement discussions that had taken place earlier in the matter. Dec.

10   Sherman,¶ 8.  At that time, counsel for TransUnion advised the Court that

11   Plaintiffs' motion for class certification was set to be filed on October 28, 2005,

12   and that certification was a significant issue for his client.  He further advised the

13   Court that after the filing of that motion, TransUnion may be interested in

14   participating in the settlement negotiations. *Id.*  Counsel for Acosta then advised

15   the Court that the motion for class certification would be filed on schedule. *Id.*  On

16   or about October 27, 2005, Acosta filed the Motion for Class Certification.  Dec.

17   Sherman, ¶ 9.

18       In December 2005 (after Acosta filed his motion for class certification and

19   before TransUnion's opposition was due), counsel for Acosta and Trans Union

20   discussed potential settlement of the matter. Dec. Sherman ¶ 10.  At that time, the

21   discussion centered on the likelihood of certification.  Trans Union's then counsel

22   requested that Acosta submit a settlement demand. *Id.*  Counsel for Acosta agreed

23   and provided a settlement demand in January of 2006. *Id.*

24       In the meantime, Trans Union was unable to timely file its Opposition to

25   Acosta's motion for class certification, so Trans Union's counsel applied ex parte

26   ───────────────

27   [4] Trans Union also took the depositions class representatives Robert Randall and
     Bertram Robison because each submitted declarations in support of Acosta's
28   motion for class certification.

                                           8

for an order continuing the opposition due date for the motion.[5] Dec. Sherman ¶ 11. The court extended the opposition due date to February 21, 2006. *Id.*

Shortly thereafter, Acosta's counsel was contacted for the first time by new counsel for Trans Union. Dec. Sherman, ¶ 12. Following that discussion, new counsel for Trans Union indicated that they had reviewed the settlement proposal and the motion for class certification and that Trans Union was interested in mediating the case. Dec. Sherman ¶ 13. Counsel for Trans Union therefore proposed to further extend the briefing and hearing of Acosta's motion for class certification to allow for mediation. *Id.* The parties reached a stipulation and agreed to mediate with Justice John K. Trotter (Ret.) at JAMS in Anaheim, California. *Id.*

Thereafter, the parties participated in multiple mediation sessions (March 14, 2006, April 20, 2006 & May 3, 2006) with Justice Trotter, and although the parameters of a deal began to take shape, no deal was initially reached. Dec. Sherman ¶ 14. As a result of the impasse in negotiations, on May 18, 2006, Trans Union filed its Opposition to Acosta's Motion for Class Certification. Dec. Sherman ¶ 15. Subsequent thereto, the parties agreed to an additional mediation session, which was conducted on August 1, 2006.[6] Dec. Sherman ¶ 16. Again, though significant progress was made and the parameters of a settlement continued to narrow, no deal was reached. *Id.* So, *Acosta* then filed his Reply in support of his motion for class certification on or about August 2, 2006 with a hearing date of September 1, 2006. *Id.* Shortly after the Reply was filed, the parties conducted a

_____

[5] Significantly, Trans Union's request was based in part on the fact that Acosta's motion for class certification included thousands of pages of supporting factual material that Trans Union did not contemplate and sworn declarations from 26 witnesses prepared to testify, which highlights the extensive work by the *Acosta* team that ultimately brought TransUnion to the settlement table.

[6] As discussed further below, prior to August 1, 2006, Equifax had become involved in the negotiations with regard to the *Pike* case and so participated in the August 1st mediation session. Dec Sherman, ¶ 23.

9

5th mediation session with Justice Trotter on August 7, 2006.  Dec. Sherman ¶ 17.

After completion of the fifth mediation session, counsel for Acosta informed

counsel for Trans Union that the parties need to reach an agreement as to the terms

of the settlement; otherwise, Acosta was prepared to take his case to certification

on September 1, 2006.  *Id.*  Thereafter, over the next few days following that

mediation session, there were multiple telephone conferences between the parties

and Justice Trotter, which, after several months of intense negotiations, finally

resulted in a settlement completed and memorialized in a Memorandum of

Understanding executed by all parties on August 11, 2006.  *Id.*

### ii.   *Pike v. Equifax Information Services, LLC* litigation

The *Pike v. Equifax Information Services, LLC* matter was originally filed in

California state court on October 14, 2005.  Dec. Sherman ¶ 18.  The matter was

subsequently removed to Federal Court on November 30, 2005, and Defendant

Equifax Information Services, LLC ("Equifax") filed its Answer.  Dec. Sherman, ¶

19.  Similar to the complaint filed in the *Acosta v.  Trans Union LLC* matter, the

*Pike* complaint also alleged violations of California's Consumer Credit Reporting

Agencies Act ("CCRAA"), specifically Civil Code sections 1785.14(b) (failure to

follow reasonable procedures to assure maximum possible accuracy of the

information concerning the individual about whom the credit report relates) and

1785.16 (failure to include a consumer statement following a dispute that goes

unresolved). Dec. Sherman ¶ 20.

Significantly, by the time the *Pike* matter was in full swing, Pike's counsel

had already amassed a discovery bank of information regarding the practices and

procedures of Equifax regarding the pertinent issues from other litigation in which

they had been involved.  Dec Recchia ¶¶ 6, 7, 8 and 9.  In fact, Pike's counsel has

conducted multiple depositions of Equifax personnel relating to these issues,

obtained written discovery responses from Equifax pertaining to these issues and

obtained numerous documents from Equifax relating to these issues.  *Id.*

Consequently, counsel for Pike was prepared to proceed with that action almost

from the very outset.  Dec Recchia ¶ 9.

In light of the foregoing, while the parties in the *Acosta v. Trans Union, LLC* matter were mediating with Justice Trotter (Ret.), Pike's counsel began discussions with Equifax's counsel regarding mediation and/or resolution of the *Pike* matter along with the *Acosta* matter.  Dec. Sherman ¶ 21.  Those discussions continued while the parties in the *Acosta* matter participated in mediation.  *Id.*  After the May 3, 2006, mediation in the *Acosta* matter, counsel for Plaintiff Pike again approached Equifax regarding settlement and Equifax expressed interest in participating in the on-going mediation sessions, but needed additional time to prepare.  Dec. Sherman ¶ 22.  Therefore, the parties to the mediation (Acosta, Pike, Trans Union and Equifax) agreed to an August 1, 2006 date, in part so that Equifax could have the additional time requested.  *Id.*  On August 1, 2006, Equifax attended the mediation session with Justice Trotter and participated in the discussions, but no settlement was reached.  Dec. Sherman ¶ 23.

Shortly thereafter, on August 7, 2006, the parties in the *Acosta* matter conducted a 5th mediation session with Justice Trotter.  Dec. Sherman ¶ 24.  Over the next few days following that mediation session, there were multiple telephone conferences between the parties and Justice Trotter, which, after several months of intense negotiations, finally resulted in a settlement of the *Acosta* matter completed and memorialized in a Memorandum of Understanding executed by Plaintiff Acosta and Trans Union on August 11, 2006.  *Id.*  Equifax did not commit to the settlement at that time, but negotiations continued.  *Id.*  Thereafter, Plaintiffs counsel continued to discuss resolution of the claims in the *Pike* matter with Equifax's counsel, who stated that Equifax would further discuss settlement proposals at the September 14, 2006, global mediation[7] with Justice Trotter.  Dec. Sherman ¶ 25.

At the September 14, 2006, mediation with Justice Trotter, counsel for both

---

[7] The global mediation also included counsel from the related *White* and *Hernandez*

parties in the *Pike* matter finally reached an agreement wherein Equifax would join the settlement agreement reached in the *Acosta* matter, which stipulates to the certification of the class at issue in this motion. Dec. Sherman ¶ 26. Similar to the settlement in *Acosta*, Pike agreed to file a Second Amended Complaint alleging nationwide claims and Equifax answered. *Id.*

The addition of Equifax to the Settlement Agreement reached in *Acosta* had a significant impact and was not simply a *pro forma* addition without any additional benefit to the settlement class. Dec. Sherman, ¶ 27. Specifically, the addition of Equifax allowed for more extensive injunctive relief, i.e., the *Acosta* settlement by itself did not provide for any scrubbing of existing files with Trans Union. *Id.* The addition of Equifax allowed for this addition as provided in Sections 4.6 and 4.7. *Id.* Furthermore, the addition of Equifax provides additional monetary relief, as well. *Id.*

### III. CASE HISTORY BASED ON CURRENT PRACTICES

The case of Acosta illustrates the affect of the current credit reporting practices. Acosta's debts were discharged in January 2002. While Acosta's post-discharge Trans Union credit report accurately reported Plaintiff's Chapter 7 bankruptcy filing and discharge date in the "Public Records" section, it reported several accounts that were discharged in the Chapter 7 bankruptcy in an inaccurate status. Dec. Recchia, ¶ 11. These accounts included Acosta's accounts with MBNA (reported as "charged off as bad debt"), Household Bank (reported "charged off as bad debt" with a $12,238 "balance" and $1,313 "past due"), and Fleet (reported as "charged off as bad debt"). *Id.* At that point, Acosta's credit score due in part to these errors was improperly deflated to **631**. Dec. Recchia, ¶ 12. So, Acosta submitted a written dispute and request for reinvestigation regarding the above mentioned accounts and informed Trans Union that the accounts were discharged in his Chapter 7 bankruptcy. Dec. Recchia, ¶ 13.

matters.

In response, Plaintiff received an updated Trans Union credit report. Trans Union corrected one of the disputed accounts.[8] *Id.* However, the MBNA and Household Bank accounts remained inaccurate. *Id.* Trans Union simply stated that the accounts were verified through the creditor as accurate and therefore kept them on Acosta's credit report as "charged off as bad debt," with a $12,238 balance and $1,313 past due. *Id.* Nevertheless, due to the correction, Plaintiff's credit score increased to **674**. Dec. Recchia, ¶ 14. So, Plaintiff submitted another dispute/request for reinvestigation to Trans Union regarding the MBNA and Household Bank accounts. Dec. Recchia, ¶ 15.

In response, Trans Union reported the MBNA and Household Bank accounts as "previously verified" and refused to correct the inaccurate account information. *Id.* Consequently, Plaintiff's credit score at that time remained practically the same increasing only a few points to **686**. Dec. Recchia, ¶ 16. So, Acosta seeing no hope in the existing reinvestigation process filed this lawsuit. Dec. Recchia, ¶ 17. A short while later[9], Acosta received an updated version of his credit report in which both the MBNA and Household Bank accounts were "corrected" and properly reported as included in "Chapter 7 Bankruptcy" and "unrated." Dec. Recchia, ¶ 18. Plaintiff's credit score then increased substantially to **742**. *Id.* Thus, by finally removing the incorrect post-bankruptcy information from his Trans Union credit report, Acosta's credit score increased **111** points.[10]

## IV.   TERMS OF THE SETTLEMENT AGREEMENT

### a.  INJUNCTIVE RELIEF

#### i.   FUTURE CHAPTER 7 DISCHARGE ORDERS

As explained in Sections 4.2 and 4.3 of the Settlement Agreement, both Trans Union and Equifax agree to modify their systems with regard to future Chapter 7

---

[8] The Fleet account was corrected and reported as "included in bankruptcy" and "unrated."

[9] After the filing of his lawsuit.

[10] A change of 111 points can have a significant impact on a consumers ability to

13

bankruptcy discharge orders entered subsequent to the Final Judgment and Order of Dismissal with Prejudice in this case.[11] Specifically, Trans Union and Equifax will identify all Bankruptcy Qualifying Tradelines ("BQTs")[12], and for the first time, automatically update the reporting on all such accounts to remove the charge-off or collection rating, delete any current and/or past due balances, and add a remark that the account was included in the individual's Chapter 7 bankruptcy. This is a major shift from Defendants' current practice,[13] which amounts to reporting the discharge, but not updating the BQT lines *until* and *unless* the creditor instructs them to regardless of the consumer's report.

Consequently, not only does the business practice change ensure that individuals obtaining a discharge in the future will not have to go through the old reinvestigation process[14], but it makes certain that millions of consumers will not have these inaccuracies in the first place thereby increasing their credit scores, lowering their interest payments and increasing their ability to access credit.

## ii.   REINVESTIGATION PROCEDURES

As described in Sections 4.4 and 4.5 of the Settlement Agreement, Trans Union and Equifax have also agreed to modify their reinvestigation procedures. Pursuant to the Settlement Agreement, now when a consumer requests reinvestigation of a tradeline contained in his or her file that is an unsecured revolving loan, is reported as "charged off", "placed for collection" or 30 or more days past due, and that file contains evidence of a discharged Chapter 7 bankruptcy (or the consumer provides that evidence), Trans Union and Equifax will, *without requiring the consumer to provide any documentation and without first seeking*

---

use and access credit.

[11] While this does not directly affect the class members who already had their bankruptcy discharges entered, this was an important consideration in making sure that future consumers do not suffer the same affects as the class.

[12] The acronym "BQT" is defined in the Settlement Agreement, Section 1.5.

[13] Affidavit of Ronald J. Mann, ¶ 16.

[14] The reinvestigation process has also been dramatically changed as part of this

14

*verification from the credit furnisher* change the reporting of any and all such tradelines to remove the derogatory information and add a remark indicating the account was included in bankruptcy.

The result of this settlement will be that Defendants will now take the word of the consumer and update these tradelines without first checking with or relying on the creditor.  Thus, consumers will no longer be at the mercy of the creditors and will now be able to instantly update post-bankruptcy tradelines that were discharged.[15]  This process alone would have saved each of the named plaintiffs hundreds of dollars in attorneys' fees, multiple years of battling with Defendants in the reinvestigation process and ultimately, the time and effort associated with filing this litigation.

### iii.  UPDATING OF CURRENT DATA

Finally, as described in Sections 4.6 and 4.7 of the Settlement agreement, Trans Union and Equifax will also design and implement new systems to identify all consumers within their credit reporting databases who currently have a Chapter 7 discharge order on their file and update all BQTs to remove the charge-off or collection rating, delete any current and/or past due balance, and add a remark indicating the that the account was included in the consumers Chapter 7 bankruptcy.  Trans Union and Equifax will do this regardless of whether the consumer submits a Claim Form or takes part in this settlement.

The significance of this change in practice by Defendants is that not only will the new procedures help those consumers obtaining discharges and seeking reinvestigation in the future, but this procedure will automatically assist those who have already obtained their discharge even if they do not make a claim or take any steps to seek reinvestigation on their own.[16]

///

---

settlement to a much more consumer friendly process, Section IV(a)(ii), infra.
[15] Affidavit of Ronald J. Mann, ¶ 17.
[16] Affidavit of Ronald J. Mann, *Id.*

15

### b. ECONOMIC RELIEF

As described in greater detail in Section V of the Settlement Agreement, there exists extensive economic relief for eligible members of Sub-Classes A & B. After submission of the appropriate Claim Form, the amount of economic relief to each eligible member will be determined after an evaluation of the member's credit report. (Ex. A, §§ 5.1-5.5) The range of economic relief varies from a free credit report and score,[17] to other relief such as a cash payment of as much as $450.00 in addition to the free credit score and report. (Ex. A, Matrix)

## V. CLASS CERTIFICATION AND PRELIMINARY APPROVAL OF SETTLEMENT AGREEMENT

Federal Rule of Civil Procedure 23(e) provides that "[a] class action shall not be dismissed or compromised without approval of the court ..." Fed. R. Civ. P. 23 (e). First though, when "the parties reach a settlement agreement prior to class certification, courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). The first step is to assess whether a class exists. *Id.* (citing *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620, 117 S. Ct. 2231 (1997)). The second step is to evaluate "whether a proposed settlement is fundamentally fair, adequate, and reasonable." *Id.* As demonstrated in greater detail below, a well defined class of persons exists and the Settlement Agreements reached in *Acosta* and *Pike* are fundamentally fair, adequate and reasonable.

### a. A WELL DEFINED CLASS OF PERSONS EXISTS

The threshold task of the court is to ascertain whether the proposed settlement class satisfies the requirements of Rule 23(a) of the Federal Rules of

---

[17] All eligible Claimants that experience any change in score will be entitled to a free credit report and score, which has an estimated value in excess of $15.00. Importantly, this will not affect the Claimants right to obtain a free annual credit report from Trans Union or Equifax pursuant to the federal Fair and Accurate Credit Transactions Act of 2003, 117 Stat. 1952 (Dec. 4, 2003).

16

Civil Procedure applicable to all class actions, namely: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).

### i. NUMEROSITY

The class must be so numerous that joinder of members is impracticable. Fed. R. Civ. P. 23 (a) (1). *See, e.g., Gay v. Waiters' & Dairy Lunchmen's Union*, 549 F.2d 1330 (9th Cir. 1997) (numerosity requirement met with approximately 110 potential class members); *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620 (5th Cir. 1990) (numerosity requirement met with between 100 and 150 potential class members). Here, the number of individuals in Sub-Class A & B alone encompass approximately 4,000,000 persons. This plainly satisfies the numerosity requirement of Rule 23 (a).

### ii. COMMONALITY

A class has sufficient commonality "if there are questions of law or fact common to the class." Fed. R. Civ. P. 23 (a) (2); *See also Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). "Common questions of fact and law are present where the defendants have engaged in standardized conduct toward members of the proposed class." *Colesberry v. Ruiz Food Products, Inc.*, 2006 U.S. Dist. LEXIS 45024 (E.D. Cal. 2006). Here, all members of the potential class share the same factual background. Each class member (1) filed a Chapter 7 bankruptcy subsequent to May 12, 1996, (2) had their debts discharged in that bankruptcy, and have post-bankruptcy Trans Union and/or Equifax credit reports reporting the discharged non-reaffirmed debts in an inaccurate status.

Furthermore, all members of the potential class also derive their claims from the same alleged standardized conduct by Defendants. Trans Union and Equifax have each (1) created standardized practices and procedures for reporting accounts discharged in Chapter 7 bankruptcy, (2) created standardized practices and procedures for reinvestigating disputes regarding accounts discharged in Chapter 7

1  bankruptcy, (3) trained their employees to follow the procedures with each

2  consumer dispute, and (4) ensure that their employees in fact follow these

3  procedures.[18]

4    Finally, the same questions of law will arise in each circumstance, i.e., there

5  is a universal question of law as to each class member whether Trans Union and

6  Equifax maintain reasonable procedure to assure maximum possible accuracy of

7  reporting discharged accounts to each class member.  Thus, the commonality

8  requirement has been satisfied.

9    **iii.  TYPICALITY**

10    The claims or defenses of the representative parties must be typical to the

11  claims and defenses of the class.  Fed. R. Civ. P. 23 (a) (3).  To be typical, the

12  claims need not be identical. *Hanlon, supra*, 150 F.3d at 1020.  Rather,

13  "[t]ypicality refers to the nature of the claim or defense of the class representative,

14  and not to the specific facts from which it arose or the relief sought." *Hanon v.*

15  *Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  In the settlement context,

16  Newberg points out "typicality of claims … requires proof that he interests of the

17  class representative and the class are commonly held for the purpose of receiving

18  similar or overlapping benefits from a settlement." *Livingston v. Toyota Motor*

19  *Sales USA, Inc.*, 1995 U.S. Dist. LEXIS 21757 (N.D. Cal. 1995) citing 2 Newberg

20  & Conte, *Newberg on Class Action* § 11.28 at 11-58 (3rd Ed. 1992).

21    Here, the claims of the class representatives are typical of all other class

22  members and the class representatives will receive similar or overlapping benefits

23  from the settlement.  Critically, each claim will be individually evaluated for

24  eligibility; thus, no claim of any class representative will affect or come at the

25  expense of any other class member.  Therefore, the benefits from the settlement are

26

27  _____

28  [18] See Declaration of Peter Recchia detailing discovery and information provided
through discovery.

1    similar as to all members and the typicality requirement is satisfied.

2    ### iv.  ADEQUACY OF REPRESENTATION

3    The representative parties must fairly and adequately protect the interests of

4    the class.  Fed. R. Civ. Proc 23 (a) (4).  This factor "depends on the qualifications

5    of counsel for the representatives, an absence of antagonism, a sharing of interests

6    between representatives and absentees, and the unlikelihood that he suit is

7    collusive."  *Brown v. Ticor Title Ins.*, 982 F.2d 386, 390 (9th Cir. 1992) (citations

8    omitted).

9    First, Plaintiff's counsel, the firm of Callahan, McCune & Willis, APLC and

10   the Law Office of Peter Recchia are qualified to represent the interests of the

11   Plaintiff Class.  The attached Affidavits of Robert W. Thompson, Lee A. Sherman,

12   and Peter Recchia evidence the experience of the firms in litigating similar class

13   and individual actions.

14   Next, there exists no antagonism between Plaintiffs and the class members.

15   The claims of the named representatives are identical to those of all of the

16   members of the class, i.e. each members has account(s) that were legally

17   discharged in a Chapter 7 bankruptcy filing and were subsequently reported in a

18   status other than unrated as a result of the reporting practices and procedures of

19   Trans Union and Equifax, and suffered damages as a result therefrom.  Thus, the

20   named representatives' interests are sufficiently aligned with the absentee members

21   of the class.

22   ### v.  RULE 23(B)(3):

23   Finally, the proposed class must meet at one of the requirements of Rule

24   23(b).  Rule 23(b)(3) is met where the court finds that questions of law or fact

25   common to the members of the class predominate over individual concerns, and

26   the class action is the superior method for the fair and efficient adjudication of the

27   controversy.   As discussed, *supra*, the common issues presented in the *Acosta* and

28   *Pike* cases predominate as each member of the proposed class share the *same* cause

19

1  of action and right to recover based on the _same_ common facts, the _same_ common

2  procedures, and the _same_ law in every circumstance.

3      Furthermore, class treatment is the superior method for the fair and efficient

4  adjudication of the controversy.  First, with such a large number of individuals

5  affected by similar conduct, class treatment is by far the superior method of

6  resolving this dispute.  Second, a class action protects the rights of those who

7  would otherwise become frustrated and confused by the systematic and uniform

8  bankruptcy discharge reporting procedures of Trans Union and Equifax, and/or

9  who would be reluctant to hire independent counsel to pursue their individual

10  actions.  What is more, there is a danger of inconsistent results from adjudicating

11  each claim separately.  Therefore, the class action is the superior method for the

12  fair and efficient adjudication of the controversy

13      **b.  THE PROPOSED SETTLEMENT IS FAIR, ADEQUATE AND**

14          **REASONABLE**

15      Once the court determines that the class is conditionally certified for

16  settlement, the "universally applied standard" in determining whether to grant

17  approval to the class action settlement is whether the proposed settlement is

18  "fundamentally fair, adequate and reasonable." 5 Moore Federal Practice, § 23.85

19  (Matthew Bender 3d 3ed.) (citing _In re Pacific Enters. Sec. Litig._, 47 F.3d 373, 377

20  (9th Cir. 1995) and _Class Plaintiffs v. City of Seattle_, 955 F.2d 1268, 1276 (9th Cir.

21  1992), cert. denied., 506 U.S. 953, 121 L. Ed. 333.  To determine whether

22  preliminary approval is appropriate, the settlement need only be _potentially_ fair, as

23  the court will make the final determination of its adequacy at the hearing on Final

24  Approval, after such time as any party has had a chance to object and/or opt out.

25  _See Armstrong v. Bd. Of Sch. Dirs. Of the City of Milwaukee_, 616 F.2d 305, 314

26  (7th Cir. 1980), _overruled on other grounds by Felsen v. Andreas_, 134 F.3d 873 (7th

27  Cir. 1998).

28      The Ninth Circuit has considered, if applicable, "the following eight factors

in determining whether a proposed class action settlement is fair, reasonable, and adequate:  (1) strength of Plaintiff's case; (2) the risk, expense, complexity, and duration of further litigation; (3) the risk of maintaining class certification throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of class members to the proposed settlement." *See Linney v. Cellular Alask P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998).

However, "[n]ot all of these factors will apply to every class action settlement.  Under certain circumstances, one factor alone may prove determinative in finding sufficient grounds for court approval." *National Rural Telecommunications Cooperative v. Directv, Inc*., 221 F.R.D. 523, 525 (C.D. Cal. 2004); *See also Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993). [19]  Nevertheless, "district courts have wide discretion in assessing the weight and applicability of each factor." *Id.* (citing 5 Moore's Federal Practice, § 23.85[2][a] (Matthew Bender 3d ed.)  "Ultimately, the district court's determination is nothing more than an 'amalgam of delicate balancing, gross approximations, and rough justice.'" *Officers for Justice v. Civil Service Comm'n of the City and County of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982) (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 468 (2d Cir. 1974).

### i. STRENGTH OF PLAINTIFFS' CASES

The court cannot and need not determine the merits of the contested facts and legal issues at this stage, *see Officers for Justice, supra*, 688 F.2d at 625, and to the extent courts assess this factor, it is to "determine whether the decision to settle is a good value for a relatively weak case or a sell-out of an extraordinarily

---

[19] Here, there are no government participants and Notice has not been provided to the class members yet so there has not been any reaction by the class members for

strong case." *Livingston v. Toyota Motor Sales USA*, 1995 U.S. Dist. LEXIS 21757 (N.D. Cal. 1995).

Here, the Settlement Agreement presents a good value for a difficult case. First, there are several problems that remain for plaintiffs in both *Acosta* and *Pike*; most notably are the issues of class certification and continued litigation of the merits, including trial.[20]  While Plaintiffs remain confident that the fully briefed motion for class certification pending in the California Superior Court would be granted, Trans Union is equally confident that the motion will be denied.  In fact, as noted by Trans Union, in the recent unpublished opinion entitled *Sorensen v. Household Fin. Corp.*, (2006 Cal. App. Unpub. LEXIS 10091) the California Court of Appeal affirmed the Orange County Superior Court's Order denying plaintiff's motion for class certification for the misreporting of certain debts by defendant Experian Information Solutions, Inc.  Given this recent ruling, Trans Union and Equifax contend there is a good chance that Acosta's motion for class certification could be denied.[21]

Nevertheless, assuming the plaintiffs were able to overcome the certification hurdle and proceed to trial, several uncertainties still remain.  First, Trans Union and Equifax contend that Plaintiffs in both cases would face a difficult burden of proving liability.  First, Trans Union and Equifax both contend that the information reported is historically accurate.  *See In re Irby*, 337 B.R. 293, 295-96 (N.D. Ohio 2005).  Second, Trans Union and Equifax deny that any class member was harmed by the alleged conduct, and even if the class was harmed, it was not the result of any conduct on the part of Trans Union or Equifax.  Instead, Trans Union and Equifax contend the original creditor, who reported the credit information to them,

---

the court to consider; therefore, these factors will not be addressed.

[20] Affidavit of Ronald J. Mann, ¶¶ 10-14.

[21] Critically, if certification is denied, there is little to no likelihood of an individual plaintiff obtaining the kind of injunctive relief the Defendants offer here.

is responsible for any inaccuracies that exist, which in turn caused the damage. More importantly, Trans Union and Equifax contend that because the members of the class filed Chapter 7 bankruptcy, any damage that has occurred (i.e., higher interest rates, denial of credit, etc.) comes as a result of the bankruptcy filing, not the credit reporting. Thus, liability, causation and damages remain highly contested, and this factor weighs heavily in favor of the settlement.

### ii. RISK, EXPENSE, COMPLEXITY, AND DURATION OF FUTURE LITIGATION

"In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." 4 A. Conte & H. Newberg, *Newberg on Class Actions*, § 11:50 at 155 (4th ed. 2002). "The court shall consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation. In this respect, 'It has been held proper to take the bird in hand instead of a prospective flock in the bush.'" *National Rural Telecommunications Cooperative, supra,*, 221 F.R.D. at 525 (quoting *Oppenlander v. Standard Oil Co.* (Indiana), 64 F.R.D. 597 (D. Colo. 1974)).

In this case, Plaintiffs have obtained significant injunctive relief in this settlement.[22] However, Trans Union and Equifax contend that the law remains unclear as to whether any plaintiff can obtain injunctive relief for a violation of the FCRA and/or the CCRAA. *See Washington v. CSC Credit Services, Inc.*, 199 F.3d 263 (5th Cir 2000); *In re Trans Union Corp. Privacy Litigation*, 211 F.R.D. 328 (N.D. Ill 2002); and *Yeagley v. Wells Fargo & Co.,* No. C 05-03403, 2006 WL 193257 (N.D. Cal. Jan. 23, 2006). Thus, there is a risk that if this matter does not settle, the injunctive relief would not ever be available. Moreover, even if the

---

[22] Affidavit of Ronald J. Mann, ¶¶ 15-18.

1   Plaintiffs were successful at establishing their ability to obtain injunctive relief,

2   there still remains a risk whether the court would order as stringent business

3   practice changes for either Trans Union or Equifax.  Therefore, trial on the merits

4   poses a great risk to Plaintiffs' request for injunctive relief.

5         Additionally, any further litigation would be lengthy, complex and present a

6   tremendous financial expense to all sides, including extensive use of judicial

7   resources.[23]  Instead, the Settlement Agreement brings concrete resolution now and

8   avoids years of litigation.  In fact, because these cases hinge primarily on questions

9   of law, any outcome of litigation would result of years of appeals.[24]  That result

10   would not benefit the members of the class who need immediate relief.

### iii.  THE RISK OF MAINTAINING CLASS ACTION STATUS THROUGHOUT THE TRIAL

13         Under Rule 23, a district court may decertify or modify a class at any time

14   during the litigation if it proves to be unmanageable. *In re School Asbestos*

15   *Litigation*, 789 F.2d at 1011 (3d Cir. 1986).  Moreover, "[t]here will always be a

16   'risk' or possibility of decertification, and consequently the court can always claim

17   this factor weighs in favor or settlement."  *In re Prudential Ins. Co. America Sales*

18   *Practice Litigation*, 148 F.3d 283, 321 (3rd Cir. 1998).  Here, given the individual

19   circumstances that exist with regard to each consumer's exact reporting, date of

20   discovery of the particular tradeline, and damages, among other things, Plaintiffs

21   risk the possibility that even if certification is conditionally granted, the court may

22   decertify the matter at a later date.

### iv.  THE AMOUNT OFFERED IN SETTLEMENT

24         In assessing the consideration obtained by the class members in a class

25   action settlement, "it is the complete package taken as a whole, rather than the

26   _____

27   [23] Affidavit of Ronald J. Mann, ¶ 18.

28   [24] Defendants have already expressed their intention to seek appellate review, if

1  individual component parts, that must be examined for overall fairness." *Officers*
2  *for Justice, supra*, 688 F.2d at 628.  In this regard, "it is well-settled law that a
3  proposed settlement may be acceptable even though it amounts to only a fraction
4  of the potential recovery that might be available to the class members at trial."
5  *National Rural Telecommunications Cooperative, supra,*, 221 F.R.D. at 527.  *See*
6  *also Linney, supra*, 151 F.3d at 1242 (quoting *City of Detroit, supra*, 495 F.2d 448,
7  455 and n.2; see also *Williams v. Vukovich*, 720 F.2d 909, 922 (6th Cir. 1983)
8  (court may not withhold approval merely because settlement is only a fraction of
9  what a successful plaintiff would have received in a fully litigated case).  Here, the
10  Settlement Agreement provides both financial compensation as well as injunctive
11  relief, which requires business practice changes.

12      First, as discussed *supra*, the range of economic relief to each Class Member
13  varies from a free credit report and score[25] to $450.00.  Critically, the FCRA and
14  CCRAA provide for damages to a consumer in the range of $100 to $1,000.  As
15  indicated in the Matrix attached as Exhibit 6 to Exhibit A hereto, the economic
16  relief comes squarely within the parameters of damages provided by statute.
17  Regardless of which payment amount a Claimant is eligible for though, that
18  Claimant will also receive a free credit report and score.[26]

19      Second, a significant portion of the value of this Settlement Agreement is the
20  injunctive relief, or change in business practices.[27]   Importantly, even Class
21  Members who fail to submit a Claim Form will benefit from this injunctive relief.

22  _____

23  necesseary.
24  [25] Estimated value in excess of $15.00.
25  [26] In light of the fact that there are approximately 4,000,000 consumers eligible for
   economic relief pursuant to the matrix, these credit reports and scores alone
26  amount to a potential economic impact of tens of millions of dollars, without even
   adding the value of the additional monetary payments or the value of the injunctive
27  relief.
28  [27] Affidavit of Ronald J. Mann, ¶¶ 15-18.

25

1    Therefore, the amount offered to the settlement class favors settlement.

2    ## v.  THE EXTENT OF DISCOVERY COMPLETED AND
3    ## THE STAGE OF THE PROCEEDINGS

4    Although it is usually desirable for full discovery to have taken place to

5    ensure the parties are making an informed decision, where there has been sufficient

6    information sharing and cooperation in providing access to necessary data, the

7    settlement may be fair and adequate. *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d

8    454, 459 (9th Cir. 2000). Here, as discussed, *infra* section II (b) (i) and (ii), the

9    parties have conducted extensive discovery.

10   ## vi.  EXPERIENCE AND VIEWS OF COUNSEL

11   "'Great weight' is accorded to the recommendation of counsel, who are most

12   closely acquainted with the facts of the underlying litigation." *In re Paine Webber*

13   *Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997) This is because "parties

14   represented by competent counsel are better positioned than courts to produce a

15   settlement that fairly reflects each party's expected outcome in the litigation." *In*

16   *re Pacific Enters. Sec. Litig.*, 47 F.3d at 378. Thus, "the trial judge, absent fraud,

17   collusion, or the like should be hesitant to substitute its own judgment for that of

18   counsel." *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977); *Hanrahan v. Britt*,

19   174 F.R.D. 356, 366-368 (E.D. Pa. 1997) (presumption of correctness applied to a

20   class action settlement reached in arms'-length negotiations between experienced,

21   capable counsel after meaningful discovery, citing *Manual for Complex Litigation*,

22   Second § 30.41 (1985) and *Ratner v. Bennett*, 1996 U.S. Dist. LEXIS 6259, No.

23   92-4701, 1996 WL 243645, *5 (E.D. Pa. May 8, 1996).

24   Here, plaintiffs' counsel finds that the Settlement Agreement provides fair,

25   reasonable and adequate relief to the Settlement Class and the court should defer to

26   counsel's judgment. As discussed, *supra*, the parties have (1) conducted extensive

27   meaningful discovery, and (2) have carried out extensive arms-length negotiations

28   before a well-qualified mediator over the course of five months. In addition,

1  plaintiffs' counsel also has extensive experience in both class action litigation and

2  FCRA litigation.  As such, the circumstances dictate that counsel is sufficiently

3  qualified to determine whether the Settlement Agreement is fair, adequate and

4  reasonable.

5  **VI.   APPOINTMENT OF CLASS REPRESENTATIVE**

6  **a.  APPOINTMENT OF CLASS REPRESENTATIVES**

7      "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of

8  interest between named parties and the class they seek to represent.  A class

9  representative must be part of the class and possess the same interest and suffer the

10  same injury as the class members." *Amchem Prods. v. Windsor* (1997) 521 U.S.

11  591, 625-626. (citations omitted)  Here, as discussed above, all four class

12  representatives, Acosta, Randall, Robison and Pike, are part of the class, possess

13  the same interest and have suffered the same injury as the rest of the class

14  members; thus are adequate and should be appointed as class representatives.

15  **b.  CLASS REPRESENTATIVE ENHANCEMENTS AND**

16  **ATTORNEYS FEES**

17      As indicated in Section 9.3 of the Settlement Agreement, any incentive

18  awards, costs and fees are to be considered separately from the Court's

19  consideration of fairness, reasonableness and adequacy of the settlement, and more

20  importantly, have no affect on the relief available to the class members.

21  Therefore, these issues are properly left for final approval and separate motion.

22  **VII.   APPOINTMENT OF CLASS COUNSEL**

23      Plaintiff's counsel, the firm of Callahan, McCune & Willis, APLC and the

24  Law Office of Peter Recchia are qualified to represent the interests of the Plaintiff

25  Class.  The attached Affidavits of Lee A. Sherman, Robert W. Thompson, and

26  Peter Recchia evidence the experience of the firms in litigating similar class and

27  individual actions.

28

## VIII.  APPROVAL OF NOTICE AND CLAIM FORMS

### a.  NOTICE TO CLASS MEMBERS

Proper Notice should include (1) the essential terms of the proposed settlement; (2) disclosure of any special benefits provided to the class representatives; (3) information regarding attorneys fees; (4) the time and place of the hearing to consider approval of the settlement, and the method for objecting to the settlement; (5) an explanation of the procedures for allocating and distributing settlement funds; and prominently display the address and phone number of class counsel and the procedure for making inquiries. *See Manual for Complex Litigation*, Third, §§ 30.212; *Marshall v. Holiday Magic*, 550 F.2d 1173, 1178 (9th Cir. 1977).  Here, the Settlement Agreement complies with these requirements. (Ex. 1).

### i.  NOTICE TO RULE 23(B)(3) INJUNCTIVE AND MONETARY RELIEF CLASS MEMBERS

When a class action is based on Rule 23(b)(3), class members must be furnished with "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. Proc. 23(c)(2)(B); *Eisen v. Carlisle & Jacquelin*, (1974) 417 U.S. 156, 173, 94 S.Ct. 2140, 2150.  While the court usually requires first class mail to all class members whose identity may be ascertained through reasonable means, *Eisen, supra*, 417 U.S. at 167, 94 S. Ct. at 2147, individual mailing to each member's last known address has been held appropriate. *See White v. National Football League*, 41 F.3d 402, 408 (8th Cir. 1994); *see also Weinberger v. Kendrick*, 698 F.2d 61, 71 (2nd Cir. 1983).  Here, Plaintiffs' proposed comprehensive notice plan is sufficient.

First, a postcard (attached to Settlement Agreement as Exhibit 5) will be mailed to the members of Subclasses A and B at their most recent address as listed in Trans Union's and/or Equifax's database(s), updated using the National Change

1  of Address database.  Next, Trans Union and Equifax have agreed to establish a

2  Settlement Website, which will set forth the full text of the Settlement Agreement,

3  the full text of the Long-Form Notice, a Spanish language translation of the Long-

4  Form Notice, the entered Preliminary Approval Order and other relevant orders of

5  the Court, the Claim Form, contact information for class counsel, and information

6  as to how a consumer may request reinvestigation of a disputed tradeline and a link

7  to Trans Union's and Equifax's respective websites for doing so.  In addition,

8  Trans Union and Equifax agree to provide "Piggyback Notice" as set forth in

9  Exhibit A, Section 3.4.  Lastly, the parties will also implement a Publication Notice

10  program as set forth in Exhibit A, Section 3.5.

### ii.  RULE 23(B)(2) INJUNCTIVE RELIEF ONLY CLASS MEMBERS

13  In a mandatory class action brought under Rule 23(b)(2), individual notice is

14  not mandatory.  Class members are not entitled to individual notice and have no

15  right to "opt out" of the lawsuit.  *See Hammond v. Powell*, 462 F.2d 1053, 1055

16  (4th Cir. 1972); *See also In re Cherry's Petition to Intervene*, 164 F.R.D. 630, 634

17  (E.D. Mich. 1996).  Nevertheless, Plaintiffs will provide appropriate notice to the

18  members of the injunctive relief only class members by way of publication Notice

19  and other methods set forth in the comprehensive notice program.

20  **IX.   CONCLUSION**

21  Based on the foregoing, Plaintiff respectfully requests the Court issue an

22  Order to accomplish the following:

23      1. Certify the stipulated Plaintiff Class;

24      2. Grant preliminary approval of the Settlement of this Class Action;

25      3. Appoint Jose L. Acosta, Jr., Robert Randall, Bertram Robison and

26         Kathryn Pike to be Class Representatives;

27      4. Appoint Plaintiff's counsel, Callahan, McCune & Willis, APLC

28         and Law Offices of Peter Recchia to be Class Counsel;

5. Approve the Notice of Class Action Settlement and Claim Forms; and

6. Schedule the Final Fairness Hearing to take place approximately 100 days from the date of the Order granting preliminary approval of the Settlement.

7. Consolidation of *Acosta* and *Pike* for purposes of settlement.

Respectfully submitted,

DATED: November 17, 2006            **CALLAHAN, McCUNE & WILLIS, APLC**

By _____

LEE A. SHERMAN
Attorneys for Plaintiffs, and on
behalf of persons similarly situated

Peter L. Recchia, Esq. (SBN 77857)
**LAW OFFICES OF PETER L.
RECCHIA**
1605 E. 4th Street, Ste. 250
Santa Ana, CA 92701
Tel: (714) 541-2858
Fax: (714) 541-6880
E-mail:   Attnyrecchia@aol.com

\\cmwoc-dc\Files\PLF\050100\Motion for Prelim Approval\Mtn Preliminary Settlement Approval.doc

30

# Exhibit A

1  CALLAHAN, MCCUNE & WILLIS, APLC
   LEE A. SHERMAN (State Bar No. 172198)
2  ROBERT W. THOMPSON (State Bar No. 106411)
   DOUGLAS A. WRIGHT (State Bar No. 239112)
3  111 Fashion Lane
   Tustin, California 92780-3397
4  Telephone: 714-730-5700
   Facsimile: 714-730-1642
5  Lee_Sherman@cmwlaw.net
   Douglas_Wright@cmwlaw.net
6
   Attorneys for Plaintiffs
7    and for the proposed Settlement Class

8  Additional counsel and parties listed on signature pages

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11                SANTA ANA DIVISION

12  JOSE L. ACOSTA, JR., ROBERT          )  Case No. 06-CV-5060 DOC(MLGx)
    RANDALL, and BERTRAM ROBISON,)
13  individually, and on behalf of all others )  **STIPULATION AND AGREEMENT**
    similarly situated,                   )  **OF SETTLEMENT**
14                                        )
                                          )
15           Plaintiffs,                  )
                                          )
16      vs.                               )
                                          )
17  TRANS UNION LLC,                      )
                                          )
18           Defendant.                   )
                                          )
19  _____   )
                                          )
20                                        )  Case No. 05-SACV-1172 DOC(MLGx)
    KATHRYN L. PIKE, individually and     )
21  on behalf of all others similarly situated, )
                                          )
22           Plaintiff,                   )
                                          )
23      vs.                               )
                                          )
24  EQUIFAX INFORMATION SERVICES )
    LLC, and DOES 1 through 1000,         )
25  inclusive,                            )
                                          )
26           Defendants.                  )
                                          )
27  _____   )

28

## STIPULATION AND AGREEMENT OF SETTLEMENT

This Stipulation and Agreement of Settlement is entered into among the following parties, and their respective counsel of record, subject to approval of the Court:[1] (i) Plaintiffs and proposed class representatives Jose L. Acosta, Jr., Robert Randall, Bertram Robison and Kathryn L. Pike, on the one hand; and (ii) TransUnion LLC and Equifax Information Services LLC, on the other.

IT IS HEREBY STIPULATED AND AGREED, by and among the parties, that all matters alleged in the operative complaints on file in the above-captioned actions, together with all claims asserted by all members of the Settlement Class in any forum, are settled, compromised and dismissed on the merits, and with prejudice, on the terms and conditions set forth in this Agreement, subject to the approval of the Court.

## RECITALS

WHEREAS, on or about May 12, 2003, Jose L. Acosta, Jr. filed the State Acosta Action, wherein Acosta asserts claims under California law on behalf of a putative class of California consumers challenging TransUnion's credit reporting procedures with respect to credit accounts discharged through Chapter 7 bankruptcy proceedings pursuant to Title 11 of the United States Code;

WHEREAS, on or about October 14, 2005, Kathryn Pike filed an action against Equifax, wherein Pike asserts claims under California law on behalf of a putative class of California consumers challenging Equifax's credit reporting procedures with respect to credit accounts discharged through Chapter 7 bankruptcy proceedings pursuant to Title 11 of the United States Code, which Equifax removed to the Central District of California on November 30, 2005, Case No. 05-CV-1172 CJC(ANx);[2]

---

[1]   See Section I below for definitions of capitalized terms.

[2]   Pursuant to General Order dated December 8, 2005, the Pike Action was transferred from the Honorable Cormac J. Carney to the Honorable Alicemarie H. Stotler, thereby changing the case number to 05-CV-1172 AHS(ANx).

WHEREAS, TransUnion filed its Answer to the Complaint in the State Acosta Action denying the allegations therein and asserting numerous affirmative defenses that TransUnion still believes are meritorious notwithstanding its willingness to enter into this Agreement;

WHEREAS, Equifax filed its Answer to Pike's Complaint denying the allegations therein and asserting numerous affirmative defenses that Equifax still believes are meritorious notwithstanding its willingness to enter into this Agreement;

WHEREAS, Acosta, by and through his counsel, has undertaken substantial investigation and formal discovery in the State Acosta Action (including review of thousands of pages of documents, interviews with numerous consumers, former TransUnion employees and review of numerous consumer credit Files maintained by TransUnion and depositions), in support of the prosecution of the State Acosta Action and settlement negotiations;

WHEREAS, Pike, by and through her counsel, has confirmed through the mediation process that the policies and procedures for reporting Chapter 7 consumer bankruptcies, and their associated effect on account tradelines, generally is the same for Equifax as it is for TransUnion;

WHEREAS, the Plaintiffs and their counsel believe that the discovery described above confirms that the description of TransUnion's and Equifax's reporting procedures at issue in this action apply not only to the Plaintiffs, but also to the class of individuals that the Plaintiffs purport to represent in these actions;

WHEREAS, the Plaintiffs further believe that the discovery described above confirms that TransUnion's and Equifax's business practices are uniform, standardized, centrally controlled and violate the FCRA, thus supporting the certification of a nationwide class for settlement purposes;

---

Subsequently, by General Order dated August 17, 2006, Judge Stotler transferred the case to this Court, thereby changing the case number to 05-CV-1172 DOC(MLGx).

1    WHEREAS, beginning on March 14, 2006, Acosta's counsel and counsel for

2    TransUnion commenced a five-month mediation process before the Honorable John

3    K. Trotter (Ret.), with additional mediation sessions before him conducted on April

4    20, 2006, May 3, 2006, August 1, 2006 and August 7, 2006;

5    WHEREAS, at the August 1, 2006 mediation of the Acosta action, Equifax

6    and its counsel participated in the mediation;

7    WHEREAS, on September 14, 2006 the Parties and their counsel, along with

8    the counsel for plaintiffs in the White, et al. v. TransUnion LLC action, Central

9    District of California Case No. 8:05-CV-01073 DOC (MLGx) and in the White, et al.

10    v. Equifax Information Services, LLC action, Central District of California Case No.

11    2:05-CV-7821 DOC (MLGx), participated in another mediation session at which

12    time Equifax agreed to settle with Pike's counsel on substantially the same terms as

13    those agreed to between Acosta and TransUnion on or about August 11, 2006;

14    WHEREAS, during the lengthy and complicated mediation process, the

15    Parties conducted extensive, arms-length and contentious negotiations that resulted

16    in the terms contained in this Agreement;

17    WHEREAS, the Plaintiffs and their counsel, on the one hand, and TransUnion

18    and Equifax, on the other, subsequently reached an agreement to settle the claims

19    being litigated in this action considering, among other things:  (1) the substantial

20    benefits available to the Plaintiffs and the Settlement Class under the terms of this

21    Agreement; (2) the attendant expense, risks, difficulties, delays and uncertainties of

22    continued litigation; (3) the desirability of consummating this Agreement promptly

23    to provide effective relief to the Plaintiffs and the Settlement Class; and (4) the

24    recommendations of the mediator;

25    WHEREAS, the Plaintiffs and Class Counsel therefore agree that this

26    Agreement provides fair, reasonable and adequate relief to the Settlement Class, and

27    that it is in the best interests of the Settlement Class; and

28

WHEREAS, TransUnion and Equifax deny all claims asserted against them in the Acosta Action, State Acosta Action and Pike Action, deny that class certification would be appropriate if the cases are litigated rather than settled, deny all allegations of wrongdoing and liability and deny that anyone was harmed by the conduct alleged. TransUnion and Equifax nevertheless desire to settle on the terms and conditions set forth in this Agreement solely for the purpose of avoiding the burden, expense, risk and uncertainty of continuing the proceedings in the Acosta Action, State Acosta Action and Pike Action, and for the purpose of putting to rest the controversies engendered. This Agreement in no event is to be construed as, or is to be deemed evidence of, an admission or concession on the part of TransUnion and/or Equifax with respect to: any claim by the Plaintiffs; any fault, liability, wrongdoing or damage; the merits of any defenses that TransUnion and Equifax asserted; or the propriety of class certification if the Acosta Action, State Acosta Action or the Pike Action were to be litigated rather than settled.

## I.      DEFINITIONS

1.1     "Acosta" means Jose L. Acosta, Jr.

1.2     "Acosta Action" means the action entitled Jose L. Acosta, Jr., et al. v. TransUnion LLC, United States District Court for the Central District of California Case No. 06-CV-5060.

1.3     "Acosta Plaintiffs" means Jose L. Acosta, Jr., Robert Randall and Bertram Robison.

1.4     "Agreement" means this Stipulation and Agreement of Settlement.

1.5     "Bankruptcy Qualifying Tradeline" or "BQT" means a tradeline that: (a) reflects an unsecured revolving loan; (b) appears as "charged off" or "placed for collection" on a consumer's credit report (and not as "unrated" or "included in bankruptcy"); (c) reflects a date "opened" that predates the date the consumer filed his or her Chapter 7 bankruptcy petition that later resulted in a general discharge; (d) was not reaffirmed; and (e) was not the subject of a complaint for non-

dischargeability.  Notwithstanding the foregoing, the following tradelines are not

BQTs:  (i) tradelines reflecting student loans or other loans obtained for educational

purposes; (ii) tradelines reflecting loans secured by real or personal property

(including without limitation mortgage and vehicle loans); and (iii) tradelines

(regardless of the purpose of the loan or whether it is secured or unsecured) with the

rating "paid charge off," "paid collection" or a less derogatory rating.

  1.6 "California Economic Relief Subclass" or "Subclass A" means all

Settlement Class members whose Chapter 7 bankruptcy discharge orders were

entered after May 12, 2001, and who reside in California at the time of entry of the

Preliminary Approval Order.

  1.7 "Claimant" means any Settlement Class Member who submits a Claim

Form in such manner and within such time as provided in this Agreement.

  1.8 "Claim Form" means a document substantially in the form attached

hereto as Exhibit 1.

  1.9 "Class Counsel" collectively means Callahan McCune & Willis LLP,

the Law Offices of Peter L. Recchia and the Law Offices of Gino Pietro, who are the

attorneys of record for the Acosta Plaintiffs and the Settlement Class in the Acosta

Action, for Acosta in the State Acosta Action and for Pike and the Settlement Class

in the Pike Action.

  1.10 "Court" means the United States District Court for the Central District

of California.

  1.11 "Equifax" means Equifax Information Services LLC.

  1.12 "Equifax's Counsel" means Kilpatrick Stockton LLP.

  1.13 "File" has the meaning set forth in 15 U.S.C. § 1681a(g).

  1.14 "Final" means the Court's entering of a Judgment that has become final

because either (i) no appeal of the Judgment has been filed and the time within which

an appeal may be filed has lapsed, or (ii) if a timely appeal has been filed, the appeal

is finally resolved, with no possibility of further appellate review, resulting in final

judicial approval of the Settlement.  For purposes of this paragraph, the term "appeal" includes writ proceedings.

1.15   "Final Fairness Hearing" means the hearing at which the Court will consider and finally decide whether to approve this Agreement, enter the Judgment and make such other rulings as are contemplated by this Agreement.  The Final Fairness Hearing shall not be scheduled for a date less than 120 days following the deadline for Settlement Class members to submit Claim Forms.

1.16   "Judgment" means a Final Judgment and Order of Dismissal With Prejudice to be entered by the Court in the Action.

1.17   "Long-Form Notice" means the notice substantially in the form attached hereto as Exhibit 2.

1.18   "Mediator" means the Honorable John K. Trotter (Ret.), or if he is incapable of serving, such other retired judicial officer as is acceptable to all of the Parties.

1.19   "Non-California Economic Relief Subclass" or "Subclass B" means all Settlement Class members whose Chapter 7 bankruptcy discharge orders were entered after October 3, 2003, and who reside outside California at the time of entry of a Preliminary Approval Order.

1.20   "Opt-Out" means to timely request exclusion from the Settlement pursuant to Federal Rule of Civil Procedure 23(c)(2)(B) as to any claim for damages. No member of the Settlement Class will be entitled to injunctive or declaratory relief except as expressly set forth in this Settlement and the Judgment.

1.21   "Parties" means Plaintiffs, TransUnion and Equifax.

1.22   "Pike" means Kathryn L. Pike.

1.23   "Pike Action" means the action filed by Pike on or about October 14, 2005, which Equifax removed to the Central District of California on November 30, 2005, Case No. 05-CV-1172 CJC(ANx).

1.24  "Plaintiffs" means Jose L. Acosta, Jr., Robert Randall, Bertram Robison and Kathryn L. Pike.

1.25  "Preliminary Approval Order" means an order to be entered by the Court in the Action substantially in the form attached hereto as Exhibit 3.

1.26  "Prime" means, for purposes of this Settlement, a credit score that is calculated as 701 points or higher under the VantageScore model.

1.27  "Released Claims" means any and all claims, actions, demands, causes of action, suits, obligations, damages, rights or liabilities, of any nature and description whatsoever, known or unknown, present or future, concealed or hidden, liquidated or unliquidated, fixed or contingent, anticipated or unanticipated, whether in tort, contract, law, equity or otherwise, that have been, could have been or might in the future be asserted by Plaintiffs or the Settlement Class members or any of their respective heirs, spouses, executors, administrators, partners, attorneys, predecessors, successors, assigns, agents and/or representatives, and/or anyone acting or purporting to act on their behalf, arising out of any claims asserted or that could have been asserted in the Acosta Action, the State Acosta Action or the Pike Action based upon the facts and circumstances giving rise to the Acosta Action, the State Acosta Action or the Pike Action.  Released Claims include, but are not limited to, all claimed or unclaimed compensatory damages, damages for emotional distress, damages for physical injury, damages for reputational injury, statutory damages, consequential damages, incidental damages, punitive and exemplary damages, as well as all claims for equitable, declaratory or injunctive relief under any federal or state statute or common law or other theory that was alleged or could have been alleged based on the facts forming the basis for the Acosta Action, the State Acosta Action or the Pike Action, including but not limited to any and all claims under credit reporting statutes, deceptive or unfair practices statutes, or any other statute, regulation or judicial interpretation.  Released Claims further include interest, costs and fees arising out of any of the claims asserted or that could have been asserted in the Acosta Action, the

1 State Acosta Action or the Pike Action.  Notwithstanding the foregoing, nothing in

2 this Agreement shall be deemed a release of the Parties' respective rights and

3 obligations under this Agreement.

4     1.28   "Released Parties" means and refers to:  (a) TransUnion LLC and its

5 present, former and future officers, directors, partners, employees, agents, attorneys,

6 servants, heirs, administrators, executors, members, member entities, predecessors,

7 successors, affiliates, subsidiaries, parents, representatives, trustees, principals,

8 insurers, vendors and assigns, or interest therein, jointly and severally; and (b)

9 Equifax Information Services LLC and its present, former and future officers,

10 directors, partners, employees, agents, attorneys, servants, heirs, administrators,

11 executors, members, member entities, predecessors, successors, affiliates,

12 subsidiaries, parents, representatives, trustees, principals, insurers, vendors and

13 assigns, or interest therein, jointly and severally.

14     1.29   "Settlement" means the agreement between Plaintiffs, on behalf of

15 themselves and on behalf of the Settlement Class, and TransUnion and Equifax to

16 settle and compromise the issues arising out of Plaintiffs' Complaints in the Acosta

17 Action, the State Acosta Action and the Pike Action and the issues arising out of said

18 Actions fully, finally and forever, as memorialized in this Agreement and the

19 accompanying documents attached hereto.

20     1.30   "Settlement Administrator" means a third party settlement administrator

21 chosen by the Parties.

22     1.31   "Settlement Class" or "Class" means all consumers, as defined by 15

23 U.S.C. § 1681a(c), residing in the United States for whom TransUnion and/or

24 Equifax maintain a File who, between April 1, 1996 and the date of entry of the

25 Preliminary Approval Order, received a Chapter 7 bankruptcy discharge order from a

26 United States Bankruptcy Court.

27

28

1.32    "State Acosta Action" means the action filed by Acosta on or about May 12, 2003 in the Superior Court of California for the County of Orange, Case No. 03CC00184, against TransUnion entitled Jose L. Acosta v. TransUnion LLC.

1.33    "Status Quo Ante" means the following:  (i) for the Acosta Action, Status Quo Ante means the restoration of the parties to the Acosta Action to their respective positions in the litigation of the State Acosta Action as of August 1, 2006, which includes a stipulation between the parties to lift the stay in the State Acosta Action and to restore Jose L. Acosta's Motion for Class Certification in the State Acosta Action to the court's calendar in the State Acosta Action requesting a hearing date that would allow it to be heard prior to the hearing of any class certification issue in any similar federal court case now pending or filed within the next 180 days, including, without limitation, Terri N. White, et al. v. TransUnion, United States District Court for the Central District of California Case No. 8:05-CV-01073 DOC (MLG), and Jose Hernandez v. Equifax Information Services, LLC, et al., United States District Court for the Central District of California Case No. 2:06-CV-03924 DOC (MLG); and (ii) for the Pike Action, Status Quo Ante means the restoration of the parties to the Pike Action to their respective positions on September 13, 2006.

1.34    "Subprime" means, for purposes of this Settlement, a credit score that is calculated as 700 points or lower under the VantageScore model.

1.35    "TransUnion" means TransUnion LLC.

1.36    "TransUnion's Counsel" means Stroock & Stroock & Lavan LLP.

1.37    "Valid Claim" means a Claim Form that is completed in full, signed by a Settlement Class Member and returned to the Settlement Administrator within the time period set by the Court, and that includes sufficient information and/or documentation from which it can be determined that the Settlement Class Member is entitled to economic relief pursuant to Part V below.

## II.   CERTIFICATION OF CLASS AND SUBCLASSES

2.1.   Subject to Sections 8.4, 11.2 and 11.3 below, the Parties shall request that the Court certify the Settlement Class pursuant to Federal Rule of Civil Procedure 23(b)(3), except that as to the Injunctive Relief set forth in Part IV below, the Settlement Class shall be certified pursuant to Federal Rule of Civil Procedure 23(b)(2).  Accordingly, no Settlement Class member may exclude himself or herself from the Injunctive Relief aspects of the Settlement.  Settlement Class members may request exclusion of claims for damages, but solely by way of the opt-out procedure set forth in the Long-Form Notice.

2.2.   Subject to Sections 8.4, 11.2 and 11.3 below, the Parties shall request that the Court certify Subclasses A and B, solely as to claims for damages, pursuant to Federal Rule of Civil Procedure 23(b)(3).

## III.   NOTICE TO THE SETTLEMENT CLASS

3.1.   Notice of the terms of the proposed Settlement, the date and time of the Final Fairness Hearing and the right of the Settlement Class members to Opt-Out or object to the proposed Settlement shall be given to the Settlement Class members as set forth in this Part III.

3.2.   <u>Mailed Notice</u>:  A postcard, substantially in the form attached hereto as Exhibit 4, will be mailed to the members of Subclasses A and B at their most recent address as listed in TransUnion's and/or Equifax's database(s), updated using the National Change of Address database no later than thirty (30) days following the Court's entry of the Preliminary Approval Order.  Not later than seven (7) days before the Final Fairness Hearing, TransUnion, Equifax and/or the Settlement Administrator will cause proof of mailing of the Mailed Notice to be filed with the Court.

3.3.   <u>Settlement Website</u>:  A Settlement Website will be established and will become accessible no later than thirty (30) days following the Court's entry of the Preliminary Approval Order.  The Settlement Website will set forth the following

1    information:  (i) the full text of this Agreement; (ii) the full text of the Long-Form

2    Notice; (iii) a Spanish-language translation of the Long-Form Notice; (iv) the entered

3    Preliminary Approval Order and any other relevant orders of the Court; (v) the Claim

4    Form; (vi) contact information for Class Counsel, including a weblink to Class

5    Counsel's website; and (vii) information as to how a consumer may request

6    reinvestigation of a disputed tradeline and a link to TransUnion's and Equifax's

7    respective websites for doing so.  Nationwide access to the Settlement Website will

8    be ensured via the following methods:  (i) the Settlement Website will be registered

9    with Google (via its free website registration service) so that appropriate internet

10   queries on Google will yield a link to the Settlement Website; (ii) a weblink will be

11   posted on TransUnion's and Equifax's respective internet sites so that visitors to

12   TransUnion's and/or Equifax's site may link directly to the Settlement Website; and

13   (iii) the Piggyback Notice, Publication Notice and Mailed Notice will reference the

14   Settlement Website.  Not later than seven (7) days before the Final Fairness Hearing,

15   TransUnion, Equifax and/or the Settlement Administrator will cause proof of the

16   establishment of the Settlement Website pursuant to the terms of this Section to be

17   filed with the Court.

18        3.4.   Piggyback Notice:  Not later than thirty (30) days following the Court's

19   entry of the Preliminary Approval Order, and continuing for 120 days thereafter,

20   TransUnion and Equifax will include the following language, in English or Spanish

21   (depending on how the consumer disclosure was requested), on consumer disclosures

22   requested by consumers for whom the requested bureau's records show a Chapter 7

23   bankruptcy discharge:  "Did you have any debts discharged in bankruptcy after April

24   1, 1996?  If so, you may be eligible for benefits under a proposed class action

25   settlement.  This settlement also may affect your legal rights if you do not request

26   exclusion ("opt out").  For more information, please visit www.*******.com or call

27   800-***-****."  Not later than seven (7) days before the Final Fairness Hearing,

28

- 12 -

1    TransUnion and Equifax will each certify to the Court that the notice under this

2    Section was implemented.

3       3.5.    Publication Notice:   A Publication Notice program will be implemented

4    to publish an advertisement substantially in the form attached hereto as Exhibit 5.

5    The Publication Notice will be published two times, once in each of two national

6    publications. Based upon the recommendation of the Settlement Administrator and

7    the agreement of the Parties, one of the national publications may be substituted with

8    multiple regional publications reasonably calculated to ensure national coverage.

9    The first publication shall occur not later than thirty (30) days after the Court's entry

10    of the Preliminary Approval Order, and the subsequent publications shall occur

11    between 14 and 21 days thereafter. TransUnion and Equifax will pay for the

12    reasonable costs of publishing the Publication Notice, not to exceed $250,000. Not

13    later than seven (7) days before the Final Fairness Hearing, TransUnion, Equifax

14    and/or the Settlement Administrator will cause proof of the Publication Notice to be

15    filed with the Court.

16       3.6.    Telephone Assistance Program:   TransUnion and Equifax will cause a

17    toll-free telephone number to be established, which will be staffed by the Settlement

18    Administrator, that will be available for 120 days after the Mailed Notice is sent

19    pursuant to Section 3.2 above, to answer questions regarding how claims may be

20    filed and take requests from Settlement Class members for copies of the Long-Form

21    Notice and Claim Form in either Spanish or English.

22       3.7.    TransUnion and Equifax shall be responsible for all fees and costs

23    incurred in having this Settlement implemented, including the costs of mailing and

24    publishing notice of the Settlement, except the cost associated with establishing

25    Class Counsel's settlement website and costs of publishing the Publication Notice in

26    excess of that set forth in Paragraph 3.5 above. If this Settlement is not approved and

27    the Court orders notice of the non-approval to be provided to the Settlement Class,

28

1   TransUnion and Equifax shall bear the reasonable costs of such notice of non-

2   approval.

3   **IV.    INJUNCTIVE RELIEF**

4        4.1.    Although TransUnion and Equifax do not concede that the FCRA or

5   CCRAA authorize private litigants to obtain injunctive relief, for purposes of this

6   Settlement only, TransUnion and Equifax would consent to the business practice

7   changes set forth in this Part IV of this Agreement to be ordered in the Judgment.

8        4.2.    TransUnion's Treatment of Future Chapter 7 Discharge Orders:

9   TransUnion will modify its systems within 120 days of the Judgment becoming Final

10  to treat the reporting of new Chapter 7 bankruptcy discharge orders it obtains

11  subsequent to the Judgment as follows:  (1) TransUnion will identify all Bankruptcy

12  Qualifying Tradelines; and (2) TransUnion will, in the first instance, update the

13  reporting on all such accounts to remove the charge-off or collection rating, delete

14  any current and/or past due balance, and add a remark indicating that the account was

15  included in the consumer's Chapter 7 bankruptcy.  TransUnion shall not be in

16  violation of the Settlement so long as the updated reporting occurs within ninety (90)

17  days of receipt by TransUnion of notice of the entry of the consumer's Chapter 7

18  bankruptcy discharge order.  Additionally, TransUnion shall not be in violation of

19  the Settlement if the original manner of reporting for the Bankruptcy Qualifying

20  Tradeline is restored after the credit information furnisher provides valid,

21  documented reasons for doing so, and the consumer is notified by TransUnion or the

22  credit information furnisher.

23       4.3.    Equifax's Treatment of Future Chapter 7 Discharge Orders:  Equifax

24  will modify its systems within 120 days of the Judgment becoming Final to treat the

25  reporting new Chapter 7 bankruptcy discharge orders it obtains subsequent to the

26  Judgment as follows:  (1) Equifax will identify all Bankruptcy Qualifying Tradelines;

27  and (2) Equifax will, in the first instance, update the reporting on all such accounts to

28  remove the charge-off or collection rating, delete any current and/or past due

- 14 -

balance, and add a remark indicating that the account was included in the consumer's Chapter 7 bankruptcy.  Equifax shall not be in violation of the Settlement so long as the updated reporting occurs within ninety (90) days of receipt by Equifax of notice of the entry of the consumer's Chapter 7 bankruptcy discharge order.  Additionally, Equifax shall not be in violation of the Settlement if the original manner of reporting for the Bankruptcy Qualifying Tradeline is restored after the credit information furnisher provides valid, documented reasons for doing so, and the consumer is notified by Equifax or the credit information furnisher.

4.4.   <u>TransUnion's Reinvestigation Procedure</u>:  TransUnion will modify its reinvestigation procedure that it has developed and follows pursuant to 15 U.S.C. § 1681i and California Civil Code Section 1785.16 within 120 days of the Judgment becoming Final as follows:  If a consumer requests reinvestigation of a tradeline that he or she claims has been discharged in bankruptcy and the tradeline is:  (a) an unsecured revolving loan; (b) reported as "charged off," "placed for collection" or 30 or more days past due on a consumer's credit report; (c) reflects a date "opened" that predates the date the consumer filed a petition for Chapter 7 bankruptcy that later resulted in a general discharge; (d) was not reaffirmed; and (e) was not the subject of a complaint for non-dischargeability, then TransUnion will change the reporting of the disputed tradeline to remove the charge-off or collection rating, delete any current and/or past due balance, and add a remark indicating that the account was included in the consumer's Chapter 7 bankruptcy without requiring the consumer to provide copies of bankruptcy records and without first seeking verification from the credit furnisher.  TransUnion only will restore the tradeline disputed pursuant to this Section to its original status upon receipt of documentary proof that the consumer's reinvestigation request was based on demonstrably false information, and the consumer is notified by TransUnion or the furnisher of the information.

4.5.   <u>Equifax's Reinvestigation Procedure</u>:  Equifax will modify its reinvestigation procedure that it has developed and follows pursuant to 15 U.S.C. §

1681i and California Civil Code Section 1785.16 within 120 days of the Judgment becoming Final as follows:  If a consumer requests reinvestigation of a tradeline that he or she claims has been discharged in bankruptcy and the tradeline is:  (a) an unsecured revolving loan; (b) reported as "charged off," "placed for collection" or 30 or more days past due on a consumer's credit report; (c) reflects a date "opened" that predates the date the consumer filed a petition for Chapter 7 bankruptcy that later resulted in a general discharge; (d) was not reaffirmed; and (e) was not the subject of a complaint for non-dischargeability, then Equifax will change the reporting of the disputed tradeline to remove the charge-off or collection rating, delete any current and/or past due balance, and add a remark indicating that the account was included in the consumer's Chapter 7 bankruptcy without requiring the consumer to provide copies of bankruptcy records and without first seeking verification from the credit furnisher.  Equifax only will restore the tradeline disputed pursuant to this Section to its original status upon receipt of documentary proof that the consumer's reinvestigation request was based on demonstrably false information, and the consumer is notified by Equifax or the furnisher of the information.

   4.6.   Updating of TransUnion's Current Data:  TransUnion will implement a computer program or programs reasonably designed to identify all consumers within its credit reporting database who currently have a Chapter 7 discharge order on their File and update all Bankruptcy Qualifying Tradelines to remove the charge-off or collection rating, delete any current and/or past due balance, and add a remark indicating that the account was included in the consumer's Chapter 7 bankruptcy.  TransUnion will update its database as set forth in this section on a rolling basis as follows:  (i) no updates to the database will be required within the first 90 days of the Judgment becoming Final to allow for the completion of the claims process and the resolution of any disputed claims; (ii) updates to the database will begin within 180 days of the Judgment becoming Final; and (iii) all updates to the database are to be completed within twelve (12) months of the Judgment becoming Final.  Within

thirteen (13) months of the Judgment becoming Final, TransUnion will file a declaration with the Court stating that it has complied with this Section 4.6 of the Settlement.

4.7.   Updating of Equifax's Current Data:  Equifax will implement a computer program or programs reasonably designed to identify all consumers within its credit reporting database who currently have a Chapter 7 discharge order on their File and update all Bankruptcy Qualifying Tradelines to remove the charge-off or collection rating, delete any current and/or past due balance, and add a remark indicating that the account was included in the consumer's Chapter 7 bankruptcy. Equifax will update its database as set forth in this section on a rolling basis as follows:  (i) no updates to the database will be required within the first 90 days of the Judgment becoming Final to allow for the completion of the claims process and the resolution of any disputed claims; (ii) updates to the database will begin within 180 days of the Judgment becoming Final; and (iii) all updates to the database are to be completed within twelve (12) months of the Judgment becoming Final.  Within thirteen (13) months of the Judgment becoming Final, Equifax will file a declaration with the Court stating that it has complied with this Section 4.7 of the Settlement.

4.8.   Nothing in this Agreement shall preclude TransUnion or Equifax from deleting, maintaining, updating, or modifying data in a particular consumer's File in order to accurately reflect that a consumer has or has not filed a bankruptcy petition, or has or has not received a bankruptcy discharge, dismissal, or other disposition of a bankruptcy petition, or in response to a written request from a United States Bankruptcy Judge to delete, maintain, update, or modify information concerning a particular consumer.

## V.   ECONOMIC RELIEF AND CLAIMS PROCESS

5.1.   Claim Forms:  To be considered for economic relief, members of Subclasses A and B must submit a Claim Form within forty-five (45) days of mailing of the Mailed Notice pursuant to Section 2.3 above.  Persons in overseas military

1    service will be allowed additional time to submit their Claim Forms, as consistent

2    with the Servicemembers Civil Relief Act, 50 U.S.C. App. § 501, et seq.

3         5.2.   BQT Impact Assessment: Economic relief will be determined based

4    upon an analysis of Claim Forms as follows.  TransUnion and Equifax will review

5    the information on a Claim Form and, if warranted by the information provided by

6    the Claimant on the Claim Form, perform an investigation of the consumer's credit

7    report.  First, TransUnion and/or Equifax will score the consumer's credit report

8    (using the VantageScore model) as it exists at the time the Claim Form initially is

9    reviewed by TransUnion and/or Equifax.  Second, TransUnion and/or Equifax will

10   identify any BQTs as defined in Section 1.5 above.  Third, if a BQT is identified,

11   TransUnion and/or Equifax, as appropriate, will update the reporting of the BQT to

12   remove the charge-off or collection rating, delete any current and/or past due

13   balance, and add a remark indicating that the account was included in the consumer's

14   Chapter 7 bankruptcy.  Finally, TransUnion and/or Equifax will re-score the

15   Claimant's credit report again using the VantageScore model.  The pre-updated and

16   post-updated credit scores will be compared, and relief will be provided to the

17   Claimant pursuant to the matrix set forth as Exhibit 6 hereto.  If TransUnion's and

18   Equifax's calculations yield different outcomes, the Claimant shall be entitled to

19   relief based upon the more favorable calculation.

20        5.3.   Alternative Economic Relief Based On Prior Successful Disputes:

21   Members of Subclasses A and B who:  (i) successfully disputed a BQT within two

22   years prior to entry of the Preliminary Approval Order by the Court; and (ii) by

23   reason of the (pre-dispute) BQT were denied housing or vehicle credit within two

24   years prior to updating of the BQT by submitting a Valid Claim, will be provided a

25   free credit report and VantageScore credit score, and paid $75.  Claimants seeking

26   relief under this Paragraph will be required to document the denial of credit that they

27   contend entitles them to this category of relief by submitting with their Claim Form a

28   copy of the adverse action notice provided to them pursuant to 15 U.S.C.

§ 1681m(a), or such other supplementary documentation as may be reasonably necessary to determine whether the Claimant is entitled to relief pursuant to this Section. Such supplementary documentation may include verification by the party denying credit that the reason for the denial was because of how TransUnion and/or Equifax reported a BQT. The Claimant shall be entitled to only a single payment of $75, no matter how many BQTs are identified or denials of credit are proven by the Claimant.

5.4. <u>Class Members Entitled To Greater Calculation Of Economic Relief</u>. Settlement Class members will be entitled to the greater value of the economic relief set forth in Sections 5.2 or 5.3 above, but will not be entitled to economic relief under both Sections 5.2 and 5.3.

5.5. <u>Timing Of Payment</u>. Except for disputed claims, all economic relief will be provided not later than ninety (90) days after the Judgment becomes Final.

**VI.   DISPUTE RESOLUTION PROCESS**

6.1   If Class Counsel disputes a decision to reject a Claimant's submitted Claim Form or disputes any denial of relief pursuant to Section 5.2 or 5.3 above, Class Counsel will notify TransUnion's Counsel and Equifax's Counsel within ten (10) days of receipt of notice of the decision to reject a Claimant's Claim Form or deny relief pursuant to Section 5.2 or 5.3 to the Claimant. TransUnion and Equifax will then have thirty (30) days from notice of the dispute from Class Counsel to respond and set forth the reasons for its or their decision to reject the Claimant's Claim Form or deny relief pursuant to Section 5.2 or 5.3 to the Claimant.

6.2   A Claim Form may not be valid for one or more of the following reasons:  (i) it is not timely; (ii) it is not complete; (iii) it is not signed under penalty of perjury; (iv) the required information contained in the Claim Form leads TransUnion or Equifax to believe that the Claimant is not a member of Subclass A or Subclass B or is otherwise not entitled to the relief claimed; or (v) required documentation is not provided by the Claimant. In the event some other good faith

1    reason arises that TransUnion and/or Equifax believe warrants the rejection of a

2    Claim Form, TransUnion's Counsel and/or Equifax's Counsel will meet and confer

3    with Class Counsel as to whether the Claim Form should be rejected.  If Class

4    Counsel and TransUnion's Counsel and/or Equifax's Counsel are unable to resolve

5    any dispute informally, the dispute will be submitted to the Mediator for binding

6    resolution in accordance with Section 6.4 below.

7         6.3    If Class Counsel's dispute of a decision to reject a Claim Form requires

8    that the Claimant submit missing and/or additional information and/or

9    documentation, the Claimant shall be notified within twenty-one (21) days of Class

10   Counsel's giving notice to the Settlement Administrator, TransUnion's Counsel or

11   Equifax's Counsel.  Notice to the Claimant will be via an agreed upon letter advising

12   the Claimant that his or her Claim Form is being challenged and the basis for the

13   challenge.  The Claimant shall then have thirty (30) calendar days from the date of

14   the letter advising them of the challenge to remedy the Claim Form and/or provide

15   supporting information and/or documentation relating to the basis for the challenge.

16   If the Claimant remedies the Claim Form by providing the necessary supporting

17   information and/or documentation relating to the basis for the challenge, TransUnion

18   and/or Equifax shall re-evaluate the Claimant's Claim Form and decide whether it or

19   they will maintain the challenge to the Claim Form.  If the challenge to the Claim

20   Form is withdrawn, the claim shall be processed and paid.

21        6.4    If TransUnion and/or Equifax maintains its/their challenge after the

22   Claimant attempts to remedy the challenge to his or her Claim Form, Class Counsel

23   and TransUnion's Counsel and/or Equifax's Counsel will have fifteen (15) days to

24   meet and confer and resolve the dispute informally.  If Class Counsel and

25   TransUnion's Counsel and/or Equifax's Counsel are unable to resolve any dispute

26   informally, the dispute will be submitted to the Mediator for binding resolution, with

27   the losing party to pay the Mediator's reasonable fees, not to exceed $500 per claim

28   in the case of a challenge lost by the Claimant, in which case, the challenging credit

- 20 -

1  bureau(s) shall pay the balance of fees to the Mediator.  Class Counsel and

2  TransUnion's Counsel and Equifax's Counsel agree to work in good faith to submit

3  groups of challenges to the Mediator to minimize the cost of resolution.

4  **VII.  RELEASES**

5      7.1    <u>Release</u>:  Upon the Judgment becoming Final, Plaintiffs and each

6  member of the Settlement Class, their respective spouses, heirs, executors,

7  administrators, representatives, agents, attorneys, partners, successors, predecessors

8  and assigns and all those acting or purporting to act on their behalf with respect to

9  their TransUnion and/or Equifax credit report(s), shall conclusively be deemed to

10  have fully, finally and forever released, relinquished and discharged the Released

11  Parties from and against any and all of the Released Claims.

12      7.2    <u>Waiver of Unknown Claims</u>:  Plaintiffs and the Settlement Class

13  members, on behalf of themselves and their respective spouses, heirs, executors,

14  administrators, representatives, agents, attorneys, partners, successors, predecessors

15  and assigns, and all those acting or purporting to act on their behalf, hereby warrant,

16  represent and agree that unknown losses or claims could possibly exist and that

17  present losses may have been underestimated in amount or severity.  Plaintiffs and

18  the Settlement Class members, on behalf of themselves and their respective spouses,

19  heirs, executors, administrators, representatives, agents, attorneys, partners,

20  successors, predecessors and assigns, and all those acting or purporting to act on their

21  behalf, explicitly take that into account in entering into this Agreement, and a portion

22  of the consideration and the mutual covenants contained herein have been bargained

23  for between Plaintiffs and the Settlement Class members, on the one hand, and

24  TransUnion and Equifax, on the other hand, with the knowledge of the possibility of

25  such unknown claims and losses, and were given in exchange for a full accord,

26  satisfaction and discharge of all such Released Claims.  Consequently, Plaintiffs and

27  the Settlement Class members expressly waive and are deemed to waive all rights

28  under California Civil Code Section 1542, which provides:

1    A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH

2    THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN

3    HIS OR HER FAVOR AT THE TIME OF EXECUTING THE

4    RELEASES, WHICH IF KNOWN BY HIM OR HER MUST HAVE

5    MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH

6    THE DEBTOR.

7    Plaintiffs and all Settlement Class members do and are deemed to understand

8 and acknowledge the significance of this waiver of California Civil Code Section

9 1542 and/or of any other applicable law relating to limitations on releases.  In

10 connection with such waiver and relinquishment, Plaintiffs and all Settlement Class

11 members do and are deemed to acknowledge that they are aware that they may

12 hereafter discover facts in addition to, or different from, those facts which they now

13 know or believe to be true with respect to the subject matter of this Settlement, but

14 that it is their intention to release fully, finally and forever all claims against

15 TransUnion and Equifax that relate to the Acosta Action, the State Acosta Action

16 and the Pike Action, and in furtherance of such intention, the release of all claims

17 will be and remain in effect notwithstanding the discovery or existence of any such

18 additional or different facts.

19    7.3    No Opt-Out Of Injunctive Relief Claims:  The Settlement shall be

20 approved pursuant to Federal Rule of Civil Procedure 23(b)(2) for purposes of the

21 relief set forth in Part IV above, and no member of the Settlement Class, therefore,

22 may Opt-Out any claim for injunctive or declaratory relief.  Thus, the Releases

23 provided for in this Part VII shall apply to the entire Settlement Class or to such

24 claims regardless of whether members of the Settlement Class have purported to

25 Opt-Out such claims.

26    7.4    Dismissal Of The State Acosta Action.  Acosta will cause the State

27 Acosta Action to be dismissed with prejudice upon the Judgment becoming Final.

28

## VIII.  COURT APPROVAL

8.1     <u>Motion for Preliminary Approval</u>:  Upon execution of this Agreement, the Parties and their counsel shall, bearing their own costs of doing so, expeditiously seek approval of the Settlement from the Court, beginning with Class Counsel filing a Motion for Preliminary Approval of the Settlement.  The Parties shall cooperate in presenting such papers to the Court as may be necessary to effectuate the intent and purposes of this Agreement.

8.2     <u>Notice Pursuant to Class Action Fairness Act</u>:  It is TransUnion's and Equifax's responsibility to comply with the notice provisions of 28 U.S.C. § 1715 at their own cost.  If at any point, any Plaintiff, any member of the Settlement Class, the Court, any state or federal officer, or any third party challenges the appropriateness of TransUnion's and/or Equifax's notice pursuant to the Class Action Fairness Act of 2005, TransUnion and/or Equifax shall have the opportunity to cure any defects before the Final Fairness Hearing may proceed.  The Parties will cooperate in good faith to re-schedule the Final Fairness Hearing in the event such curative notice is required of TransUnion and/or Equifax.

8.3     <u>Time to Cure Any Defect of Notice Under Class Action Fairness Act</u>: Following the Final Fairness Hearing and upon approval by the Court of the Settlement, the Court shall enter the Judgment on a date not earlier than the date set forth in 28 U.S.C. § 1715(d).  In the event that any objection arises, following entry of the Judgment, as to notice under 28 U.S.C. § 1715(d), the Parties agree to seek relief pursuant to Federal Rule of Civil Procedure 60(b) by jointly moving the Court to vacate the Judgment so that TransUnion and/or Equifax can cure any alleged defect in the notice required under 28 U.S.C. § 1715.  Once the defect is cured, the Parties agree to jointly move the Court to re-enter the Judgment consistent with the requirements of 28 U.S.C. § 1715.

8.4     <u>Non-Approval of Settlement of Acosta and Pike Actions</u>:  If the Settlement is not approved by the Court, or if for any reason the Court does not enter

1   the Judgment or does not determine, pursuant to Federal Rule of Civil Procedure 23,

2   that this Settlement is fair, adequate and reasonable, or if the Court enters the

3   Judgment and appellate review is sought and, on such review, such Judgment is

4   modified or reversed, then all orders certifying or preliminary certifying any claim or

5   subclaim will be vacated and the parties shall be restored to the Status Quo Ante, and

6   the terms and provisions of this Agreement shall have no further force or effect and

7   shall not be utilized in the Acosta Action, the State Acosta Action, the Pike Action or

8   any other proceeding for any purpose, including without limitation in support of a

9   motion for class certification, except as expressly set forth herein.

10  **IX.   ATTORNEYS' FEE APPLICATION AND COST AWARD**

11       9.1    TransUnion and Equifax agree that they will not oppose an application

12  for attorneys' fees and costs not to exceed a grand total of $5,485,000 (FIVE

13  MILLION, FOUR HUNDRED EIGHTY-FIVE THOUSAND DOLLARS).

14  TransUnion and Equifax further agree that they will not oppose an application by

15  Plaintiffs for incentive awards not to exceed a grand total of $55,000 (FIFTY-FIVE

16  THOUSAND DOLLARS).

17       9.2    Plaintiffs' attorneys' fees and costs incurred in connection with approval

18  proceedings shall be deemed included within the amounts payable pursuant to this

19  Section.  Notwithstanding the foregoing, TransUnion and Equifax agree that they

20  will not object to any further application by Class Counsel to seek up to an additional

21  $70,000 in total costs from TransUnion and Equifax for the purpose of paying

22  experts retained by Class Counsel to provide testimony at the Final Fairness Hearing

23  or otherwise in connection with the settlement approval proceedings.

24       9.3    Plaintiffs understand and agree that awards of attorneys' fees, costs

25  (including without limitation expert costs), and incentive awards are subject to the

26  Court's discretion.  The procedure for and the allowance or disallowance by the

27  Court of any application by Class Counsel for fees and costs and Plaintiffs' incentive

28  fee are not part of the settlement of the Released Claims as set forth in this

Agreement, and are to be considered by the Court separately from the Court's consideration of the fairness, reasonableness and adequacy of the settlement of the Released Claims. Any separate order making a finding, ruling or holding with respect to any fee and/or cost application, or any separate appeal from any order making such a finding, ruling or holding, shall not operate to terminate or cancel this Agreement, or otherwise affect or delay the finality of the Judgment or the approval of this Agreement and the settlement of the Action as set forth herein.

9.4   In no event will any fees, costs or incentive awards be payable until fifteen (15) days after the Judgment becomes Final, including without limitation with respect to the amount of any fees, costs and incentive awards.

## X.   PUBLIC STATEMENTS

10.1   The parties will negotiate and agree upon a joint press release regarding this Settlement. No party to this Agreement shall issue press releases regarding the Settlement other than as provided in this Section.

10.2   The parties and/or their counsel shall make no statements to any third party regarding the Settlement prior to entry by the Court of the Preliminary Approval Order, without the consent of the other party or his, her or its counsel, unless such statements are required by law.

10.3   Plaintiffs and Class Counsel shall refrain from disparaging TransUnion or Equifax publicly or in the media or taking any action designed to harm the public perception of TransUnion or Equifax regarding any issue related to the Acosta Action, the Acosta State Action or the Pike Action.

10.4   Class Counsel agrees that all extra-judicial statements in regard to the Settlement will comport with Rule 5-120 of the California Rules of Professional Conduct. Class Counsel may respond to direct communications from clients or potential clients. Inquiries other than those from members of the Settlement Class seeking legal advice may be responded to only by reference to information contained in the public record.

## XI.   GENERAL PROVISIONS

11.1   <u>Denial Of Wrongdoing Or Liability</u>.  TransUnion and Equifax have denied and continue to deny each and all of the claims and allegations in the Acosta Action, the State Acosta Action and the Pike Action.  TransUnion and Equifax have asserted and continue to assert many defenses thereto and have expressly denied and continue to deny any fault, wrongdoing or liability whatsoever arising out of the conduct alleged in the Acosta Action, the State Acosta Action and the Pike Action. Neither this Agreement nor any document referred to herein, nor any action taken to carry out this Agreement and/or the Settlement is, or may be construed as, or may be used in any proceeding as, an admission by or against TransUnion and/or Equifax of any fault, wrongdoing or liability whatsoever, or any infirmity of any defenses asserted by TransUnion and/or Equifax, including, without limitation, arguments in opposition to any motion for class certification.  TransUnion and Equifax expressly deny any fault, wrongdoing or liability whatsoever, as well as the validity of each of the claims and prayers for relief asserted in the Acosta Action, the Pike Action and in the State Acosta Action.

11.2   <u>No Admission of Elements of Class Certification</u>.  TransUnion and Equifax deny that a class should be certified other than for purposes of this Settlement.  In the event the Settlement is not approved by the Court (or affirmed through any appeal), the parties shall be returned to the Status Quo Ante as if no settlement had been negotiated or entered into, and no agreements made by TransUnion and Equifax in connection with the Settlement may be used by Plaintiffs or Class Counsel to establish any of the elements of class certification.

11.3   <u>Opt-Out Threshold</u>.  TransUnion and Equifax reserve the right to withdraw from the Settlement on the grounds that the number of Subclass A members who Opt-Out exceeds 750, or if the number of Subclass B members who Opt-Out exceeds 750, or if the total number of combined Opt-Outs between Subclasses A and B exceeds 1000.  In the event TransUnion and/or Equifax decides

to withdraw from the Settlement pursuant to this Paragraph, which decision is in TransUnion's and Equifax's sole discretion, the Parties shall be returned to the Status Quo Ante.  To exercise this option, TransUnion and/or Equifax shall provide Class Counsel with written notice of its or their intent to void the Settlement at least twenty (20) days prior to the Final Fairness Hearing.

11.4   Entire Agreement.  This instrument and the other instruments specifically referred to herein and executed herewith constitute and contain the entire agreement and understanding concerning the subject matter between the parties and supersede and replace all prior negotiations and proposed agreements, whether written or oral, including without limitation, that certain Memorandum of Understanding dated August 10, 2006 and the Supplement to that certain Memorandum of Understanding dated September 14, 2006.  The Parties, and each of them, represent and warrant that no other party or any agent or attorney of any other party has made any promise, representation or warranty whatsoever not contained in this Agreement and the other documents referred to in this Agreement to induce them to execute the same.  The Parties, and each of them, represent and warrant that they have not executed this instrument or the other documents in reliance on any promise, representation or warranty not contained in this Agreement and the other documents referred to in this Agreement.

11.5   Successors and Assigns.  The terms of this Agreement shall apply to and bind the parties as well as their heirs, successors and assigns.  The financial obligations of this Agreement also shall be binding on any corporation or other entity that might be created as the result of any reorganization of TransUnion and/or Equifax.

11.6   Competency of Parties.  The Parties, and each of them, acknowledge, warrant, represent and agree that in executing and delivering this Agreement, they do so freely, knowingly and voluntarily, that they had an opportunity to and did discuss its terms and their implications with legal counsel, that they are fully aware of the

1   contents and effect of the Agreement and that such execution and delivery is not the

2   result of any fraud, duress, mistake or undue influence whatsoever.

3       11.7   Authority.  The persons signing this Agreement on behalf of

4   TransUnion and Equifax warrant and represent that he or she is authorized to sign on

5   TransUnion's and Equifax's behalf.

6       11.8   Modifications.  This Agreement may not be modified except by a

7   writing signed by each of the Parties, or their duly authorized representatives stating

8   that the same is a modification of this Agreement.  To the extent that the Court

9   makes immaterial changes to this Agreement or to any document described herein or

10   appended hereto, the Parties shall nonetheless be bound to perform their obligations

11   under the Agreement.  However, to the extent that the Court makes material changes,

12   each of the Parties and Class Counsel has the right to withdraw from the Settlement

13   in its entirety; if so, all parties will be returned to the Status Quo Ante as if this

14   Agreement had never been made, and all parties will be relieved from any orders or

15   stipulations made in connection with this Agreement, except as other provided for

16   herein.

17       11.9   Applicable Law.  This Agreement shall, in all respects, be interpreted,

18   construed and governed by and under the laws of the United States of America.  To

19   the extent state law applies for any reason, the laws of the State of California shall be

20   applied.  All judicial proceedings regarding this Agreement shall be brought only in

21   the Court.  Any notice period set forth in this Agreement shall be calculated pursuant

22   to the Federal Rules of Civil Procedure and the Central District of California's Civil

23   Local Rules.

24       11.10 Construction.  Each of the Parties has cooperated in the drafting and

25   preparation of this Agreement.  Hence, in any construction to be made of this

26   Agreement, the same shall not be construed against any of the parties.  Before

27   declaring any provision of this Agreement invalid, the Court shall first attempt to

28   construe the provision valid to the fullest extent possible consistent with applicable

precedent so as to find all provisions of this Agreement valid and enforceable. After applying this rule of construction and still finding a provision invalid, the Court shall thereupon interpret the invalid provision to the fullest extent possible to otherwise enforce the invalid provision. The invalidity of any one provision shall not render this Agreement otherwise invalid and unenforceable unless the provision found to be invalid materially affects the terms of this Agreement after application of the rules of construction set forth in this paragraph.

11.11 <u>Agreement Controls</u>. All of the exhibits attached hereto are hereby incorporated by reference as though fully set forth. To the extent that there is any conflict between the terms of this Agreement and the exhibits attached hereto, this Agreement shall control.

11.12 <u>Counterparts</u>. This Agreement may be executed in one or more counterparts and by facsimile. All executed counterparts and each of them shall be deemed to be one and the same instrument. Counsel for the Parties shall exchange among themselves signed counterparts and a complete set of executed counterparts shall be filed with the Court.

Dated: 11/16/06 , 2006

JOSE L. ACOSTA, JR.

By: _____
        Jose L. Acosta, Jr.

Dated: 11/16/06 , 2006

ROBERT RANDALL

By: _____
        Robert Randall

Dated: 11-16-06 , 2006

BERTRAM ROBISON

By: _____
        Bertram Robison

Dated: _____, 2006

KATHRYN PIKE

By: _____
        Kathryn Pike

Dated: _____, 2006

TRANSUNION LLC

By: _____

Its: _____

Dated: _____, 2006

EQUIFAX INFORMATION SERVICES LLC

By: _____

Its: _____

- 30 -

1

2     Dated: _____, 2006          JOSE L. ACOSTA, JR.

3

4                                        By: _____
                                                  Jose L. Acosta, Jr.
5

6     Dated: _____, 2006          ROBERT RANDALL

7

8                                        By: _____
                                                   Robert Randall
9

10    Dated: _____, 2006          BERTRAM ROBISON

11

12                                       By: _____
                                                  Bertram Robison
13

14    Dated: *Nov. 16*, 2006             KATHRYN PIKE

15                                       By: *Kathryn L. Pike*_____
16                                                  Kathryn Pike

17

18    Dated: _____, 2006          TRANSUNION LLC

19

20                                       By: _____

21                                       Its: _____

22    Dated: _____, 2006          EQUIFAX INFORMATION SERVICES
                                         LLC
23

24

25                                       By: _____

26                                       Its: _____

27

28

                                    - 30 -

Dated: _____, 2006  JOSE L. ACOSTA, JR.

By: _____
    Jose L. Acosta, Jr.

Dated: _____, 2006  ROBERT RANDALL

By: _____
    Robert Randall

Dated: _____, 2006  BERTRAM ROBISON

By: _____
    Bertram Robison

Dated: _____, 2006  KATHRYN PIKE

By: _____
    Kathryn Pike

Dated: *Nov. 17*, 2006  TRANSUNION LLC

By: *Daniel O. Hahn*
Its: *Senior Attorney*

Dated: _____, 2006  EQUIFAX INFORMATION SERVICES LLC

By: _____
Its: _____

```
 1
    Dated: _____, 2006          JOSE L. ACOSTA, JR.
 2

 3
                                     By: _____
 4                                        Jose L. Acosta, Jr.

 5
    Dated: _____, 2006          ROBERT RANDALL
 6

 7
                                     By: _____
 8                                        Robert Randall

 9
    Dated: _____, 2006          BERTRAM ROBISON
10

11
                                     By: _____
12                                        Bertram Robison

13
    Dated: _____, 2006          KATHRYN PIKE
14

15
                                     By: _____
16                                        Kathryn Pike

17
    Dated: _____, 2006          TRANSUNION LLC
18

19                                   By: _____

20                                   Its:

21
    Dated: 11/17 _____, 2006     EQUIFAX INFORMATION SERVICES
22                                    LLC

23

24                                   By: _____

25                                   Its: KENT E. MAST
26                                        VICE PRESIDENT and GENERAL COUNSEL

27

28
```

- 30 -

APPROVED AS TO FORM:

Dated: *November 17*, 2006

STROOCK & STROOCK & LAVAN LLP
JULIA B. STRICKLAND
STEPHEN J. NEWMAN
BRIAN C. FRONTINO
LINDSAY G. CARLSON

By: _____

Attorneys for Defendant
    TRANSUNION LLC

Dated: _____, 2006

KILPATRICK STOCKTON LLP
CRAIG E. BERTSCHI
CINDY D. HANSON
KALI WILSON BEYAH

By: _____

Attorneys for Defendant
    EQUIFAX INFORMATION
    SERVICES LLC

Dated: _____, 2006

CALLAHAN, MCCUNE & WILLIS APLC
LEE A. SHERMAN

LAW OFFICES OF PETER L. RECCHIA
PETER L. RECCHIA

LAW OFFICES OF GINO PIETRO
GINO P. PIETRO

By: _____
              Lee A. Sherman

Attorneys for Plaintiffs
    JOSE L. ACOSTA, JR., ROBERT
    RANDALL and BERTRAM
    ROBISON

- 31 -

1    APPROVED AS TO FORM:

2
3    Dated: _____, 2006        STROOCK & STROOCK & LAVAN LLP
                                     JULIA B. STRICKLAND
4                                    STEPHEN J. NEWMAN
                                     BRIAN C. FRONTINO
5                                    LINDSAY G. CARLSON

6
7    By: _____
                        Julia B. Strickland

8
9    Attorneys for Defendant
         TRANSUNION LLC

10
11   Dated: _____, 2006        KILPATRICK STOCKTON LLP
                                     CRAIG E. BERTSCHI
12                                   CINDY D. HANSON
                                     KALI WILSON BEYAH
13
14   By: _Cindy D Hanson_____

15
16   Attorneys for Defendant
         EQUIFAX INFORMATION
17       SERVICES LLC

18
19   Dated: _____, 2006        CALLAHAN, MCCUNE & WILLIS APLC
                                     LEE A. SHERMAN
20
                                     LAW OFFICES OF PETER L. RECCHIA
21                                   PETER L. RECCHIA

22                                   LAW OFFICES OF GINO PIETRO
                                     GINO P. PIETRO
23

24   By: _____
                        Lee A. Sherman
25

26   Attorneys for Plaintiffs
         JOSE L. ACOSTA, JR., ROBERT
27       RANDALL and BERTRAM
         ROBISON
28

- 31 -

1    APPROVED AS TO FORM:

2

3    Dated: _____, 2006      STROOCK & STROOCK & LAVAN LLP
                                               JULIA B. STRICKLAND

4                                                 STEPHEN J. NEWMAN
                                                BRIAN C. FRONTINO

5                                                 LINDSAY G. CARLSON

6

7                                                 By: _____

8

9                                                 Attorneys for Defendant
                                                   TRANSUNION LLC

10

11    Dated: _____, 2006      KILPATRICK STOCKTON LLP
                                                CRAIG E. BERTSCHI

12                                                 CINDY D. HANSON
                                               KALI WILSON BEYAH

13

14                                                 By: _____

15

16                                                 Attorneys for Defendant

17                                                 EQUIFAX INFORMATION
                                                SERVICES LLC

18

19    Dated: 11/17, 2006      CALLAHAN, MCCUNE & WILLIS APLC
                                                LEE A. SHERMAN

20

21                                                 LAW OFFICES OF PETER L. RECCHIA
                                                PETER L. RECCHIA

22                                                 LAW OFFICES OF GINO PIETRO

23                                                 GINO P. PIETRO

24

25                                                 By: _____
                                                          Lee A. Sherman

26

27                                                 Attorneys for Plaintiffs
                                                JOSE L. ACOSTA, JR., ROBERT

28                                                 RANDALL and BERTRAM
                                                ROBISON

EXHIBIT 6

|  | Subprime to Subprime | Prime to Prime | Subprime to Prime |
|---|---|---|---|
| **Score Increase Between 1 and 50 Points** | A free credit report and score.[*] | A free credit report and score. | A free credit report and score, and $75.00 |
| **Score Increase Between 51 and 100 Points** | A free credit report and score, and $75.00 | A free credit report and score, and $75.00 | A free credit report and score, and $225.00 |
| **Score Increase Between 101 and 200 Points** | A free credit report and score, and $187.50 | A free credit report and score, and $187.50 | A free credit report and score, and $375.00 |
| **Score Increase 201 or More Points** | A free credit report and score, and $225.00 | A free credit report and score, and $225.00 | A free credit report and score, and $450.00 |

[*] For purposes of this Agreement and this Exhibit 6, the free credit report will set forth customary disclosures explaining how items may be disputed on a credit report. The free credit report will not affect the class member's right to obtain one free annual credit report from TransUnion and from Equifax pursuant to the federal Fair and Accurate Credit Transactions Act of 2003, 117 Stat. 1952 (Dec. 4, 2003).  The score will be calculated using the VantageScore model.

# Exhibit 1

## CLAIM FORM
## CLAIMANT INFORMATION
[Class Member Name and Address]

**Jose L. Acosta, Jr., et al. v. TransUnion LLC**

**Kathryn Pike v. Equifax Information Services LLC**

**THIS FORM MUST BE POST-MARKED NO LATER THAN _____, 2007.  PLEASE BE ADVISED THAT IF YOUR FORM IS NOT POSTMARKED BY THE DEADLINE, IS NOT FILLED OUT COMPLETELY OR IF ANY REQUIRED DOCUMENTATION IS NOT SUBMITTED, YOUR CLAIM MAY BE DENIED.  ALTHOUGH YOU WILL NOT BE CONSIDERED FOR ECONOMIC RELIEF IF YOU DO NOT SUBMIT A CLAIM FORM, SUBMISSION OF THIS CLAIM FORM DOES NOT GUARANTEE PAYMENT OR ANY OTHER ECONOMIC RELIEF.**

If you wish to make a claim pursuant to the terms of the Settlement, you must complete this Claim Form in full, date it and sign it, and mail this Claim Form to the Settlement Administrator at the following address:

**TransUnion/Equifax Bankruptcy Class Action Settlement Administrator**
**c/o Settlement Administrator**
**Number Street**
**City State Zip**

Please answer all of the following questions that apply to you:

1.      State your full legal name, social security number and current address:
        _____.

2.      Have you been known by any other names?  If so, please provide all of your prior names:
        _____.

3.      If you have lived at your current address for less than two (2) years, please please provide your previous address.
        _____.

4.      Did you obtain a general discharge under Chapter 7 of the United States Bankruptcy Code from a federal bankruptcy court? Yes  No


Please answer all of the following TransUnion questions that apply to you:

1.      Since _____ (**two years prior to entry of preliminary approval date**), have you disputed any accounts or tradelines listed on your TransUnion consumer report? Yes  No

2.      If your answer to Question 1 is "Yes," which account(s) did you dispute?
        _____.

3.      After you disputed the account(s), did TransUnion change the way it was reporting the account(s)? Yes  No (**Note:** If you need more room to explain because of multiple accounts that you disputed, you may use a separate sheet of paper to do so.)

4.      If your answer to Question 3 is "Yes," were you denied housing or vehicle credit before the reporting of the account was changed? Yes  No

5.      If your answer to Question 4 is "Yes," you **must** include with this Claim Form proof that the reason for the denial of housing or vehicle credit was because of the reporting of debts discharged in bankruptcy.  Such proof may include an "adverse action" notice or other written evidence that you were denied housing or vehicle credit by reason of the

reporting.  Failure to submit such documentation **will** disallow your claim for relief as a result of such denied housing or vehicle credit; however, you may still be entitled to other relief under the Settlement.

Please answer all of the following Equifax questions that apply to you:

1.    Since _____ (**two years prior to entry of preliminary approval date**), have you disputed any accounts or tradelines listed on your Equifax consumer report?  Yes  No

2.    If your answer to Question 1 is "Yes," which account(s) did you dispute?
      _____.

3.    After you disputed the account(s), did Equifax change the way it was reporting the account(s)?  Yes  No  (**Note:** If you need more room to explain because of multiple accounts that you disputed, you may use a separate sheet of paper to do so.)

4.    If your answer to Question 3 is "Yes," were you denied housing or vehicle credit before the reporting of the account was changed?  Yes  No

5.    If your answer to Question 4 is "Yes," you **must** include with this Claim Form proof that the reason for the denial of housing or vehicle credit was because of the reporting of debts discharged in bankruptcy.  Such proof may include an "adverse action" notice or other written evidence that you were denied housing or vehicle credit by reason of the reporting.  Failure to submit such documentation **will** disallow your claim for relief as a result of such denied housing or vehicle credit; however, you may still be entitled to other relief under the Settlement.

I declare under penalty of perjury under the laws of the United States of America that the information contained in this Claim Form and/or the documentation provided with this Claim Form is true and correct.

Dated: _____        _____
                                          Signature

                                          _____
                                          Print Name

**PLEASE KEEP A COPY OF THIS FORM AND ANY DOCUMENTATION YOU SUBMIT.**

[Spanish-language translation, as may be necessary, to be developed by the Settlement Administrator in consultation with the Parties]

50341635v3

**Exhibit 2**

**NOTICE OF SETTLEMENT OF CLASS ACTION,
FAIRNESS HEARING AND CLAIMS PROCEDURE**

*Jose L. Acosta, Jr., et al. v. TransUnion LLC*
United States District Court for the Central District of California , Case No. 06-CV-5060

and

*Kathryn Pike v. Equifax Information Services LLC*
United States District Court for the Central District of California, Case No. 05-CV-1172

(collectively, the "Litigation")

TO:  All consumers, as defined by 15 U.S.C. § 1681a(c), residing in the United
States for whom TransUnion or Equifax maintains a file, as defined by 15
U.S.C. § 1681a(g), who, between April 1, 1996 and _____, received a
Chapter 7 bankruptcy discharge order from a United States Bankruptcy Court
(the "Settlement Class").

**YOU ARE NOT BEING SUED.  PLEASE READ THIS NOTICE
CAREFULLY AND IN ITS ENTIRETY.  YOU MAY BE ENTITLED TO
MONEY OR OTHER ECONOMIC RELIEF.  YOUR RIGHTS MAY BE
AFFECTED BY THE LEGAL PROCEEDINGS IN THIS LITIGATION.**

This notice (the "Notice") is only a summary of the terms of a class action settlement of the Litigation (the
"Settlement").  The complete terms of the Settlement are set forth in a Stipulation and Agreement of Settlement (the
"Agreement"), which is on file with the court identified above (the "Court"), and which also may be downloaded from
the "Settlement Website" located at www._____.com.  In the event there is any conflict between this Notice
and the Agreement, the terms of the Agreement shall control, because it and the orders of the Court are the official
documents governing the Settlement.

I.    SUMMARY OF NOTICE AND BACKGROUND OF THE LITIGATION

The parties to this Litigation have agreed to settle claims alleged in the Litigation against TransUnion LLC
("TransUnion") and Equifax Information Services LLC ("Equifax") on a class action basis.  In the Litigation, plaintiffs
Jose L. Acosta, Jr., Robert Randall, Bertram Robison and Kathryn Pike ("Plaintiffs") claim that TransUnion and
Equifax violated federal and California law with respect to how they report consumer debts that were discharged in
Chapter 7 bankruptcy proceedings.  Plaintiffs also allege that, after consumers submitted disputes to TransUnion and
Equifax regarding accounts that should have been reported as included in or discharged in bankruptcy, TransUnion and
Equifax violated federal and California law by failing to properly reinvestigate how they were reporting these accounts.
TransUnion and Equifax deny these allegations and contend that they complied with all applicable laws.  Nevertheless,
TransUnion and Equifax desire to settle Plaintiffs' claims solely to avoid the burden, expense, risk and uncertainty of
continuing the proceedings in the Litigation, and for the purpose of putting to rest the controversies at issue.

On _____, 2007, the Court preliminarily approved the proposed Settlement of the claims described
above, and preliminarily certified the Settlement Class for purposes of the Settlement.  The purpose of this Notice is to
advise you of your rights with respect to the proposed Settlement and that the Court will hold a Final Fairness Hearing
to determine whether to finally approve the Settlement and enter a final "Judgment," as described in greater detail in
the Agreement.  Certain members of the Settlement Class may be eligible for money or other economic relief, but will
only be considered for such money or other economic relief if they timely submit a "Claim Form" in accord with the
instructions set forth in Section III below, and if they otherwise qualify for relief under the Agreement.

50341622v2

US2000 9596078.1

II.   TERMS OF THE SETTLEMENT

    A.   NEW CREDIT REPORTING PROCEDURES

        If the Court finally approves the Settlement, the Settlement will require TransUnion and Equifax to change their procedures with respect to certain tradelines reflecting unsecured revolving loans (such as unsecured credit card accounts). However, tradelines reflecting student loans or secured loans (such as mortgages or automobile loans) are not subject to any of these new procedures.

       1.   How TransUnion and Equifax Will Treat New Information They Receive About Bankruptcies

        The Agreement provides that TransUnion and Equifax will modify their procedures so that within 90 days after receiving information regarding any new Chapter 7 bankruptcy discharge order entered in no asset, consumer bankruptcies:

        (a)   TransUnion and Equifax will identify unsecured revolving accounts on the consumer's credit file that are being reported as "charged off" or "placed for collection" where the date "opened" on file pre-dates the consumer's Chapter 7 bankruptcy petition date; and

        (b)   TransUnion and Equifax will, even in the absence of a reinvestigation request by the consumer, change how they report such accounts to remove the charge-off or collection rating, delete any current and/or past due balance, and add a remark indicating that the account was included in bankruptcy.

       2.   How TransUnion and Equifax Will Update Existing Information They Maintain About Bankruptcies

        The Agreement provides that TransUnion and Equifax will implement programs to update their databases so that within 1 year of the Judgment becoming Final, TransUnion and Equifax will identify all consumers within their databases who currently have a Chapter 7 bankruptcy discharge order on their credit file, and:

        (a)   identify unsecured revolving accounts on the those consumer's credit files that are being reported as "charged off" or "placed for collection" where the date "opened" on file pre-dates the consumer's Chapter 7 bankruptcy petition date; and

        (b)   update such accounts to remove the charge-off or collection rating, delete any current and/or past due balance, and add a remark indicating that the account was included in bankruptcy.

       3.   How TransUnion and Equifax Will Modify Their Reinvestigation Procedures

        The Agreement also provides that TransUnion and Equifax will modify their reinvestigation procedures as follows. When a consumer requests reinvestigation of an unsecured, revolving debt that: (i) appears as "charged off", "placed for collection" or 30 or more days past due and where the date "opened" on file pre-dates the consumer's Chapter 7 bankruptcy petition date (that later resulted in a general discharge); (ii) was not reaffirmed; and (iii) was not the subject of a complaint for non-dischargeability, and where his or her credit file contains, or he or she provides, evidence of a discharged Chapter 7 bankruptcy, TransUnion and Equifax will change how they report any and all such accounts to remove the charge-off or collection rating, delete any current and/or past due balance and add a remark indicating that the account was included in bankruptcy , without requiring the consumer to provide copies of bankruptcy records and without first seeking verification from the creditor.

       4.   Restoring of Updated Bankruptcy Tradelines to Original Reporting

        The Agreement also provides that TransUnion and Equifax will not restore the original reporting of a tradeline updated as a result of the produces described above unless the furnisher of the credit information provides to

50341622v2

US2000 9596078.1

TransUnion and Equifax valid, documented reasons for doing so, and the consumer is notified by TransUnion, Equifax or the furnisher of the credit information.

B.   ECONOMIC RELIEF FOR QUALIFYING CLASS MEMBERS

1.   Basic Economic Relief

Under the Settlement, some Settlement Class members also may qualify for "Basic Economic Relief." Settlement Class members who wish to be considered for Basic Economic Relief by submitting a Claim Form must fall into one of the following two subclasses:  (1) those who reside in California on or after _____, 2007, and whose Chapter 7 discharge orders were entered after May 12, 2001 ("Subclass A"); and (2) those who reside outside of California on or after _____, 2007, and whose Chapter 7 bankruptcy discharge orders were entered after October 3, 2003 ("Subclass B").  IF YOU ARE A MEMBER OF SUBCLASS A OR SUBCLASS B AND WISH TO BE CONSIDERED FOR BASIC ECONOMIC RELIEF, YOU MUST TIMELY SUBMIT A CLAIM FORM TO THE SETTLEMENT ADMINISTRATOR IDENTIFIED BELOW IN THE SECTION ENTITLED "CLAIMS PROCEDURE."

Under the Settlement, a VantageScore will be calculated for eligible members of Subclass A or Subclass B who submit Claim Forms.  After the initial credit score is calculated, the Settlement Class member's credit file will be examined and the new procedures described in Paragraph II.A will be applied.  If the new procedures result in any changes to the Settlement Class member's credit file, a new credit score will be calculated.

Depending on the initial credit score calculation, and any subsequent recalculation, the Settlement Class member may be entitled to Basic Economic Relief as follows:

|  | Score remains under 700 points ("subprime"). | Score remains at 701 points or higher ("prime"). | Score moves from below 700 points ("subprime") to 701 points or higher ("prime"). |
|---|---|---|---|
| Score Increase Between 1 and 50 Points | A free credit report and score from both TransUnion and Equifax. | A free credit report and score from both TransUnion and Equifax. | A free credit report and score from both TransUnion and Equifax, and $100 |
| Score Increase Between 51 and 100 Points | A free credit report and score from both TransUnion and Equifax, and $75 | A free credit report and score from both TransUnion and Equifax, and $75 | A free credit report and score from both TransUnion and Equifax, and $225 |
| Score Increase Between 101 and 200 Points | A free credit report and score from both TransUnion and Equifax, and $187.50 | A free credit report and score from both TransUnion and Equifax, and $187.50 | A free credit report and score from both TransUnion and Equifax, and $375 |
| Score Increase 201 or More Points | A free credit report and score from both TransUnion and Equifax, and $225 | A free credit report and score from both TransUnion and Equifax, and $225 | A free credit report and score from both TransUnion and Equifax, and $450 |

If TransUnion's and Equifax's recalculation results in different outcomes, the Class member will receive relief based on the more favorable recalculation.

TransUnion and Equifax both estimate that the current retail value of a free credit report and VantageScore credit score is between $15 and $20.  Receipt of a free credit report will not affect the right of any Settlement Class member to obtain one free annual credit report from TransUnion and Equifax pursuant to the federal Fair and Accurate Credit Transactions Act of 2003.

3