ORIGINAL

1  Michael W. Sobol (State Bar No. 194857)
   (msobol@lchb.com)
2  Paul A. Moore (State Bar No. 241157)
   (pmoore@lchb.com)
3  LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
   275 Battery Street, 30th Floor
4  San Francisco, CA 94111-3339
   Telephone: (415) 956-1000
5  Facsimile: (415) 956-1008

6  Michael A. Caddell (admitted *pro hac vice*)
   (mac@caddellchapman.com)
7  Cynthia B. Chapman (State Bar No. 164471)
   (cbc@caddellchapman.com)
8  George Y. Niño (State Bar No. 146623)
   (gyn@caddellchapman.com)
9  CADDELL & CHAPMAN
   1331 Lamar, Suite 1070
10 Houston, TX 77010
   Telephone: (713) 751-0400
11 Facsimile: (713) 751-0906

12 *Attorneys for Plaintiffs*

13            UNITED STATES DISTRICT COURT

14          CENTRAL DISTRICT OF CALIFORNIA

15                  (Southern Division)

16

17 **JOSE L. ACOSTA**, *et al.*,            | **Case No. 06-cv-5060 DOC (MLG)**

18            **Plaintiffs**,               | **DECLARATION OF DAVID A. SZWAK IN SUPPORT OF**

19        **v.**                            | *WHITE/HERNANDEZ* **PLAINTIFFS' OPPOSITION TO**

20 **TRANS UNION, LLC**, *et al.*,          | **THE** *ACOSTA/PIKE* **PLAINTIFFS' MOTION FOR AN ORDER**

21            **Defendants.**               | **GRANTING PRELIMINARY APPROVAL OF SETTLEMENT**

22

23                                          | Date:    **January 22, 2007**
                                            | Time:    **8:30 a.m.**
24                                          | Place:   **Courtroom 9D**
                                            | Judge:   **Honorable David O. Carter**

25

26      1.      I am an Attorney in Shreveport, Louisiana, and practice in the

27 law firm of Bodenheimer, Jones & Szwak, LLC. A copy of my current CV is

28 attached and provides information about my background including articles I

DECLARATION OF DAVID A. SZWAK
*Case No. CV 06-05060 DOC (MLG)*

581389.1

1  authored and lectures I have presented.  I have written extensively in the field of

2  Fair Credit Reporting Act [FCRA] litigation.  I am regularly asked to teach

3  seminars, CLE and other educational training in the field.  A major part of my

4  practice involves consumer credit litigation involving the Fair Credit Reporting Act

5  and activities of the consumer [credit] reporting agencies.

6      2.      I have been retained by Plaintiffs' counsel in <u>White, et al. v.

7  Trans Union, LLC</u> and <u>White, et al. v. Equifax</u> to offer an opinion as to the

8  underlying credit reporting mechanics of the proposed settlement in this case,

9  <u>Acosta v. Trans Union</u>.  I have been asked to explain the manner in which Trans

10 Union and Equifax will of necessity implement the terms of the proposed reporting

11 changes required in the settlement.  Having litigated extensively in this field under

12 the Fair Credit Reporting Act [FCRA], 15 U.S.C. 1681, et seq., against Trans Union

13 and Equifax, I have also been asked to render an opinion as to the adequacy of the

14 litigation and discovery conduct by Plaintiff's counsel in this case.

15      3.      I attained a Bachelor of Science in Quantitative Business

16 Analysis from Louisiana State University.  That degree program and my studies

17 included computer programming, operations research, computer logic, database

18 design, information practices, database construction and maintenance, digital logic,

19 statistics, as well as a number of other disciplines helpful to the understanding and

20 assessment of issues in credit reporting actions.  Further, I have handled thousands

21 of matters assisting consumers and businesses in understanding credit reports,

22 credit extension practices, assessing the ability to correct credit and credit reporting

23 errors, assessing credit reporting policies and procedures, and evaluating collection

24 and credit reporting records and computer files.  I continuously study, document

25 and report on the operations and processes of the credit and credit reporting

26 industries.  The opinions I express herein come from my personal knowledge I have

27 obtained through these experiences and education. I have handled roughly 100 or

28 more cases against these defendants, Equifax and Trans Union, over the past 15

- 2 -

SR1389 1

1  years, in various venues across the nation.  I have handled roughly 100 or more

2  cases against these defendants, Equifax and Trans Union, over the part 15 years.  I

3  have engaged in extensive discovery with these defendants, including examination

4  of their search program functions, data codings, data structures, data archival

5  structures, all internal manuals, systems analysis flow diagrams, and metro tape

6  structures.  I have also deposed numerous witnesses in the companies' structures.

7  Most of the discovery accomplished in such matters was under the governance of a

8  protective order, usually demanded by the reporting agency.  I am careful not to

9  violate those orders.

10       4.       I have previously testified by affidavit, report and/or deposition

11  in a number of other cases involving issues under the Fair Credit Reporting Act

12  [FCRA] and involving the credit reporting, credit card and banking industries.  I

13  have also attached hereto a copy of my expert witness case listing for your review.

14  I have agreed to provide my unique expertise at an hourly rate of $350.00 per hour

15  for non-testimonial consultation, review and advice, and $500.00 per hour for my

16  deposition and court testimony.  Those fees do not include my expenses which are

17  separately itemized.

18       5.       Also attached hereto is a Statement of Facts provided to me by

19  Leonard Bennett, counsel for the Plaintiffs in <u>White, et al v. Trans Union, LLC</u>, and

20  <u>White, et al v. Equifax Information</u>.   I have relied on this Statement of Facts in

21  rendering my opinions herein.

22       6.       The other documents I specifically reviewed in connection with

23  my declaration include: Documents Bates Labeled TUWHAP0001-0410

24  [D.Bradley letter, 7-16-2003 and attachments; P.Recchia letter, 6-24-2003; FRCP

25  26[f] Report; Recchia In-House memo; G.Pietro letter, 3-18-2005; JDR Fax and

26  attachments, 3-29-2005; L.Sherman letter, 1-20-2006; JAMS letter and

27  attachments, 3-17-2006; Stipulation; numerous emails between counsels; JAMS

28  letter and attachments, 2-23-2006; L.Sherman letter and attachments, 2-13-2006;

DECLARATION OF DAVID A. SZWAK
Case No. CV 06-05060 DOC (MLG)

581389.1

1  Memorandum of Understanding re: Settlement of Acosta v. Trans Union; JAMS
2  letter and attachments, 5-31-2006; B.Frontino letter and attachments, 5-12-2006;
3  JAMS letter and attachments, 4-21-2006; Settlement Term Sheet; B.Frontino letter,
4  7-20-2006; JAMS letter and attachments, 8-3-2006; D.Wright letter and
5  attachments, 5-6-2006; L.Sherman letter, 7-14-2006; Supplementation to MOU, 9-
6  14-2006; JAMS letter and attachments, 9-8-2006; Executed MOU, 9-7-2006;
7  Confidential Mediation Brief of Trans Union and attachments; Documents Bates
8  Labeled TUWHAP0411-0952 [Group 1 documents; Group 2 documents; Group 2
9  documents, part 2; Group 2 documents, part 3; series of discovery requests by
10  Trans Union to plaintiff; Plaintiff's responses to Trans Union's written discovery
11  and attachments]; Documents Bates Labeled TUWHAP0953-1409 [Supplemental
12  Responses to Trans Union's Requests For Production of Documents and
13  attachments; Plaintiff's Form Interrogatories to Trans Union; Trans Union's
14  responses to Responses to Form Interrogatories; Plaintiff's Non-Form
15  Interrogatories to Trans Union; Plaintiff's Special Interrogatories to Trans Union;
16  Trans Union's Responses to Plaintiff's 2nd Special Interrogatories to Trans Union;
17  Trans Union's Supplemental Responses to Plaintiff's 2nd Special Interrogatories to
18  Trans Union; Plaintiff's 3rd Special Interrogatories to Trans Union; Trans Union's
19  Responses to Plaintiff's 3rd Special Interrogatories to Trans Union; Trans Union's
20  Responses to Plaintiff's 2nd Special Interrogatories to Trans Union; Trans Union's
21  Responses to Plaintiff's Requests For Production and attachments; Plaintiff's
22  Requests For Production to Trans Union;  Plaintiff's 2nd Requests For Production
23  to Trans Union; Trans Union's Responses to Plaintiff's 2nd Requests For
24  Production and attachments; Plaintiff's 3rd Requests For Production to Trans
25  Union; Trans Union's Responses to Plaintiff's 3rd Requests For Production and
26  attachments; Plaintiff's 4th Requests For Production to Trans Union; Trans Union's
27  Responses to Plaintiff's 4th Requests For Production and attachments; Plaintiff's
28  5th Requests For Production to Trans Union; Trans Union's Responses to

DECLARATION OF DAVID A. SZWAK
*Case No. CV 06-05060 DOC (MLG)*

SB1389.1

1  Plaintiff's 5th Requests For Production and attachments; Plaintiff's Requests For

2  Admissions to Trans Union and attachments; Trans Union's Responses to

3  Plaintiff's Requests For Admissions to Trans Union and attachments; Plaintiff's

4  2nd  Requests For Admissions to Trans Union and attachments; Trans Union's

5  Responses to Plaintiff's 2nd Requests For Admissions to Trans Union and

6  attachments; Plaintiff's Supplemental Requests For Production to Trans Union;

7  Trans Union's Responses to Plaintiff's Supplemental Requests For Production;

8  Plaintiff's Supplemental Interrogatory to Trans Union; Trans Union's Responses to

9  Plaintiff's Supplemental Interrogatory; Documents Bates Labeled TUWHAP1410-

10  1917 [which included TU00001-00079] [D.Terry, Trans Union, depo. 12-2-2004

11  and attachments; S.Reger, Trans Union, depo. 2-8-2005 and attachments]; R.Mann

12  Affidavit, 11-17-2006; Notice of Motion and Motion For an Order Granting

13  Approval of Stipulated Class Action Settlement, etc., ad attachments; Kirkpatrick v.

14  Equifax, trial transcript; Hudgins v. Equifax, Complaint; Bright v. Equifax,

15  Complaint; Hunter v. Equifax, Complaint; Crowe v. Equifax, Complaint; T.Corpuz,

16  Declaration; Plaintiff's interrogatories and requests for production to Equifax and

17  Equifax's responses and attachments thereto; Equifax's interrogatories and requests

18  for production to plaintiff and plaintiff's responses and attachments thereto; L.Dijk,

19  FICO, deposition and exhibits, 12-17-2003; Equifax frozen scans in Pike v.

20  Equifax; A.Fluellen, Equifax, deposition and exhibits, 5-19-2005; Equifax

21  Indicating Manual; A.Fluellen, Equifax, deposition and exhibits, 10-23-2003;

22  J.Acosta, deposition and exhibits, 12-8-2003; D.Pike, deposition and exhibits, 5-31-

23  2005; Equifax Initial Disclosures and attachments, #0001-0144; Equifax Subscriber

24  Agreement.

25       7.    I am also familiar with credit reporting agencies' processes and

26  procedures through interrogating and otherwise deposing agencies and its

27  employees and from reviewing a very large number of contracts, publications,

28  records, manuals and other writings of the agencies and their affiliate bureaus.

- 5 -

DECLARATION OF DAVID A. SZWAK
Case No. CV 06-05060 DOC (MLG)

581389.1

1   These include metro tape 1 and 2 format manuals, credit reporting policy and

2   procedure manuals, public records reporting manuals, reinvestigation manuals, data

3   deletion and suppression documents, data retention and archival processes, CDV

4   and ACDV processes, UDF and AUDF processes, policy and procedure manuals in

5   consumer relations and other such materials published by the agencies and their

6   affiliated credit bureaus.

7      8. Bankruptcy reportings originate from the public record and from

8   lender trade line reportings.  On the public record side, clerk of courts may report

9   and transmit to the agencies the bankruptcy information in the standardized Metro

10   Tape reporting format for bankruptcy data.  If the clerk does not have a cooperative

11   agreement to provide that data to the national credit reporting agency, then the

12   agencies routinely employ public records data vendors who travel to the courthouse

13   and record public records information from the face of the public records and then

14   the vendor types the data into a metro tape format and transmits the data to the

15   agency[ies].  The incoming public records posting, regardless of the manner of

16   initial collection and transmittal, will eventually be received by the credit reporting

17   agency, who screens the data for basic glitches and then uploads the standardized

18   data submissions to the credit reporting database.  Based on indicative information

19   [consumer personal identifiers] associated with each reporting data string, the data

20   will be matched and posted to file as credit reports and disclosures are assembled

21   and maintained.

22      9. The second type of bankruptcy reporting is the "included in

23   bankruptcy" [AIIB] and similar comment fields which lenders, collectors and other

24   trade and collection account "furnishers" attach to account reportings.  This is not

25   what we typically term a "public records" posting.  This "comment" is appended to

26   a specific trade line [account] that normally was being reported by the furnisher

27   before the consumer went into bankruptcy.  The furnisher normally updates its

28   monthly [periodic] reporting of that trade to enter a "status code" in the proper

- 6 -

DECLARATION OF DAVID A. SZWAK
Case No. CV 06-05060 DOC (MLG)

5813891

1   metro tape field affiliated with that trade so that the AIIB [or related comment] will

2   post and display as associated with the specific trade on the report. Again, these

3   comments are manually [normally] engaged by inclusion of the comment by the

4   furnisher. Some furnishers who have experienced high volumes of bankruptcies

5   have attempted to develop an automated screen of public records for consumers

6   who have filed bankruptcy for comparison to indicative information in their files in

7   order to trigger an automatic [non-manual] inclusion of a bankruptcy comment to

8   trades but this type of test system has proven flawed for a number of reasons. The

9   bottom line is that in the trade reporting metro tape fields, there are bankruptcy

10  comment fields which can be engaged to cause standardized and free form text

11  messages to display, depending on options available and the desires of the furnisher

12  to add commentary to the trade display on the reports of the subject consumer. As

13  with any item of information in file, the individual indicative information

14  determines how that item of data is matched to a specific file and consumer.

15          10.     Trade/account and collection data is reported to Equifax and

16  Trans Union by their subscribing customers, the furnishers, in an alpha-numerically

17  coded format, Metro Tape 1 and Metro Tape 2, created by the national reporting

18  agencies through the trade group, now known as the Consumer Data Industry

19  Association (CDIA). The original title to the manual detailing for furnishers how to

20  use the Metro Tape 2 format was titled, "Metro 2 Format for Consumer Credit

21  Reporting." The Current manual is titled, "Credit Reporting Resource Guide." The

22  Metro Tape 2 format requires creditor/collection data to be reported to the agencies

23  in one line of code per account, each line segments from left to right by an assigned

24  number of spaces per field. For example, name, account number, payment history

25  and a great number of other items, each assigned to a fixed number of spaces in the

26  same order for every account.

27          11.     Metro Tape 2 data is reported in "segments." The first, the

28  "Header" segment [not the same as credit file "header data" which is names and

- 7 -

DECLARATION OF DAVID A. SZWAK
*Case No. CV 06-05060 DOC (MLG)*

581389 1

1   addresses of consumers] is a single item reported with a group of separate account
2   files.  It tells the agencies the details about who is reporting that batch of files and
3   how.   There are some other misc. segments that are also largely irrelevant [for
4   example, a co-debtor will have a separate "J1 Segment" added].  The key reporting
5   segment is the "Base Segment," which is the line of characters for a single credit or
6   collection account.  It contains all of the account specific data.  There are two
7   lengths for Metro Tape 2 Base segments, 366 and 426 characters.  For example, in
8   the 366 Base Segment, spaces 183-207 contain the consumer's surname; 208-227
9   the middle name; 249-253 the social security number; 356-364 the zip code; etc.

10          12.    Under the Metro and Metro 2 formats, the agencies are able to
11   determine the type of trade account being reported.  There are several reporting
12   features that permit this.  The subscriber code, for example, is a key to the Kind of
13   Business [KOB code] reporting the specific item of information.  Debt collectors
14   [For ex., Equifax code "YC"] have differing codes from banks [Equifax code
15   "BB"], from insurers [Trans Union code "I"], and from car dealers, etc.  The KOB
16   code is an important element built into the agency coding to help it differentiate
17   furnishers without having to completely "decode" the entire subscriber code.  The
18   subscriber code also contains geographic information, built into the individual
19   subscriber code string, about the subscriber.  There are a number of these KOB
20   codes which are very specific as to the separate industries reporting data.  Other
21   examples of coding information is highlighted on an affiliated credit bureaus' sites:
22   www.cbainfo.com/glossary.html [comprehensive code listings];
23   www.coastalcredit.com/html/creditreporttutorial.html;
24   www.accuratecredit.com/html/tutorial-equifax.html  Also, bureau vendor's explain
25   these codes: http://creditengine.net/equifax_format.htm;
26   http://creditengine.net/transunion_format.htm.
27          13.    Further, General Codes and other account coding is built into the
28   Metro Tape reporting sequences to enable the agencies and other users [subscribers

- 8 -

1  viewing reports] to understand detailed information about the kind and nature of the
2  accounts being reported in the credit report file.  General codes describe the nature
3  of the account transaction and security or lack thereof.  The Type of Account codes
4  describe if the trade is a mortgage, revolving, installment, open or other type of
5  account.  The ECOA designator describes precisely "who" is responsible for the
6  account.  It may be individual liability, joint, authorized user, co-signor, etc.  There
7  are numerous sets of data fields with countless potential codes which may be
8  entered and each code translates into a text message detailing specific information
9  about the account.  There are also multiple Public Records Codes which detail out a
10  number of bankruptcy related scenarios on the public records postings. Metro Tape
11  2 has a list of account type codes.  These are reported by furnishers in Metro 2 Field
12  9 [Spaces 68-69], under the heading Account Type.  Relevant to the present case,
13  these account type codes identify everything that would be needed to identify
14  whether a trade/account is one of those narrow categories that may not be
15  discharged.  For example, while certain types may be clearly discharged [01
16  unsecured loan, 07 charge account, 18 credit card, 90 medical debt], others are
17  easily identifiable as likely not discharged [12 Education loan, 22 and 23 secured
18  by household goods, 50 and 93 child and family support, 65-74 various government
19  obligations including 71 for fines and penalties, and various codes for types of
20  mortgage debt].

21          14.    After my review of all facts, I believe that the proposed
22  settlement in the Acosta case is inadequate.

23          15.    The proposed Acosta settlement would not correct the targeted
24  inaccuracies.  The proposed settlement would only require correction of a narrow
25  subset of the types of inaccuracies faced by consumers after they obtain a
26  bankruptcy discharge, which is designed to provide protections and a fresh start.

27          16.    The proposed settlement creates a new and unique term "BQT"
28  which it defines as a Revolving [Type of Account code: "R"; distinguished from all

- 9 -

DECLARATION OF DAVID A. SZWAK
Case No. CV 06-05060 DOC (MLG)

581389 1

1   other types of accounts] account with a Chargeoff or Collection status [Rate Code

2   "9"; distinguished from all other codes 0-8 and other "9" codes which are not

3   specified as charge-off or collection] reported before the bankruptcy discharge.

4   While this description may appear to be expressed in laymen's terms, it actually has

5   specific meaning in the context of credit reporting that was probably not known or

6   fully understood by Acosta counsel.  This has a specific meaning within industry

7   jargon.  Trans Union and Equifax certainly choose this language to greatly narrow

8   the actual changes which would be required of their systems and to limit the

9   protection provided the class members.

10          17.    The term "Revolving account" means a credit account trade

11   which is coded with the Portfolio Type field in Metro 2 identifying the "Type of

12   Account" coded as "R" in Metro 2 Field 8 (Space 67).  But this definition thus

13   excludes from correction all other credit account/trade which are not coded in this

14   fashion including those coded:

15          C= Line of credit;

16          I= Installment credit;

17          M= Mortgage; and

18          O= Open account.

19          18.    The settlement correction would not include any of these other

20   reported credit types.

21          19.    It should specifically be noted that "BQT" [Bankruptcy

22   Qualified Trade] is not industry jargon and is a phrase created solely within the

23   context of the proposed settlement.

24          20.    By definition, the Acosta proposed settlement, limited to its

25   "BQT's," would not correct and would exclude lines of credit, installment credit

26   such as car loans, discharged mortgage deficiencies, open accounts and other non-

27   revolving accounts.   It would also exclude debts that are not reported as an

28

- 10 -

DECLARATION OF DAVID A. SZWAK
*Case No. CV 06-05060 DOC (MLG)*

581389.1

1    account/trade, such as pre-discharge judgments and various collection accounts,

2    such as medical billing collections.

3          21.    The "BQT" also only includes trade lines from this narrow

4    subset of revolving account types which are reported with a "Charge-off" or

5    "Collection" status, with a "9" Rating Code.

6          22.    Metro 2 Field 17A (Spaces 99-100) provides for the Account

7    Status reporting.  There are a number of different account status codes in data

8    reported within the industry's standard Metro 2 format.   While it is customary to

9    see a consumer version [plain language, decoded] credit report with such coding as

10   "R-9" for charge-off of a revolving account or "R-1" for a revolving, current

11   account, these are really just MOP [Method of Payment; listing Type of Account

12   and Account Status together as MOP Coding] summary codes used by Trans Union

13   and Equifax in their readable, end-user reports.  The internal coding in which this

14   data is reported and maintained is by the Metro Tape 2 "Account Status" code and

15   separately the "Type of Account" code.  For example, a creditor who wants to

16   report an account as 30 days late/delinquent uses code "71;" 60 days late uses code

17   "78," 90 days late uses code "80," 120 days late uses "82," 150 days late uses "83,"

18   and 180 days or more past due uses "84" for a status code.  In addition to these and

19   the below, there are also codes for repossessions, foreclosures, current accounts,

20   and others.

21          23.    The only changes that the Acosta settlement would make would

22   be to credit card accounts with a pre-discharge reporting of an Account Status code

23   "97" ["Unpaid balance reported as a loss by credit grantor (charge-off)"] or Account

24   Status "93" ["Account assigned to internal or external collections."].  This will

25   leave uncorrected countless consumers who fit within the large number of other

26   scenarios, for ex., current, 30+, 60+, 90+, 120+, 150+, 180+, involuntary

27   repossession, foreclosure, voluntary repossession, deed in lieu, etc.  These are all

28   scenarios that will exist in the credit files of class members in this case.

                                    - 11 -                   DECLARATION OF DAVID A. SZWAK
                                                            *Case No. CV 06-05060 DOC (MLG)*

S81389.1

24.   The "BQT" language will expressly exclude accounts [from even this narrowest of subsets] that are not so reported until after the bankruptcy. Many of the inaccuracies faced by consumers post-discharge are actually reported inaccurately post-bankruptcy and not pre-discharge.

25.   The asserted changes to the agencies' reinvestigation procedures under the Acosta proposed settlement are also meaningless.  The proposed settlement would purport to require the agencies to correct trades/accounts to an "unrated" Account Status or an "included in bankruptcy" [comment] after a dispute without the need to verify the reporting with the underlying furnisher-creditor. Although the Sherman Group may not have even known it, it should be noted that this is currently the procedure used by Equifax and Trans Union.  If the consumer's credit file already listed a bankruptcy public record posting that is inconsistent with the disputed trade/account comment, upon the consumer's dispute the agencies' procedures call for it to update the trade/account without the need to contact the creditor and report consistent with the public records.  The actual bankruptcy papers will not be required if the consumer's dispute is consistent with the other information already in the consumer's credit file.

26.   The problem is not in the agencies' procedures or business rules for considering a consumer's dispute but the agencies' reinvestigation failures principally arise from the agencies' failure to allocate adequate resources to such reinvestigation functions.  See, for ex., Cushman v. Trans Union, 115 F.3d 220 [3rd Cir. (Pa.) 1997] ["Similarly, the jury could have concluded that seventy-five cents per investigation was too little to spend when weighed against Cushman's damages."]; Comparably: Centuori v. Experian Information Solutions, Inc., 431 F.Supp.2d 1002 [U.S.D.C. Ariz. 2006] ["However, in 2001, Experian decided to offer MIS customers direct Internet access to its database of more than 200 million consumer credit histories, which included the records of Arizona consumers. Offering Internet access to MIS' customers (and others) would increase profits for

- 12 -

1   Experian, and allow it to expand its market. Switching from phone lines to the
2   Internet would cut costs of five to seven cents per minute, which in the aggregate
3   would save Experian millions of dollars. The new Internet interface would be more
4   user-friendly, and allow Experian to spend less on customer training."]
5       27.   In fact, several years ago both Trans Union and Equifax
6   discontinued conducting their own reinvestigations and handling of consumer
7   disputes and outsourced the work to countries such as India, Philippines, and
8   Jamaica. Equifax sends the disputes it receives by electronic file to third party
9   outsource vendors in the Philippines and Jamaica. Trans Union does the same with
10  an outsource vendor in India. Outsourcing has compounded credit reporting
11  reinvestigation failures.
12      28.   The Acosta proposed settlement appears to do nothing to
13  address this underlying cause of the failures in the CRA reinvestigation practices.
14      29.   I reviewed the work performed by the Sherman Group in this
15  case and have been asked to comment on the quality of that work. I reviewed the
16  depositions taken from the defendants and the discovery undertaken. I ultimately
17  concluded that it appeared that the Sherman Group did not attempt to discover or
18  understand basics of the credit reporting process and did not press Trans Union or
19  the other parties to produce documents and deponents in order to explore and obtain
20  necessary facts and evidence to understand and provide the court an understanding
21  of the facts. Plaintiff's counsel was grossly negligent in litigation of the Acosta
22  case.
23      30.   The Sherman Group did not even obtain the most basic credit
24  reporting manuals from defendants. In evaluating this case, it is necessary to obtain
25  and have an understanding of the Metro Tape reporting system. Since
26  implementation of Metro 2, most of the industry has converted to the updated
27  version though some have lagged behind and use the older version. Trade and other
28  reported data is reported in what is called Metro Tape, a standardized data reporting

- 13 -

DECLARATION OF DAVID A. SZWAK
Case No. CV 06-05060 DOC (MLG)

581389 1

1   format with a variety of preset data fields and standardized formatting for easy
2   uploading and inclusion into the credit reporting database system and its existing
3   file record format.  Each of the national credit reporting agencies use this
4   standardized format and this format is promoted for use by the entire lending,
5   collection and data reporting communities through the agencies' trade organization
6   and lobby group, CDIA [Consumer Data Industry Association].  The Metro tape
7   format contains data fields for reporting a variety of bankruptcy and bankruptcy-
8   related items of information.  These data fields, in the database structure, are
9   capable of being searched and evaluated by the credit reporting database search
10  mechanisms and programs.  Without those manuals to understand these highly
11  technical and coded fields, it would be impossible to understand the reporting
12  process and how to cure bankruptcy reporting problems in credit reports.  I found
13  that the Sherman Group lacked an understanding of Metro Tape formatting, fields,
14  search mechanisms, and coding.

15          31.     I also noted that Trans Union and the other parties failed to
16  provide the Sherman Group even less sophisticated manuals, such as the Credit
17  Reporting System [CRS] manual, which provides new credit reporting agency
18  employees an overview of the systems and flow of information.  This basic
19  overview would have offered the Sherman Group some insight into other
20  documents they needed to request and necessary industry jargon.  It appeared to me
21  that the Sherman Group was stumbling through the litigation with a lack of
22  knowledge of the basic concepts and documents needed to litigate the case and
23  develop evidence about the source of the problem their clients were grappling with
24  and a lack of understanding as to how to fix it.

25          32.     From my analysis of the Acosta case, it seems that Trans Union
26  produced only 79 pages of documents.  These were the basic documents always
27  provided by Trans Union in any of its cases.  These documents pertain only to Mr.

28

- 14 -

DECLARATION OF DAVID A. SZWAK
Case No. CV 06-05060 DOC (MLG)

581389.1

1    Acosta and are largely a copy of those documents he already would have received

2    in the dispute/reinvestigation process.  These are not helpful to the issues presented.

3         33.    I also noted that the defendants provided witnesses to the

4    Sherman Group which were ill-suited for the needs of this case.  For example, I

5    have deposed Diane Terry and Steve Reger, from Trans Union, on multiple

6    occasions over many years.  Mrs. Terry is a Fullerton, California-based employee

7    of Trans Union who works in a quasi-legal department status and is nothing short of

8    a professional witness for the company, having been deposed and offered to provide

9    testimony for Trans Union on countless occasions.  It is her role with the company.

10   Her background is reinvestigations of consumer fraud and identity theft disputes

11   and she has no knowledge [admittedly] of the metro tape reporting system or codes

12   or search programs and routines.  She has no background in bankruptcy reporting

13   codes and fields in metro tape.  She is simply and routinely offered up as a

14   Fed.R.Civ.Proc. 30[b][6] witness to plaintiff counsels.  While she is acceptable in

15   basic reinvestigation process and CDV and ACDV interpretation, she lacks any

16   training or knowledge about the data intake, data posting, data match logic,

17   comparative search program and related areas.  Any novice attorney could have

18   easily determined that in a few minutes of taking her deposition. Comparably, Mr.

19   Reger is a Fullerton, California-based employee of Trans Union who works in

20   Fraud Victim Assistance Department [FVAD] and is also a professional witness for

21   the company, having been deposed and offered to provide testimony for Trans

22   Union on countless occasions.  Mr. Reger has been in the FVAD for many years

23   and is normally offered in theft of identity litigation.  This is his role with the

24   company.  His background is ID theft reinvestigations of consumer disputes and

25   basic services Trans Union offers to fraud victims.  He has no knowledge

26   [admittedly] of the metro tape reporting system, codes, search programs and

27   routines.  He has no background in bankruptcy reporting codes and fields in metro

28   tape.  He is simply and routinely offered up as a Fed.R.Civ.Proc. 30[b][6] witness

- 15 -

581389.1

1   to plaintiff counsels.  While he is acceptable to discover basic identity theft

2   reinvestigation process, fraud alert postings through reinvestigation center

3   activities, and CDV and ACDV interpretation, he lacks any training or knowledge

4   about the data intake, data posting, data match logic, comparative search program

5   and related areas.  Neither Terry nor Reger would be involved in setting any policy

6   or procedure relevant to this case.

7            34.    The Sherman Group needed to depose Lynn Romanowski and

8   William "Bill" Stockdale, who are widely known as persons in Trans Union who

9   would have requisite knowledge of the issues in this case.  Of course, they are just

10  two of the routinely offered corporate designees on proper topics.  Of course, the

11  Sherman Group failed to articulate the proper areas of inquiry to Trans Union.  Mrs.

12  Romanowski works in a systems analyst role and devises business rules for

13  incorporation into computer programs by the programmers at Trans Union.  She

14  could easily testify about Metro Tape formats, codes, search programs, routines,

15  match logic, and how to "fix" the problem addressed in this lawsuit, from Trans

16  Union's perspective.  She has testified on many occasions for Trans Union and I

17  have taken her testimony in the past on multiple occasions.  Mr. Stockdale oversees

18  public records data intake and works with Trans Union sources, including [at least

19  historically] Hogan Information.  Mr. Stockdale would be knowledgeable about

20  Metro Tape formats, codes, search programs, routines, match logic, and how to

21  "fix" the problem addressed in this lawsuit, from Trans Union's perspective.  He

22  has testified on many occasions for Trans Union and I have taken his testimony in

23  the past on multiple occasions.

24           35.    Both Romanowski and Stockdale are figureheads at Trans

25  Union and their names and roles are widely reported.  Further, both have worked in

26  study groups and association groups to address Metro Tape issues.  The Sherman

27  Group simply failed to research the area and determine who the widely known

28  witnesses were.

DECLARATION OF DAVID A. SZWAK
*Case No. CV 06-05060 DOC (MLG)*

581389 1

36.    I have also deposed Alicia Fluellen, the only witness Plaintiff's counsel deposed from Equifax, on multiple occasions over many years. Mrs. Fluellen is an Atlanta, Georgia-based employee of Equifax who works in a quasi-legal department status and is nothing short of a professional witness for that company, having been deposed and offered to provide testimony for Equifax on countless occasions. This is her role with the company. Her background is reinvestigations of consumer disputes and she has no knowledge [admittedly] of the metro tape reporting system or codes or search programs and routines. She has no background in bankruptcy reporting codes and fields in metro tape. She is simply and routinely offered up as a Fed.R.Civ.Proc. 30[b][6] witness to plaintiff counsels. While she is acceptable in basic reinvestigation process and CDV and ACDV interpretation, she lacks any training or knowledge about the data intake, data posting, data match logic, comparative search program and related areas. Any novice attorney could have easily determined that in a few minutes of taking her deposition. At Equifax, the proper witness the address the issues in this case would have been Lynn Hudziak, a corporate designee for issues pertaining to match logic, metro tape formatting and codes and bankruptcy reporting issues.

37.    Any novice attorney could have easily determined that in a few minutes of taking his deposition. My review of these two Fluellen depositions revealed that plaintiffs' counsel taking the depositions was not well informed or equipped to understand the testimony being taken. For example, various common industry terms and concepts were unknown to counsel and he appeared to be confused by basic concepts.

38.    The Sherman Group could have obtained the limited information is was able to discover in Acosta and Pike, and considerably more by reaching out to one of the many consumer groups that have a noted presence in this field, such as the National Association of Consumer Advocates [NACA], National Consumer Law Center [NCLC], United States Public Interest Research Group

- 17 -

581389 1

1   [USPIRG], Electronic Privacy Information Center [EPIC], and countless other
2   consumer information sources who have specialized knowledge and research
3   capabilities to assist counsel, such as the Sherman Group, with such information
4   needs.  NACA and NCLC provide regular and national conferences on the FCRA.
5   There is a large network of attorneys with skill and experience in this area including
6   a number of them in California and even more generally in the Ninth Circuit.  In
7   addition, most attorneys who practice in this very specialized field do so in cases
8   across the country.  Some of these attorneys can be found on the website
9   www.myfaircredit.com, an internet site ranking on the first page of most common
10  FCRA word and phrase FCRA "google" searches.  Further, these consumer
11  organizations and consumer lawyer groups work cooperatively and publish a large
12  number of books, manuals and other writings to assist lawyers and consumers who
13  face credit reporting and related problems.  The Sherman Group could have
14  obtained basic discovery devices from the most well known source books for
15  lawyers on consumer laws, the National Consumer Law Center series on consumer
16  law topics, particularly, the Fair Credit Reporting Act manual and CD enclosures.
17  Further, as shown above, a cursory "google" search would have exposed codes and
18  information which should have made the problems with "BQT" glaring to the
19  Sherman Group.

20          39.    Defense counsel in this case and others where the credit
21  reporting agencies are sued are particularly knowledgeable about their clients'
22  business, computer structure, data formats, reporting codes, documentation and
23  jargon.  These attorneys are carefully and continuously trained in the business and
24  most of them handle exclusively the work of that agency and have no other
25  substantial clientele.

26          40.    My conclusion is unqualified that the litigation of that case was
27  entirely inadequate for an individual case, let alone one that would seek to represent
28  a larger class.  The Sherman Group work product in my opinion was very poor.

                                    - 18
                                      -          DECLARATION OF DAVID A. SZWAK
                                                 Case No. CV 06-05060 DOC (MLG)

581389.1

41.   I do not know the attorneys who litigated the Acosta case and have no knowledge of their work outside this one case I have reviewed.  But it is my opinion that the litigation or lack thereof in Acosta very likely negatively impacted the value of Mr. Acosta's case individually.  It appears that no meaningful discovery was accomplished.  No useful depositions were taken.  No substantive or relevant documents were exchanged.  Although the Plaintiff's propounded numerous written discovery pleadings, including multiple sets of Interrogatories, Requests for Production of Documents and Requests for Admission, they received almost nothing substantive in response.  This is not uncommon in litigation against Trans Union and Experian.  In fact, in nearly all substantial litigation against these Defendants under the FCRA, the Plaintiff has had to  prosecute a Motion to Compel.  In Acosta, Trans Union acknowledged this tactic when it refused to respond to a latter set of Interrogatories because Acosta counsel had failed to timely file a Motion to Compel.

42.   Though listed above, I need to specifically make additional comment about the discovery documents from a second case Kathryn Pike v. Equifax, provided to me by White/Hernandez plaintiffs' counsel, which they represent were received pursuant to a stipulation and order with defendants.  As stated, I reviewed those documents.  I am uncertain which if any of these documents were ever used in that case, but the list of such documents and discovery apparently obtained by Acosta's counsel pertaining to Equifax was limited to the following: (a) Trial transcripts from an unrelated mixed file/id theft case litigated by my colleague and good friend Robert Sola, Kirkpatrick v. Equifax, [U.S.D.C. Ore.]; (b) Copies of various Complaints filed in other cases by other attorneys, including some FCRA attorneys who are members of NACA [in one such case I was an expert witness for the plaintiff, Tina Hunter]; (c) Equifax's general responses to basic Interrogatories, Requests for Admission and Requests for Production of Documents in Acosta v. Equifax, Superior Court of California,

- 19 -

SR1389 1

County of Orange [Case No. 03CC06992]; (d) Deposition Transcript of Luke Van Dijk in Acosta v. Equifax, Superior Court of California, County of Orange [Case No. 03CC06992]; (e) A letter from Equifax' counsel dated October 3, 2005 transmitting the frozen scans in the Dennis Pike v. Equifax matter and including a few frozen scans; (f) Deposition Transcripts of Alicia Fluellen taken in Jose L. Acosta v. Equifax Information Services, Superior Court of the State of California, County of Orange, Case No. 03CC06992 [October 23, 2003] and Dennis Pike v. Equifax Information Services, Superior Court of the State of California, County of Orange, Case No. 03CC10991 [May 19, 2005]; (g) A mostly redacted Equifax 2001 Indicating Manual; (h) Equifax Information Services LLC – Agreement for Service. An Attachment to an email (6/5/03); and (i) Equifax' Initial Disclosures in Kathryn Pike v. Equifax, U.S.D.C. Central Division of California [Southern Division], including some documents [February 27, 2006]. The only document provided to me that pertains to the case of Kathryn L. Pike v. Equifax Information Services LLC, 8:05-cv-01172 [U.S.D.C. C.D. Cal.], was the initial disclosures in that case from February 2006. Most of these documents have nothing to do with the account "Included in Bankruptcy" [AIIB] problem and litigation that is the subject of this case. Kirkpatrick v. Equifax was a Mixed File/ID Theft case and I consulted with plaintiff's counsel in that case. The frozen scans of Dennis Pike are simply the internal archive of that other consumer's credit file at Equifax. Most of the Equifax discovery answers pertain solely to the posture of the prior Acosta v. Equifax case, which I am told was settled, or the actual credit files of Jose Acosta maintained by Equifax. I am not sure why Acosta counsel gathered the several other FCRA complaints from other cases, but they are forms that are fairly outdated, with more relevant and current pleadings already available in the NCLC manual/treatise, Fair Credit Reporting. The depositions and evidence from Equifax's spokesperson, Alicia Fluellen, are also not helpful in a case such as this one. Her deposition testimony, rarely changing, is also often circulated amongst FCRA attorneys who

- 20 -

DECLARATION OF DAVID A. SZWAK
Case No. CV 06-05060 DOC (MLG)

SR1389 1

are litigating their first case against Equifax and need to understand the nature of her knowledge. The only other relevant document apparently obtained or used by the attorneys for Kathryn Pike was the Equifax Indicating Manual. This is the standard document that Equifax provides to opposing parties in litigation about the agency's reinvestigation procedures. It is a simply stated manual that describes the basic Equifax rules for handling a consumer's dispute. However, Equifax provided only a 2001 edition and even then only one that was almost entirely redacted. Still, had Acosta or Pike counsel understood and obtained a complete Equifax Indicating Manual, they would have learned that Equifax already follows the "new" reinvestigation procedure the Acosta settlement claims to impose. As in the Acosta case, it appears that the Kathryn Pike counsel had very little documentary evidence or meaningful discovery responses upon which to base their claims.

43.    The targeted problem presented in this case, the failure to update trades post-discharge, has been one of the "hottest" and growing case patterns in the FCRA field. Numerous attorneys are litigating these claims across the country under both the FCRA and as bankruptcy stay and discharge violations. I conservatively estimate that there have been at least dozens of cases filed against Trans Union and Equifax for their inaccurate post-bankruptcy reporting. At each of the last several NACA and NCLC FCRA conferences and advanced seminars, the bankruptcy reporting claims have been the most discussed. I fully expect that there will be numerous objections to the present proposed settlement from these attorneys and likely some public interest groups if considered for a Fairness Hearing.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 14th day of December, 2006.

Dated:  December 14, 2006

David A. Szwak
60 Turnbury
Bossier City, Louisiana  7111
(318) 752-1166

- 21 -

DECLARATION OF DAVID A. SZWAK
Case No. CV 06-05060 DOC (MLG)

581389 1

**DAVID ANTHONY SZWAK**
**BODENHEIMER, JONES & SZWAK, LLC**
509 Market Street, 7th Floor
United Mercantile Bank Building, Shreveport, Louisiana  71101
318-221-6444 / 318-272-9303 / Fax 318-221-6555
Web Sites: www.MyFairCredit.com and www.MyFairDebt.com / e-mail:
bjks1507@aol.com

## EDUCATION:

**PAUL M. HEBERT LAW CENTER, LSU**
Honors:   Student Bar Association, Freshman Class
President, Junior Class Treasurer; Student Ethics
Committee, 1990-91; Legal Community Relations
Committee, 1990-91; Election Court, 1990-91.
**Admitted to Practice - Louisiana**: October 10, 1991
Also admitted to practice in the federal courts of
the Eastern, Western and Middle Districts of
Louisiana, the Eastern and Western Districts of
Arkansas, the Northern, Eastern and Southern
Districts of Texas, the Eastern District of
Michigan, the District of Arizona, the Fifth
Circuit Court of Appeals, the Eighth Circuit Court
of Appeals, the Ninth Circuit Court of Appeals and
the Eleventh Circuit Court of Appeals.
Admitted, United States Supreme Court, 2003
**Notary Public, State of Louisiana**
**LOUISIANA STATE UNIVERSITY, BATON ROUGE**
Bachelor of Science, Quantitative Business
Analysis, December, 1987.
**Woodlawn High School**, Baton Rouge
**Sam Rayburn High School**, Pasadena, Texas

## WORK EXPERIENCE:

December '05    **BODENHEIMER, JONES & SZWAK, LLC**
   to          Title:  Attorney/Owner
Present        Areas of Practice:  Insurance defense, personal
injury, consumer credit and commercial litigation.
509 Market Street, 7th Floor, United Mercantile Bank
Building, Shreveport, Louisiana 71101
Telephone:  318-221-6444
Telefax:    318-221-6555

January '02    **BODENHEIMER, JONES, SZWAK & WINCHELL, LLP**
   to          Title:  Attorney/Partner
Present        Areas of Practice:  Insurance defense, personal
injury, consumer credit and commercial litigation.
Partner [January, 2002 - December, 2005]
401 Market Street, Ste. 240, American Tower,
Shreveport 71101
Telephone:  318-424-1400
Telefax:    318-424-1476

| | |
|---|---|
| October '96<br>to<br>Present | **BODENHEIMER, JONES & SZWAK, LLP**<br>Title:  Attorney/Partner<br>Areas of Practice:  Insurance defense, personal injury, consumer credit and commercial litigation.<br>Partner [October, 1996 - Date]<br>401 Market Street, Ste. 240, American Tower, Shreveport 71101<br>Telephone:  318-424-1400<br>Telefax:    318-424-1476 |
| July '91<br>to<br>October '96 | **BODENHEIMER, JONES, KLOTZ & SIMMONS, LLP**<br>Title:  Attorney/Partner<br>Areas of Practice:  Insurance defense, personal injury, consumer credit and commercial litigation.<br>Associate [October, 1991 - December, 1994]<br>Partner [December, 1994 - October, 1996] |
| May '90<br>to<br>June '91 | **SEALE, SMITH, ZUBER & BARNETTE**<br>Title:  Law Clerk<br>Areas of Research:  Insurance defense, personal injury, bankruptcy and medical malpractice defense.<br>Phone:  504-922-4400  **Bill Kaufman, Brent Kinchen** |
| May '89<br>to<br>June '91 | **KLEINPETER, SCHWARTZBERG & STEVENS**<br>Title:  Law Clerk<br>Areas of Research:  Personal injury and toxic tort.<br>Phone:  504-926-4130  **Bob Kleinpeter** |
| May '89<br>to<br>July '91 | **WILLIAM E. CRAWFORD, JAMES BAILEY PROF. OF LAW**<br>Title:  Law Clerk<br>Areas of Research:  Special research projects for the Law Center, Law Institute, Bar Review and CLE programs.  Focused research: Appellate review of civil juries.<br>Phone:  504-342-6361 / 504-388-8646  **William E. Crawford** |
| January '85<br>to<br>August '88 | **NINETEENTH JUDICIAL DISTRICT COURT**<br>Title:  Interviewer, Bail Bond Project<br>Duties:    Interview arrestees and prisoners requiring appearances in District Court.  Review police reports and assist judges in setting fair bond amounts and recommending personal sureties.<br>Phone:  504-389-3114  **Hon. Michael Ponder** |

**BAR ACTIVITIES:**

Chairman, Consumer Protection Section, Louisiana State Bar Association [2006-Present]; Louisiana State Bar Association, House of Delegates, 26th Judicial District Court [2006-Present]; Louisiana Law Institute, Committee Member, Uniform Computer

Information Transactions Act [UCITA], 2000-2001; Louisiana State Bar Association, House of Delegates, First Judicial District Court [1998-2000]; National Association of Consumer Advocates [NACA] [1997-date]; Special Assistant Attorney General, State of Louisiana [1993-1994]; Harry V. Booth-Henry Politz American Inn of Court, Shreveport Chapter, Pupil [1993-1994], Barrister [2004-2007]; Editor, "The Bar Review," Shreveport Bar Association [1994-1996]; Louisiana, Federal, American and Shreveport Bar Associations; Louisiana Association of Defense Counsel; Founding Member, Credit Fraud Research Institute, Inc.

**CIVIC ACTIVITIES:**

Northwest Louisiana Wildlife & Aquatic Education Program, Board of Directors [1998-2000]; Bossier Little League Tee-Ball and Baseball, Sponsor and Head Coach, Tigers [1999], Indians [2000], Marlins [2001], Cubs [2002], Phillies [2003], Reds [2003], Reds [2004], Pirates [2005], Reds [2005]; Yankees [2006], Red Sox [2006]; Krewe of Gemini, Mardi Gras Krewe [1997-2003], Duke of Arkansas [2000-2001]; Ducks Unlimited, Bossier Chapter, Member and Sponsor; Shreveport Pee-Wee Football League, Sponsor and Head Coach, First Baptist Patriots [2001]; Bossier Parish Pee-Wee Football League, Coach, Dolphins [2002], Head Coach, Cowboys [2003], Head Coach, Cowboys [2004], Head Coach, Steelers [2005]; Head Coach, Steelers [2006]; Bossier Parish Summer League Baseball, Head Coach, Braves [2003], Astros [2004]; Sponsor, Shreveport Mudbugs Canadian Hockey League team [2003-2006].

**ARTICLES:**

**"Louisiana Premises Liability in the Post-Cates v. Beauregard Electric Cooperative Era,"** *Louisiana Law Review*, Vol.53, Issue 6, p.1935 [1993]; **"Theft of Identity - A Credit Nightmare,"** *Texas Bar Journal*, Texas Bar Association, Vol.56, No.10, p.994 [November, 1993], reprinted: *The Docket*, National Association of Legal Secretaries, Vol.43, Issue 4, p.31 [January-February, 1994], reprinted: *The Bar Review*, Shreveport Bar Association, [in 3 parts], Vol.3, No.2, [February through April, 1994], reprinted: *The Academy of Florida Trial Lawyers Journal*, The Academy of Florida Trial Lawyers, No.381, p.27 [June, 1994], reprinted: *The Prairie Barrister*, Nebraska Association of Trial Lawyers, p.10 [Summer, 1994]; **"Trespassers and the**

**Attractive Nuisance Doctrine in Louisiana**," *The Bar Review*, Shreveport Bar Association, Vol.4, No.1, p.10 [August, 1994]; "**Temporomandibular Joint [TMJ]: A Primer**," *The Bar Review*, Shreveport Bar Association, Vol.4, No.2, p.1 [September, 1994], reprinted: The Lectric Law Library, www.lectlaw.com/files/med20.htm; Co-Author: "**Networking Personal Computers For Word Processing Purposes**," *The Bar Review*, Shreveport Bar Association, Vol.4, No.3, p.9 [October, 1994]; "**Theft of Identity, Call it Data Rape**," *The Alaska Bar Rag*, Alaska Bar Association, Vol.18, No.6, p.20 [November-December, 1994]; "**Theft of Identity: Roadkill on the Information Highway**," *Trial Bar News*, New Hampshire Bar Association - Helms Publications, Vol.16, pp.181-188 [Winter, 1994]; "**Theft of Identity: Data Rape**," *The Colorado Lawyer*, Colorado Bar Association, Vol.24, No.1, p.23 [January, 1995], reprinted: *Voir Dire*, Mississippi Trial Lawyers Association, p.14-18 [Winter, 1994], reprinted: *Trial Talk*, Colorado Trial Lawyers Association, Vol.43, Issue 11, p.17-19 [December, 1994], reprinted: *The Prairie Barrister*, Nebraska Association of Trial Lawyers, p.15 [Fall, 1994], reprinted: *Advocate*, Consumer Attorneys Association of Los Angeles, pp.8-10, [December, 1994], reprinted: *The Advocate*, The West Virginia Trial Lawyers Association, pp.16-17 [Winter, 1994], reprinted: *Minnesota Trial Lawyer*, Minnesota Trial Lawyers Association, p.20-21, 30 [Spring, 1995], reprinted: *Bar Journal*, New Mexico Bar Association, pp.48-51, [January, 1995], reprinted: *The Vermont Bar Journal & Law Digest*, Vermont Bar Association, pp.45-46, [February, 1995], reprinted: *Trial*, The Association of Trial Lawyers of America [ATLA], The New Lawyer Forum, [February, 1995], reprinted: *Michigan Bar Journal*, Michigan Bar Association, Vol.74, No.3, pp.300-302 [March, 1995], reprinted: *Advocate*, Nevada Trial Lawyers Association, Vol.XIX, No.10, pp.5-11 [December, 1995]; "**Credit Cards in America**," *John Marshall Journal of Computer & Information Law*, John Marshall Law School Law Review, Chicago, Illinois, Vol. XIII, Issue 4, pp.573-584 [Summer, 1995], reprinted: *The Prairie Barrister*, Nebraska Association of Trial Lawyers, pp.5-8 [Summer, 1994], *early release*, *The Bar Review*, Shreveport Bar Association, Vol.4, No.6, p.4 [January, 1995],

reprinted: *The Vermont Bar Journal & Law Digest*, Vermont Bar Association, Vol.21, No.5, pp.38-41 [October, 1995], reprinted: The Lectric Law Library, www.lectlaw.com/files/ban15.htm; **"Data Rape: High-Tech Theft of Credit Identities**," *The National Law Journal*, Corporate Counsel Edition, January 16, 1995, pp.C18-19; **"False Arrest in Louisiana**," *The Bar Review*, Shreveport Bar Association, Vol.4, No.7, p.4 [February, 1995]; **"Appellate Review of Facts in Louisiana**," *The Bar Review*, Shreveport Bar Association, Vol.4, No.7, pp.6-7 [February, 1995]; **"Theft of Identity - How 'Credit Pirates' Live in Luxury on Victim's Identities**," *Nevada Lawyer*, Nevada Bar Association, Vol.3, No.3, pp.22-25 [March, 1995]; **"Theft of Identity: Beware**," *OSB Bulletin*, Oregon Bar Association, pp.15-18 [May, 1995]; **"Fishing in Discovery**," *The Bar Review*, Shreveport Bar Association, Vol.4, No.9, p.6 [June, 1995]; Contributing Author: **"Making Crime Pay: How Identity Thieves Cash in on Your Credit**," Bill Effinger, New Hope Press, La Jolla, California [1995]; Contributing Author: **"Appellate Review of Fact**," *LABI Court Watch*, Louisiana Association of Business and Industry, Vol.II, No.3 [April 5, 1995]; **"Data Rape: Theft of Identity**," *The Pennsylvania Lawyer*, Pennsylvania Bar Association, pp.16-41 [September-October, 1995]; **"Laying the Cards on the Table**," *Facts & Findings*, The Journal For Legal Assistants, National Association of Legal Assistants, Vol. XXII, Issue 3, pp.26-42 [November, 1995], reprinted: *The Digest*, The Arizona Paralegal Association, pp.1-6, [January, 1996]; **"Credit Cards, Credit Reports and Fraud: Enforcing Consumer Rights**," *The Colorado Lawyer*, Colorado Bar Association, Vol.25, No.4, pp.23-28 [April, 1996]; **"Understanding Credit Cards, Credit Reports and Fraud**," *Loyola Consumer Law Reporter*, Loyola University Chicago, Vol.9, No.1, pp.31-42 [March, 1997], reprinted: www.money-investing.us/dir/understanding_credit_reports/index.shtml, reprinted: The Lectric Law Library, www.lectlaw.com/files/ban16.htm; **"A Report From the Trenches: The Truth About Credit Reporting**," *The Consumer Advocate*, National Association of Consumer Advocates, Vol.3, Issue 2, pp.18-22 [March/April, 1997]; **"Credit Cards, Credit Reports and Fraud**,"

*Portfolio*, Portfolio Publishing Company, p.9 [September-October, 1997]; **Fair Credit Reporting, Credit Cards and Fraud,** Practicing Law Institute, 990 PLI/CORP 647 [1997]; **"Enforcement of the Assault and Battery Exclusion in Louisiana: <u>Hickey v. Centenary Oyster House</u>,"** *Louisiana Law Review*, Vol.60, Issue 3, pp.793-807 [Spring 2000]; **"Uniform Computer Information Transactions Act [UCITA]: The Consumer's Perspective,"** *The Consumer Advocate*, National Association of Consumer Advocates, Vol.9, Issue 1, pp.9-30 [April, 2003]; **"Uniform Computer Information Transactions Act [UCITA]: The Consumer's Perspective,"** *Louisiana Law Review*, Vol.63, Issue 1 [Spring 2003]; **"Update on Identity Theft Under the FCRA,"** *Quarterly Report: Consumer Finance Law*, Vol.58, Nos. 1-2, pp.66-71, cited as 58 Consumer Fin. L.Q. Rep. 66, [Spring-Summer, 2004]; **"The Consumer Corner: "As Is" Sales in Louisiana,"** *The Bar Review*, Shreveport Bar Association, Vol.14, No.2, pp.8-9 [February, 2005]; **"The Consumer Corner: Privacy Exposed: Public versus Private Settings,"** *The Bar Review*, Shreveport Bar Association, Vol.14, No.3, pp.10-11,18 [March, 2005]; **"The Consumer Corner: Louisiana's Physical Fitness Services Act,"** *The Bar Review*, Shreveport Bar Association, Vol.14, No.4, p.16 [April, 2005]; **"The Consumer Corner: FACTA,"** *The Bar Review*, Shreveport Bar Association, Vol.14, No.5, pp.16-17 [May, 2005]; **"The Consumer Corner: What is HOEPA?,"** *The Bar Review*, Shreveport Bar Association, Vol.14, No.6, pp.14-15,19 [June, 2005]; **"The Consumer Corner: FTC Holder Rule,"** *The Bar Review*, Shreveport Bar Association, Vol.14, No.7, pp.19-21 [September, 2005]; **"Privacy Exposed,"** *Quarterly Report: Consumer Finance Law*, Vol. 59, No. 3, pp.261-264, cited as 59 Consumer Fin. L.Q. Rep. 261 [Fall, 2005]; **"The Consumer Corner: Fair Debt Collections Practices Act [FDCPA],"** *The Bar Review*, Shreveport Bar Association, Vol.14, No.9, p.14 [November, 2005]; **"The Consumer Corner: Check 21: What Now?,"** *The Bar Review*, Shreveport Bar Association, Vol.14, No.10, p.16,18 [December, 2005]; **"The Consumer Corner: Self-Help Repossession,"** *The Bar Review*, Shreveport Bar Association, Vol.15, No.5, pp.12-13 [May, 2006]; **"The Consumer Corner: Class Action Fairness**

Act of 2005," *The Bar Review*, Shreveport Bar Association, Vol.15, No.6, [Part 1] pp.16-17 [June, 2006]; **"The Consumer Corner: Class Action Fairness Act of 2005,"** *The Bar Review*, Shreveport Bar Association, Vol.15, No.7, [Part 2] p.15 [September, 2006]; **"The FTC "Holder" Rule,"** *Quarterly Report: Consumer Finance Law*, CCFL, Vol. 60, No. 2, pp.361-365, cited as 59 Consumer Fin. L.Q. Rep. 261 [Fall, 2005]; **"The Consumer Corner: Louisiana's Anti-Price Gouging Law,"** *The Bar Review*, Shreveport Bar Association, Vol.15, No.8, pp.16-17 [October, 2006]; **"The Consumer Corner: Privacy and Cellular Telephone Records,"** *The Bar Review*, Shreveport Bar Association, Vol.15, No.9, pp.25-27 [November, 2006]; **"Statute of Limitations Under The Fair Credit Reporting Act,"** The Lectric L a w    L i b r a r y , http://www.lectlaw.com/files/ban09.htm; Numerous licenses assigned to WestLaw for publication.

**LECTURES/MEDIA:**

**Fair Credit Reporting and Credit Cards**, Credit Professionals International, Baton Rouge Chapter [April, 1992]; **Credit**, Shreveport Legal Secretaries Association [June, 1993]; **Credit**, Northwest Louisiana Trial Lawyers Association [October, 1993]; **Credit**, Northwest Louisiana Trial Lawyers Association [February, 1994]; **Credit**, Shreveport High Twelve [April, 1994]; **Credit Fraud**, Nightline, ABC [June, 1994]; **Credit Fraud and Stephen Shaw case**, WESH TV - NBC, Orlando, Florida [April, 1994]; **Credit Fraud and Stephen Shaw case**, TV Asahi, Asahi, Japan [April, 1994]; **Credit**, Optimist's Club, Shreveport Chapter [July, 1994]; **Credit Fraud**, KSLA T.V. - Channel 12, Shreveport, Louisiana [November, 1994]; "CLE By the Hour," **Fair Credit Reporting and Credit Cards**, Shreveport Bar Association [December 9, 1994]; **Privacy Summit**, Washington, D.C. [January 13-14, 1995]; Northwest Louisiana Paralegal Association [April, 1995]; **"Automobile Insurance and Credit,"** Young People's Law School, Shreveport Bar Association, [May, 1995]; **Fair Credit Reporting and Credit Cards**, The Academy of New Orleans Trial Lawyers, [August, 1995]; **Check Fraud and Credit Fraud Conference**, International Business Communications [IBC], New York City, [September, 1995]; **Fair Credit Reporting**

**Act and Consumer Litigation** [1 session], "Fourth Annual National Consumer Rights Litigation Conference," National Consumer Law Center [NCLC], San Francisco, California [November, 1995]; **Credit**, Lions Club of Shreveport [October, 1995]; **Fair Credit Reporting, Investigations and Credit Reports**, Northwest Louisiana Claims Association [January 9, 1996]; **Theft of Identity and Credit Fraud**, The Phil Donahue Show, Multimedia Entertainment, [February, 1996]; **Credit Fraud**, KSLA T.V. - Channel 12, Shreveport, Louisiana [April, 1996]; **Fair Credit Reporting, Credit Cards and Fraud**, "Banking, Commercial & Consumer Law Seminar," Center For Continuing Professional Development, Paul M. Hebert Law Center, Louisiana State University [May 10, 1996]; **Fair Credit Reporting, Credit Cards and Fraud**, National Association of Consumer Bankruptcy Attorneys, "1996 Annual Convention and CLE," San Antonio, Texas [May 17, 1996]; **Consumer Credit**, "Challenges & Changes CLE Seminar," Shreveport Bar Association [May 31, 1996]; **Consumer Credit Information: What You Can and Can't Get**," "Louisiana Claims Association's Educational Conference/Expo," Louisiana Claims Association, Inc. [June 21, 1996]; **Credit Fraud**, Shreveport Legal Secretaries Association [October, 1996]; **Fair Credit Reporting Act: Introduction to Litigation and Fair Credit Reporting Act Developments** [2 sessions], "Fifth Annual National Consumer Rights Litigation Conference," National Consumer Law Center [NCLC], Washington, D.C. [October, 1996]; **Fair Credit Reporting Act Litigation**, "Statewide Consumer Rights Litigation Conference," Consumer Law Task Force-Southeast Louisiana Legal Services Corporation, Lafayette, Louisiana [November, 1996]; **Complying With the Fair Credit Reporting Act, Data Compilation, Privacy, and Reporting Laws, and Requirements For Correcting Billing and Credit Report Errors**, "Consumer Credit Law Update," Louisiana State Bar Association, New Orleans, Louisiana [April, 1997]; **Fair Credit Reporting, Credit Cards and Fraud**, "Keeping the Big Boys Honest - Consumer Law Seminar," Virginia Trial Lawyers Association, Richmond, Virginia [April, 1997]; **Fair Credit Reporting, Credit Cards and Fraud**, "People's Law School," Shreveport Bar Association [April 29, 1997]; **Fair Credit**

**Reporting, Credit Cards and Fraud**, "Consumer Financial Services Litigation," Practising Law Institute, New York City, New York [May 1-2, 1997]; **Consumer Remedies and Bankruptcy Relief: Student Loans and the Fair Credit Reporting Act**, National Association of Consumer Bankruptcy Attorneys, "1997 Annual Convention and CLE," San Diego, California [May 2-4, 1997]; **Internet Security, Privacy and Fraud**, Cable News Network [CNN] [July 22, 1997]; **Fair Credit Reporting Act Developments: New Statute and New Cases, Fair Credit Reporting Act I, Preparing an FCRA Case: Common Violations, Client Selection and Pleading**, and **Fair Credit Reporting Act II, Litigation: Pre-Trial Practice, Discovery, Expert Witnesses, Summary Judgment and Settlement** [3 sessions], "Sixth Annual National Consumer Rights Litigation Conference," National Consumer Law Center [NCLC], New Orleans, Louisiana [October, 1997]; **Theft of Identity, Fraud and the Bronti Kelly Case**, EXTRA [ABC] [November 5, 1997]; **Credit Fraud, Credit and Insurance**, KEEL Radio, Shreveport, Louisiana [numerous talk shows, 1993-date]; **Credit Fraud**, KBCL Radio, Shreveport, Louisiana [talk shows, 1995]; **Credit Fraud**, USA Radio Network, Daybreak Show, Dallas, Texas [talk show, August, 1996]; **Credit**, WREC, Memphis, Tennessee [talk show, August, 1996]; **Credit Fraud**, WJR, Paul J. Smith Show, Detroit, Michigan [talk show, August, 1996]; **Credit**, KWKH Radio, Shreveport, Louisiana [Lawline, March, 1997]; **Credit**, WWL Radio, New Orleans, Louisiana [The Bob Show, August, 1997]; **Use of Credit Reports in Check-Cashing Environment**, KSLA T.V. - Channel 12, Shreveport, Louisiana [February 5, 1998]; **Presceening and Pre-Approved Credit**, KSLA T.V. - Channel 12, Shreveport, Louisiana [March 3, 1998]; **Salary-Lenders, Check Cashing Services and Loansharking**, KTBS T.V. - Channel 3, Shreveport, Louisiana [March 19, 1998]; **Fair Credit Reporting Act Developments: Updates**, "Seventh Annual National Consumer Rights Litigation Conference," National Consumer Law Center [NCLC], San Diego, California [October, 1998]; **Y2K: Year 2000 Problem With Computers**, KSLA T.V. - Channel 12, Shreveport, Louisiana [November, 1998]; **Fair Credit Reporting, Investigations and Accessing Credit Reports**, Northwest Louisiana Claims Association [October 13,

1996]; **Fair Credit Reporting**, "The Art of Handling Consumer Law Issues," Louisiana State Bar Association, New Orleans, Louisiana [November, 1998]; **Consumer Scams During the Holidays**, KTBS T.V. - Channel 3, Shreveport, Louisiana [November, 1998]; **Salary-Lenders, Check Cashing Services and Loansharking**, KTBS T.V. - Channel 3, Shreveport, Louisiana [January 4, 1999]; **Consumer Law: The Role of the Federal Trade Commission and the Private Attorney**, Shreveport Bar Association [March 24, 1999]; **Credit Fraud and the Carol Mixon Case**, KTBS T.V. - Channel 3, Shreveport, Louisiana [March 26, 1999]; **Consumer Law Violations**, Optimist Club of Bossier City, Barksdale AFB, Louisiana [March 31, 1999]; **Credit Fraud**, KTBS T.V. - Channel 3, Shreveport, Louisiana [May, 1999]; **Claims Adjusting, FCRA, Privacy and Internet Research**," "Louisiana Claims Association's Educational Conference/Expo," Louisiana Claims Association, Inc. [June, 1999]; **Online Banking: Security, Accuracy, Authentication and Cryptography**, KTBS T.V. - Channel 3, Shreveport, Louisiana [July, 1999]; **Credit Report Mis-Merges: Father/Son, Junior-Senior, and the Brian Holoubek case**, KTBS T.V. - Channel 3, Shreveport, Louisiana [July, 1999]; **Fair Credit Reporting, Credit Cards and Fraud**, "Fall Fiesta," Virginia Trial Lawyers Association, Williamsburg, Virginia [September, 1999]; **Credit is Hard to Restore: Theft of Identity and the Mixon v. Equifax, et al, Case**, CBS Evening News, Eye on America, Http:// www.cbs58.com/ now/ story/0,1597,65044-393,00.shtml, [October 5, 1999]; **Wendell Rogers/Sunbelt Ponzi Litigation**, KTBS T.V. - Channel 3, Shreveport, Louisiana [October 7, 1999]; **Fair Credit Reporting Act Developments** [1 session], "Eighth Annual National Consumer Rights Litigation Conference," National Consumer Law Center [NCLC], Washington, D.C. [November, 1999]; **Fair Credit Reporting Act and Introduction to Litigation**, "VTLA's February Fiesta," Virginia Trial Lawyers Association, Williamsburg, Virginia [February, 2000]; **Credit and Collections**, WBAL Radio, Baltimore, Maryland [May 18, 2000]; **The Fair Credit Reporting Act, Investigations, Identity Theft and Privacy-Related Matters**, Louisiana Private Investigators Association [October 8, 2000]; **Fair Credit Reporting Act and Introduction to Litigation**, "VTLA's Fall Fiesta," Virginia Trial

Lawyers Association, Williamsburg, Virginia [October, 2000]; **Fair Credit Reporting Act Developments** [1 session], "Ninth Annual National Consumer Rights Litigation Conference," National Consumer Law Center [NCLC], Denver, Colorado [October, 2000]; **Credit Fraud During the Holidays**, KTBS T.V. - Channel 3, Shreveport, Louisiana [November, 2000]; **Your Financial Future**, Hosted by Robertson, Bailes & McClelland, LLP, Certified Public Accountant firm, KEEL Radio, Shreveport, Louisiana [December 18, 2000]; **Fair Credit Reporting, Credit Cards and Fraud**, "Consumer Financial Services," American Bar Association, Park City, Utah [January 5, 2001]; **Fair Credit Reporting Act, Investigations and the Gramm-Leach-Bliley Act**," "Charting Your Course to Success: Louisiana Claims Association Educational Conference/Expo, Louisiana Claims Association, Inc., Biloxi, Mississippi [May, 2001]; **Fair Credit Reporting Act**, "Putting the 'Fair' Back Into Fair Credit Reporting," National Association of Consumer Advocates, Las Vegas, Nevada [June 9-10, 2001]; **Fair Credit Reporting Act, Credit Cards and Fraud**, "VTLA's Fall Fiesta," Virginia Trial Lawyers Association, Richmond, Virginia [September 29-30, 2001]; **More Fair Credit Reporting Act Developments and Tips** [1 session], "Tenth Annual National Consumer Rights Litigation Conference," National Consumer Law Center [NCLC], Baltimore, Maryland [October 26-29, 2001]; **Identity Theft and Account Fraud**, "Collections Practice 2001: You Haven't Won if it's Not in the Bank," State Bar of Texas, Dallas, Texas [November 8-9, 2001]; **Stolen Identities and Credit Fraud**, KTAL T.V. - Channel 6, Texarkana, Texas [December, 2001]; **Credit Fraud and Information Security**, KTBS T.V. - Channel 3, Shreveport, Louisiana [January 18, 2002]; **Identity Theft and Account Takeover Fraud**, "Collections Practice 2001: You Haven't Won if it's Not in the Bank," State Bar of Texas, Houston, Texas [January 31, 2002]; **Class Action versus Mass Action: What Are the Client's Rights?**, KSLA T.V. - Channel 12, Shreveport, Louisiana [June 20, 2002]; **Identity Theft and Credit Fraud**, Certified Fraud Examiners, Shreveport, Louisiana [September 10, 2002]; **Identity Theft and Credit Reporting**, "Consumer Credit 2002," The Conference on Consumer Law Finance, Fort Worth, Texas [October 9-10, 2002];

**Identity Theft and Privacy Issues**, "The Law of Credit Contracts and Payment Systems," The Conference on Consumer Law Finance, New Orleans, Louisiana [October 17-18, 2002]; **Identity Theft: Who Are You When Your Identity is Gone, Mrs. Jones?**, "Consumer Credit 2002," The Conference on Consumer Law Finance, Dallas, Texas [November 7-8, 2002]; **Fair Credit Reporting Act Developments** [1 session], "Eleventh Annual National Consumer Rights Litigation Conference," National Consumer Law Center [NCLC], Atlanta, Georgia [October 24-27, 2002]; **Information Law**, WIBR - Talk Radio, Baton Rouge, Louisiana [January 10, 2003]; **Fair Credit Reporting Act Conference**, National Association of Consumer Advocates, Orlando, Florida [March 7-9, 2003]; **Identity Theft and Privacy Issues**, Annual Conference of Louisiana Fraud and Forgery Investigators, Gonzales, Louisiana [April 10, 2003]; **Fair Credit Reporting's Interplay With Bankruptcy**, National Association of Consumer Bankruptcy Attorneys, "2003 Annual Convention and CLE," New Orleans, Louisiana [May 2-4, 2003]; **Privacy Issues in Claims Investigations and Surveillance**," "Louisiana Claims Association Educational Conference/Expo," Louisiana Claims Association, Inc., Biloxi, Mississippi [May, 2003]; **Credit Reporting, Credit Cards and Fraud**, Florida State Bar Association Annual Continuing Legal Education and Convention, Orlando, Florida [June 23-27, 2003]; **Identity Theft**, American Association of Law Libraries, 96th Annual Meeting and Conference, Seattle, Washington [July 13-16, 2003]; **Update on Identity Theft and Impermissible Access to Credit Reports**, "Consumer Debt Collection and Bankruptcy," The Conference on Consumer Law Finance, Fort Worth, Texas [October 16, 2003]; **Update on Identity Theft and Uniform Computer Information Transactions Act [UCITA]**, "Electronic Commerce, Privacy, and Money laundering Compliance," The Conference on Consumer Law Finance, Dallas, Texas [December 12, 2003]; **Are You the Victim of Identity Theft? Identity Theft and Credit Reporting Rights**, "Louisiana Library Association Annual Conference," Louisiana Library Association, Monroe, Louisiana [March 25, 2004]; **Identity Theft, Account Takeover Fraud and the Fair Credit Reporting Act**, Oklahoma Bar Association, Tulsa, Oklahoma [May 14, 2004]; **Fair Credit**

**Reporting Act**, National Association of Consumer Advocates, Chicago, Illinois [May 15-16, 2004]; **Identity Theft, Account Takeover Fraud and the Fair Credit Reporting Act**, Oklahoma Bar Association, Oklahoma City, Oklahoma [May 21, 2004], **Credit Reporting Industry Issues: Mixed Files, Identity Theft & Accuracy Issues. How to Help the Harmed Consumer**, Hawaii Trial Lawyers, Honolulu, Hawaii [July 10, 2004]; **Consumer Protection, Identity Theft, The FACT Act, and the FCRA**, "Payment Transactions and Credit Contracts in the Twenty-First Century," The Conference on Consumer Law Finance, Grapevine, Texas [September 23-24, 2004]; **The FACT Act and the FCRA**, NARCA Annual Conference, National Association of Retail Collection Attorneys, Boston, Massachusetts [April 14-15, 2005]; **Identity Theft and Financial Crimes**, Shreveport Bar Association Pro Bono Project, Shreveport, Louisiana [May 25, 2005]; **Identity Theft**, KRMD Radio, The Tom Pace Show, Shreveport, Louisiana [May 27, 2005]; "Litigating Accuracy Cases With Furnishers," National Association of Consumer Advocates [NACA] 2005 Fair Credit Reporting Act Conference, [5 sessions] New Orleans, Louisiana [June 3-5, 2005]; **Identity Theft and Financial Scams**, KEEL Radio, The Best of Times Show, Gary Calligas, Shreveport, Louisiana [June 11, 2005]; **Security Freezes and FCRA Amendments**, KTAL T.V. - Channel 6, Texarkana, Texas [August 2005]; **Identity Theft, FCRA, FACTA Issues and Privacy**, "Auto Sales and Finance 2005," The Conference on Consumer Law Finance, Fort Worth, Texas [September 22-23, 2005]; **FTC Holder Rule, Choice of Law, Choice of Venue, and Arbitration Clauses** and **Identity Theft, Mixed Credit Files and Privacy Breaches: Credit Bureau and Furnisher of Data Issues [FCRA and FACTA]**, Missouri Bar Association, Kansas City and St. Louis, Louisiana [October 20-21, 2005]; **NACA 2006 Fair Credit Reporting Act Conference**, "Playing to Win," National Association of Consumer Advocates, Las Vegas, Nevada [May 5-7, 2006] [five sessions: Case Updates, Credit Reporting Agencies' Internal Documents, Strategies in Multi-Defendant Cases, Trial Issues, and Roundtable Discussions]; **Credit Reporting and Identity Theft**, Florida Consumer Law Symposium, Florida State Bar Association Consumer Protection Committee and Office of the Attorney

General for the State of Florida, Tallahassee, Florida [May 16, 2006]; **Consumer and Family Law Conference**, Naval Justice School, Newport, Rhode Island [May 23, 2006] [two sessions: Fair Credit Reporting Act and FTC Holder Rule]; **Identity Theft**, Louisiana Credit Union League, Shreveport, Louisiana [June 1, 2006]; Identity Theft, Credit and Collections, Privacy Piracy, Mari Frank, KUCI-88.9-FM Talk Radio, Irvine, California [June 7, 2006]; **"Borrower/Lender Litigation,"** **[Predatory Lending; Breach of Contract; Unjust Enrichment; LUPTA; TILA; FCRA; FDCPA; ECOA; Anti-Fax; Anti-Price Gouging; FTC Holder Rule; Arbitration; UCITA]**, Advanced Commercial Litigation Seminar, LSU Law Center, Baton Rouge, Louisiana [September 14, 2006]; **"Identity Theft Update,"** Consumer and Commercial Law Course, Texas Bar Association, Dallas, Texas [October 12-13, 2006]; **"Identity Theft Update,"** Consumer and Commercial Law Course, Texas Bar Association, Houston, Texas [November 30 - December 1, 2006]; "Maxed Out," the movie, www.maxedoutmovie.com/index1.html, by Trueworks [movie production company], Producer James Scurlock, premieres March 11, 2006, at the South By Southwest Film Festival in Austin, Texas.

**FEATURED / QUOTED:**

J. Rothfeder, *"Nothing Personal: Privacy's Dead. Your Life's an Open File Online,"* **NetGuide**, pp.61-62 (July, 1995); S. Garfinkel, *"Separating Equifax From Fiction,"* **Wired**, pp.96-107 (September, 1995); E. Hendricks, *"Biggest Yet! Texas Couple Wins $1.45 Million For 'ID Theft,'"* **Privacy Times**, Vol.15, No.18, pp.1-3 (October, 1995); R. Smith, *"Some Are More Equal Than Others,"* [Discussion of VIP databases maintained by consumer reporting agencies], **Privacy Journal**, Vol.22, No.1, p.3 (November, 1995); R. Smith, *"Equifax To Tip Skip Tracers,"* [Discussion of Equifax's REAPPEAR service], **Privacy Journal**, Vol.22, No.2, p.3 (December, 1995); K. McMurry, *"Judge Favors Plaintiffs in Theft of Identity Case,"* The Association of Trial Lawyers of America [ATLA], **Trial**, p.84, (January, 1996); M. Wilcox, *"Who's Peeking at Your Credit Records?,"* [Discussion of inquiries into consumer reports], **Kiplinger's Personal Finance Magazine**, http://www.kiplinger.

**com/magazine/archives/1996/February**,   p.18 (February, 1996); R. Smith, "*A Look Inside A Credit Bureau's Operation*," [Excerpt of deposition of Judith Chipley concerning error rates at all national consumer reporting agencies], **Privacy Journal**, Vol.22, No.6, p.5 (April, 1996); S. Greengard, "*Privacy: Entitlement or Illusion*," [Lengthy discussion of employer use of credit reports to investigate and other work place privacy issues], **Personnel Journal**, Vol.75, No.5, pp.74-88 (May, 1996); R. Smith, "*Fraud Happens: Here's How*," [Discussion of <u>Sam Williamson v. OVFCU, et al</u>, an impermissible access case], **Privacy Journal**, Vol.22, No.9, pp.5-6 (July, 1996); U.S. Public Interest Research Group, "*Theft of Identity: The Consumer X-Files*," [Public report issued regarding theft of identity and other abuses by the consumer reporting agencies], **U.S. Public Interest Research Group, A PIRG Consumer Team Report**, (August, 1996); The Associated Press, "*Personal Information not so Secure in Computer Age*," [Report about theft of identity, credit issuance abuses and credit reporting errors], **1996 Nando.net, Associated Press**, (August, 1996); B. McMenamin, "*Invasion of the Credit Snatchers*," [Discussion of theft of identity, credit fraud and the <u>Dwyer</u> and <u>Shaw</u> cases I handled], **Forbes**, p.256-258 (August 26, 1996); V. Beiser, "*The Cyber Snoops*," [Discussion of Canadian privacy rights and data market, theft of identity, credit fraud and the Internet], **MacLean's**, Canada's Weekly Magazine, p.42 (June 23, 1997); "*Pilot Program Photographs Debtors at Section 341 Hearings*," [Discussion of debtors digitized pictures taken at bankruptcy hearings ostensibly to prevent bankruptcy fraud], **Consumer Bankruptcy News**, LRP Publications, Vol.6, Issue 18, pp.1,6 (June 5, 1997); The Associated Press, "*Company Makes Consumer Credit Reports Available Over the Internet*," [Report about online, internet-based credit report access and obvious security deficiencies and related harms and abuses], **1997 Lubbock Avalanche-Journal, The Associated Press**, (August 15, 1997); "*Are You A Target For Identity Theft? The Credit Industry Can And Should Do More To Protect Consumers From This Crime*," [Discussion of wide range of theft of identity and credit fraud issues], **Consumer Reports**, pp.10-16 (September,

1997); "*Quick Access to Credit Reports Speeds Business, Raises Concerns,*" [Discussion of wide range of credit reporting and fraud issues], **New Orleans City Business**, pp.1,21-22 (September 1, 1997); **Consumer Law Pleadings**, The Consumer Credit and Sales Legal Practice Series, National Consumer Law Center [NCLC], Chapter Five [1997]; "*Collecting Old Debts Might Violate Federal 'Fair Debt' Act,*" [Discussion of collection abuses and decision in Stepney v. Outsourcing Solutions, Inc., no. 97C5288, U.S.D.C. N.D. Ill. 1998], **Lawyers Weekly USA**, pp.1,14 (February 23, 1998); B. Murray, "*Trash at Banks Provides Path to Your Cash,*" The Star-Ledger, Newark, New Jersey [May 8, 1998]; "*Causes of Action: Ten [10] New Bases For Suits,*" **The National Law Journal**, pp.A15 (July 20, 1998) [Discussion of new theories of liability];"Who's Watching While You Surf, and What Do They Know About You? You Might Be Surprised," **PC World.Com**, http://www.pcworld.com/resource/article/0,aid,8377,pg,1,00.asp [October 12, 1998]; J. Rothfeder, "*You Are For Sale,*" part of "*Privacy in the Internet Age*" special edition [Discussion of internet privacy, commercial transaction security, computer security and theft of personal information], **PC World**, pp.95-106 (September, 1998); Microsoft, Money Central, "*Fraud Attorney's Advice: When All Else Fails, Sue,*" [Theft of identity, credit issuance abuses, credit reporting errors and use of the courts to force compliance], **Microsoft MoneyCentral, Http://www. moneycentral.msn.com**; Infokom Edisi Nopember 1998, "*Tanpa Sadar Anda Telah "Menjual Diri,*" [Report about theft of identity, credit issuance abuses and credit reporting errors], **Infokom Edisi Internet, http://www.infokomputer.com/internet/1198/cakra/cakrawal.sht**, (November, 1998); "*Lawyers Are Overlooking Claims Against Auto Dealers and Lenders,*" [Discussion of repossession defenses, FTC Holder Rule and various related actions], **Lawyers Weekly USA**, pp.1,20-21 (April 19, 1999); "*Identity Theft,*" [Discussion of theft of identity and the high cost to the banking community and consumers alike], **Independent Banker**, (July 1, 1999); S. Okula, "Fraud Attorney's Advice: When All Else Fails, Sue," Microsoft Network, Money, Microsoft C  o  r  p  o  r  a  t  i  o  n  ,

www.moneycentral.msn.com/articles/banking/credit/1
342s1.asp?Printer; R. Smith, "*A Racial Reference?,*"
[Discussion of <u>In re: Joseph Hoffler</u>], **Privacy
Journal**, (March 1, 2000); P. Wenske, "*Simple Mix-
Up, Irritating Errors Crept Onto Missourian's
Credit Reports, Setting Off Three-Year Battle to
Clean Them Up,*" Sunday Business Credit: The Byline,
The Kansas City Star [November 18, 2001]; "*Trans
Union Molding A Post-Sept. 11 Agenda,*" [Discussion
of Trans Union and its credit reporting practices],
**American Banker**, Http://www.americanbanker.com/
(November 20, 2001); Q&A, [Discussion about rights
regarding credit card charges], **Woman's World
Magazine**, (December, 2001); D. Dratch, *Billing
Error? Here's How to Fix It*, [Discussion about
rights regarding billing errors], **Bankrate.com**,
http://www.bankrate.com/brm/news/pf/20020311b.asp?
prodtype=loan, (March 11, 2002); G. Haas,
"*Consumers Can Sue Bank For False Credit Report,*"
[Discussion of 15 U.S.C. 1681s-2(b) and the <u>Nelson
v. Chase Manhattan</u> decision issued by the U.S. 9th
Circuit], **Lawyers Weekly USA**, (March 18, 2002); L.
Lazarony, Don't Get Flattened By a Used Car With a
Rolled-Back Odometer," **Bankrate.com**,
<u>http://www.bankrate.com/brm/search/story-autos.asp</u>
[August 22, 2002]; J. Dam, "*Lawsuits Over Credit
Report Errors Booming,*" [Discussion of credit
reporting abuses, lawsuits and $5.3 million verdict
in <u>Thomas v. Trans Union, LLC</u>, U.S.D.C. Ore. 2002],
**Lawyers Weekly USA**, (September 5, 2002); W. Lee,
"*Trans Union Praises Favorable Federal Court
Ruling,*" [Discussion of Trans Union class action
treatment], **American Banker**,
Http://www.americanbanker.com/ (September 30,
2002); C. Hirschman, "*Identity Theft's New
Wrinkle,*" [Discussion of identity theft and fake
employment posting websites], The Employment
Management Association Reporter, pp.4-8
(March/April, 2003); S. Ramage, "*America's
ChoicePoint Buys Up Personal Info - but Europeans
are Protected by Strong Privacy Laws,*" [Discussion
of ChoicePoint, an Equifax spin-off], **The
Transatlantic Journal**,
Http://www.transatlanticjournal.com/this_month/new
s1.htm (June, 2003); C. Fleck, "*Prime Target: You,
How Do You Defend Yourself Against America's
Fastest Growing Crime,*" [discussion of identity

theft and resulting harms to victims], **AARP Bulletin**, American Association of Retired Persons, Vol.45, No.2 [February, 2004]; L. Weston, "Zombie Debt Collectors Dig Up Your Old Mistakes," MSN Money, http://www.moneycentral.msn.com/content/ Savinganddebt/Managedebt/P74812.asp [March 14, 2004]; D.Dratch, "Are Collection Agents Treating You Fairly? If Not, Fight Back!," Bankrate.com, www.bankrate.com/brm/news/pf/20020311a.asp [March, 2002]; "Louisiana Does Away With State Collection Laws," Collection Technology News, Vol.4, No.12, www.pbdsinc.com/Net30_UtilColl_PR.pdf, [August, 2000]; "Protecting Expatriates in Harm's Way From the President," Society for Human Resource Management, www.shrm.org/technet/hrtechknow/2003/ pdf/2qtr2003_hrtechknow.pdf [2d quarter 2003]; Bob Sullivan, "How the Credit Bureaus Helped the Biggest Identity Theft in History," MSNBC, www.msnbc.msn.com/id/5800052/ [2004]; C.Fleck, "Stealing Your Life: Identity Thieves Hit Nearly 10 Million Americans Last Year Could You Be Next?," **AARP Bulletin Online**, American Association of Retired Persons, www.aarp.org/bulletin/yourlife/Articles/a2004-01-28-stealinglife.html [February 2004]; "ID-Theft Laws Unlikely to Work, Lawyers Say," **Bank Security News**, Royal Media, Vol.1, No. 23, pp. 1-3, [June 9, 2004]; A. Todorova, "The Secret Life of Your Social Security Number," **Smart Money**, http://smartmoney.com/debt/advice/index.cfm?story= ssn2004, [July 8, 2004]; "One Woman's Fight Against A Credit Bureau," **Personal-Finance-101**, http://www.personal-finance-101.com/LPMIssue.asp?I SI=9 [Spring, 2004]; Bob Sullivan, **Your Evil Twin: Behind the Identity Theft Epidemic**, Wiley & Sons; Bob Sullivan, "Glitches Mar Launch of Free Credit Report Site: Some Consumers Furious at Credit Bureaus Over First-Day Problems," MSNBC.com, http://www.msnbc.msn.com/id/6576905/ [November 24, 2004]; "Take the Next Step: Correct Any Credit Errors," On the Home Front, Utah State University Extension, www.co.utah.ut.us/apps/WebLink/Dept/EXTEN/2005mayj une.pdf [May/June, 2005]; "Agencies Warn of Scam Artists," Houston Chronicle, http://www.chron.com/disp/story.mpl/special/05/rit a/3384143.html [October 6, 2005]; L. Weston, "Zombie Debt is Hard to Kill," MSN Money, http://articles.moneycentral.msn.com/SavingandDebt /ManageDebt/ZombieDebtIsHardToKill.aspx?page=1 [August 2, 2006].

<u>I BELIEVE THIS IS A COMPLETE LISTING OF CASES WHERE I HAVE
TESTIFIED BY DEPOSITION, AFFIDAVIT AND/OR REPORT IN, AS AN EXPERT:</u>

* <u>Catherine Bergeron v. E. Bruce Ebert</u>, a suit in State Court in
  Dallas County, Texas,

* <u>Melvin McBride, et al v. CSC Credit Services, et al</u>, a suit in
  the United States District Court, Northern District of Texas,

* <u>Herbert Woller v. Box Canyon Creek Corporation</u>, a suit in the
  United States District Court in Oregon,

* <u>Emily Wagner v. TRW</u>, a suit in the United States District
  Court for the Western District of Louisiana,

* <u>Wilson v. Equifax, et al</u>, c/w <u>Brame v. Equifax, et al</u>, suits
  in the United States District Court for the Middle District of
  North Carolina,

* <u>Janice Burrell v. GMF</u>, a suit in the United States District
  Court in Nevada,

* <u>Elias Morales v. TRW, et al</u>, a suit in the United States
  District Court for the Middle District of Florida,

* <u>Philip C. Larson v. Trimax Holdings, Inc., et al</u>, a suit in
  the Court of Common Pleas of Alleghany County, Pennsylvania,

* <u>William Ghores v. Las Vegas Paving</u>, a suit in the United
  States District Court for the District of Nevada,

* <u>Michael Ricke v. Trans Union, et al</u>, a suit in the United
  States District Court for the District of Minnesota,

* <u>Terry O. Cousin v. Memphis Consumer Credit Association</u>, a suit
  in the United States District Court for the Northern District
  of Mississippi,

* <u>Retail Merchants Association of Abilene, Inc. d/b/a Credit
  Bureau of Abilene, Inc. v. TRW</u>, c/w <u>Experian Information
  Solutions, Inc. v. Retail Merchants Association of Abilene,
  Inc. d/b/a Credit Bureau of Abilene</u>, suits in the United
  States District Court for the Central District of California,

* <u>Hackney v. Access America, et al</u>, a suit in the United States
  District Court for the District of Washington,

* <u>David Pena, Jr. v. CSC Credit Reporting, et al</u>, a suit in the
  United States District Court for the Southern District of
  Texas,

* <u>Dr. Louis Thibodeaux v. Michael Rupers, et al</u>, a suit in the
  United States District Court for the Southern District of
  Ohio,

* <u>Klempf v. Dunlap & Seeger</u>, a suit in state court in Minnesota,

* <u>Gerry Doran Homes v. Craig Hockelburg</u>, a suit in state court in Missouri,

* <u>In Re National Credit Management Group LLC d/b/a 1-800-YES-CREDIT</u>, a suit in the United States District Court in New Jersey,

* <u>Myra S. Coleman v. Trans Union Corp.</u>, a suit in the United States District Court for the Northern District of Mississippi,

* <u>Thomas Chumley v. New South Federal Savings Bank, et al</u>, a suit in the United States District Court for the Northern District of Alabama,

* <u>Ronald Watson v. Transsouth Financial Corp.</u>, a suit in the state court in Arizona,

* <u>Henry McMillen v. Equifax Information Services</u>, a suit in the United States District Court for the District of Connecticut,

* <u>Michael J. Nagle v. Experian Information Solutions</u>, a suit in the United States District Court for the Northern District of Alabama,

* <u>Randolph S. Phillips, et al v. Trans Union Corporation</u>, a suit in the United States District Court for the Western District of Washington,

* <u>Johnna Marie Doran v. Credit Bureau Associates, et al</u>, a suit in the United States District Court for the Eastern District of Pennsylvania,

* <u>Jerry Short v. Trans Union</u>, a suit in the United States District Court for the Southern District of Mississippi,

* <u>James E. Jensen v. Experian Information Solutions</u>, a suit in the United States District Court for the Eastern District of Texas,

* <u>Lavon Phillips v. Mary Grendahl, et al</u>, a suit in the United States District Court for the District of Minnesota,

* <u>Jacqueline L. Richardson v. Equifax Credit Information Services, et al</u>, a suit in the United States District Court for the Northern District of Mississippi,

* <u>Terry O. Cousin v. Trans Union</u>, a suit in the United States District Court for the Northern District of Mississippi,

* <u>Shirley Sternaman v. Experian, et al</u>, a suit in the United States District Court for the District of Minnesota,

* <u>Gracie Hernandez v. SMF Terrace Park, et al</u>, a suit in the Superior Court of the State of Arizona, Maricopa County,

* <u>John Gilbert Reite v. American Express, et al</u>, a suit in the United States District Court for the Northern District of California;

* <u>Nicole Alexis Anderson v. URS West, Inc., et al</u>, a suit in the United States District Court for the Northern District of California,

* <u>Donald K. Melton v. Easy Credit, Inc., et al</u>, a suit in the United States District Court for the Northern District of Mississippi,

* <u>John Clemmons Mares v. Trans Union, LLC, et al</u>, a suit in the United States District Court for the District of New Mexico;

* <u>Harold Scott, Jr. v. Trans Union, et al</u>, a suit in the United States District Court for the District of Maryland;

* <u>Michael R. Norris v. Experian Information Solutions, et al</u>, a suit in the United States District Court for the Southern District of Texas,

* <u>Cecilia Kief v. Franklin Credit Management Corp., et al</u>, a suit in the 332nd Judicial District of Hidalgo County, Texas,

* <u>Edwin Gregory Urreco v. Citibank, NA, et al</u>, a suit in the United States District Court for the Southern District of Texas,

* <u>John J. McHale, et al v. Credit Bureau of the Pacific, et al</u>, a suit in the United States District Court for the Hawaii,

* <u>Angela Neal v. Wells Fargo Bank, et al</u>, a suit in the United States District Court for the Nebraska.

• <u>Franklin Clark, on behalf of himself and all others similarly situated v. Experian Information Solutions, Inc.</u>, and <u>Franklin Clark, on behalf of himself and all others similarly situated v. Equifax Information Services, LLC</u>, and <u>Franklin Clark, on behalf of himself and all others similarly situated v. Trans Union, LLC</u>, class action suits in the United States District Court for the District of South Carolina,

• <u>Bijan Hatefi v. Towbin Nissan, Inc.</u>, and <u>Bijan Hatefi v. Towbin Jeep Eagle, Inc.</u>, suits in the United States District Court for the District of Nevada,

• <u>Andrew Cole, Sr. v. Sherman Financial Group, et al</u>, a suit in the United States District Court for the Eastern District of Texas,

- <u>Jonathan E. Zorilla, et al v. Equifax Information Services, LLC</u>, a suit in the United States District Court for the Southern District of Florida,

- <u>Tim and Lisa Miller. v. Wells Fargo, et al</u>, a suit in the United States District Court for the Western District of Kentucky;

- <u>In re Angelia Collins</u>, No.04-13990, in the United States Bankruptcy Court, in and for the Western District of Louisiana;

- <u>Priyank Shah v. Collecto, Inc.</u>, No.DKC-04-4059, in the United States District Court, in and for the District of Maryland;

- <u>Leonard Sacks v. Nissan Motor Acceptance Corp.</u>, No.MJG-00-3285, in the United States District Court, in and for the District of Maryland.

1  Michael W. Sobol (State Bar No.
   194857)
2  (msobol@lchb.com)
   Paul A. Moore (State Bar No. 241157
3  (pmoore@lchb.com)
   LIEFF, CABRASER, HEIMANN &
4  BERNSTEIN, LLP
   Embarcadero Center West
5  275 Battery Street, 30th Floor
   San Francisco, CA 94111-3339
6  Telephone: (415) 956-1000
   Facsimile: (415) 956-1008
7

Michael A. Caddell (admitted *pro hac
vice*)
(mac@caddellchapman.com)
Cynthia B. Chapman (State Bar No.
164471
(cbc@caddellchapman.com)
George Y. Niño (State Bar No.
144623)
(gyn@caddellchapman.com)
CADDELL & CHAPMAN
1331 Lamar, Suite 1070
Houston, Texas 77010-3027
Telephone: (713) 751-0400
Facsimile: (713) 751-0906

9  *Attorneys for the White/Hernandez
   Plaintiffs*

10

11                    **UNITED STATES DISTRICT COURT**

12                    **CENTRAL DISTRICT OF CALIFORNIA**

13  TERRI N. WHITE, ROBERT          )  Case No. 8:05-CV-01073 DOC (MLG)
    RADCLIFFE, CHESTER CARTER,      )
14  MARIA FALCON, and ALEX GIDI, et )
    al.,                            )
15                                  )
16             Plaintiffs,          )
                                    )      **STATEMENT OF FACTS**
17      vs.                         )
                                    )
18  TRANS UNION LLC,                )
                                    )
19             Defendant.           )
                                    )
20  ─────────────────────────────── )
    TERRI N. WHITE, ROBERT          )  Case No. 05-CV-07821 DOC (MLG)
21  RADCLIFFE, CHESTER CARTER,      )
    MILAGROS GABRILLO, and          )
22  CLIFTON C. SEALE III, et al.,   )
                                    )
23             Plaintiffs,          )
                                    )
24      vs.                         )
                                    )
25  EQUIFAX INFORMATION             )
26  SERVICES, LLC                   )
                                    )
27             Defendant.           )
                                    )
28

580335.1

## INTRODUCTION

This Statement of Facts is prepared by counsel in the above-captioned actions (the "*White/Hernandez* cases"). It provides background information in connection with the class action settlements being proposed by counsel for plaintiffs in two different, but related cases, pending before the same Court (the "*Acosta/Pike* cases"). The proposed settlements concern Trans Union LLC ("Trans Union") and with Equifax Information Services, Inc. ("Equifax"). Plaintiffs' counsel in the *White/Hernandez* cases are opposing the *Acosta/Pike* settlements on the grounds that those settlements represent an abuse of the class action mechanism as a matter of procedure, ethics and substance.

## STATEMENT OF FACTS

### A.   The Allegations of the *White/Hernandez* Cases

Plaintiffs, Terri N. White, Jose Hernandez, Robert Radcliffe, Chester Carter, Maria Falcon, and Alex Gidi, are individual consumers who have previously filed petitions for bankruptcy pursuant to Chapter 7 of the U.S. Bankruptcy Code. Plaintiffs have obtained orders of discharge, which, under federal bankruptcy laws, fully and completely discharge all statutorily dischargeable debts[1] incurred prior to the filing of the petition, except for those that have been: (1) reaffirmed by the debtor in a reaffirmation agreement; or (2) successful challenged by one of his creditors in a related adversary proceeding. Yet, in the cases of all six plaintiffs, the credit reporting agencies have issued credit reports which erroneously report the discharged debts as due and owing.

The *White/Hernandez* Plaintiffs have brought class actions under the Fair Credit Reporting Act, 15 U.S.C. §§ 1601 *et seq.* (the "FCRA") and the California Consumer Credit Reporting Agency Act, CAL. CIV. CODE § 1780, *et seq.*

---

[1] Discharged debts typically encompass a number of different debts, including credit card, mortgage, back rent, medical, bank loans, and utility debts. They ordinarily do not extend to certain discrete, statutorily non-dischargeable debts, such as alimony, domestic support obligations, or student loans.

1   ("CCRAA") on behalf of a nationwide class of consumers against the three major

2   credit reporting agencies, Trans Union Company ("Trans Union") and Equifax

3   Information Services, Inc. ("Equifax") and Experian Information Solutions, LLC.[2]

4   They seek damages and to stop defendants from issuing credit reports that falsely

5   report discharged debts as "due and owing," thereby preventing Plaintiffs from

6   enjoying the "fresh start" that the bankruptcy laws promise.  Plaintiffs seek to

7   represent the class of millions of consumers nationwide who have filed petitions for

8   bankruptcy pursuant to Chapter 7 of the U.S. Bankruptcy Code, obtained orders of

9   discharge, but whose credit reports still show the discharged debts as due and

10  owing.  The named defendants are national repositories for consumer credit

11  information engaged in the credit reporting business of issuing credit reports to

12  third parties.

13       The *White/Hernandez* Plaintiffs allege that Defendants have violated the

14  FCRA by failing to follow "reasonable procedures to assure maximum possible

15  accuracy" in its credit reporting.  15 U.S.C. § 1681e(b); *see* CAL. CIV. CODE

16  §1785.14(b).  Instead, defendants employ procedures that produce twice as many

17  erroneous reports than they do accurate ones.  Plaintiffs allege that through the

18  computerized court reporting service known as PACER, Defendants already obtain

19  access to each and every discharge order issued by a U.S. Bankruptcy Court in

20  Chapter 7 proceedings.  Moreover, by means of an automated search in PACER,

21  Defendants can easily determine whether a debt has been reaffirmed or successfully

22  challenged.

23       Yet, instead of reconciling the firsthand information it has already obtained

24  directly from the records of the bankruptcy courts or using available services with

25  PACER and the information in their own databases to retrieve discharged debt

26  _____

27  [2] A copy of the Second Amended Complaint against Trans Union is attached hereto
    as Exhibit A.  This statement of facts concerns primarily Trans Union and Equifax,
    and not Experian, because there is no proposed settlement with Experian at this

28  time.

1  information, Defendants inexplicably rely solely on consumers' creditors to

2  voluntarily update the status of their accounts with consumers who are the

3  beneficiaries of a Chapter 7 discharge order.  These creditors have no statutory

4  obligation to update past reporting and what duty they have to ensure an updated

5  account status in future reporting is effectively limited as there is no private cause

6  of action against creditors for such neglect or misconduct.  15 U.S.C. §1681s-2(c).

7       The expected and obvious result is that Defendants systematically over-

8  report debts as due and owing that have been discharged in bankruptcy.[3]  Indeed, a

9  survey of 960 Credit Reports issued by Trans Union showed an error rate of 64

10  percent.  A survey of approximately 900 Credit Reports issued by Equifax showed

11  an error rate of about 66% percent.  The average number of falsely listed debts was

12  between three and four per report regarding these Defendants and, in some cases,

13  the number of such errors was ten or more.

14       Defendants know or should know that the information creditors furnish

15  regarding the status of pre-bankruptcy debts is highly unreliable and that their

16  procedures for reporting such debts fail to assure "maximum possible accuracy."

17  Even when placed on notice of errors in the Credit Reports, these Defendants

18  continue to falsely record the status of consumers' debts.  Rather than fulfill its

19  statutory obligation to reinvestigate and accurately report debts, Trans Union

20  continues to falsely report these debts in approximately seventeen percent of the

21  cases and Equifax falsely reports these debts in approximately twenty-two percent

22  of the cases.  Plaintiffs therefore claim that defendants do so willfully and in

23  conscious disregard of plaintiffs' statutory right to protection from the transmission

24  of inaccurate information.  *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329,

25  1333 (9th Cir. 1995).  Yet, Defendants continue to employ reporting procedures

26  that wholly fail to ensure any accuracy, let alone "maximum possible accuracy."

27  [3] The *White/Hernandez* team has created a database of over 1,000 individuals who
have filed Chapter 7 bankruptcy.  This database identifies the inaccuracies in these

28  individuals' post-discharge credit reports.

1   15 U.S.C. § 1681e(b); and CAL. CIV. CODE §1785.14(b).

2        In each case, Plaintiffs' credit ratings have been adversely affected by

3   Defendants' erroneous Credit Reports.  As a direct consequence of Defendants'

4   inadequate and inaccurate initial reporting procedures and inadequate

5   reinvestigations, Plaintiffs have been effectively denied the fresh start to which they

6   are legally entitled under the U.S. Bankruptcy Code.

7        Millions of consumers nationally are potentially affected by the Defendants'

8   standardized, systemic practices.  Defendants themselves have provided Federal

9   and State officials with a chart "setting forth a reasonable estimate based upon

10  Defendants' records, of the class member data" and identifying 14,019,000

11  (rounded to the nearest thousand and broken down on a state by state basis)

12  consumers with a bankruptcy discharge on a Trans Union file and 11,053,000 on an

13  Equifax file. [4]

14       **B.    The *Acosta* and *Pike* California-Only State Court Class Action**

15           **Cases.**

16       On May 12, 2003, the *Acosta v. Trans Union* action was filed by attorney

17  Peter Recchia in the California Superior Court (Orange County) on behalf of a class

18  of California-only residents. [5]  It alleges that Trans Union's practices for reporting

19  the status of debts discharged in bankruptcy violates California law, specifically

20  the CCRAA.  During the three years that the state court *Acosta* case has been

21  pending, there has been no ruling on class certification, two depositions of Trans

22

23  [4] Attached as Exhibit B is Defendants' November 22, 2006, CAFA Notice to
    Federal and State Officials.

24  [5] Peter Recchia is an attorney licensed in the State of California.  The California
25  Bar has disciplined Recchia three times, with the latest disciplinary proceeding
    occurring in 1997.  In February 1997, while serving a five-year probation as the
26  result of a 1995 disciplinary proceeding, Recchia received a one-year stayed
    suspension for carrying a firearm into the Orange County courthouse.  Recchia also
    pled guilty to a misdemeanor regarding this firearm.  Recchia's 1995 five-year
27  probation concerned a failure to supervise a law student who worked for him and
    represented a client.  Recchia's 1994 five-year probation resulted from conduct the
28  California Bar described as "multiple acts of concealment and dishonesty."

580335.1                              - 4 -

1  Union witnesses, a single declaration from a Trans Union employee relating solely
2  to reinvestigation procedures, and the production of documents relating solely to
3  the credit history of named plaintiffs.

4      On October 14, 2005, Mr. Recchia filed the *Kathryn Pike v. Equifax* action
5  also in the California Superior Court (Orange County), likewise brought on behalf
6  of a California class and likewise limited to claims under the CCRAA.[6] There has
7  been no motion practice and no discovery in the *Kathryn Pike* case, whatsoever.

8      In both cases, the pleadings reflect a deliberate decision to limit the class to
9  California residents and limit claims to the CCRAA. In both cases, efforts were
10  also made to keep the cases out of federal court: (a) when *Acosta* was removed on
11  June 20, 2003 to the Central District of California (Judge Stotler), plaintiffs
12  successfully sought remand back to state court, where it has been pending since
13  December 17, 2003 (albeit now stayed pending a decision on approval of the
14  *Acosta* settlement discussed herein); the *Kathryn Pike* case was originally filed in
15  state court, removed to federal court, and then dismissed; only subsequently was the
16  other *Kathryn Pike* case filed (*i.e.*, the case filed on October 14, 2005) again in state
17  court, but again removed to the District Court for the Central District of California,
18  where it remains.

19      **C.**    **The Early Proposed Settlements In The State Court *Acosta* Case.**
20      On two occasions in 2003, plaintiffs' counsel, Mr. Recchia, attempted to
21  settle the state court *Acosta* case – not on behalf of the class he sought to represent,
22  but on behalf of his individual client.[7] First, on June 24, 2003, Recchia, on behalf

---

23  [6] The *Kathryn Pike* class case, which is not be confused with an individual case that
24  Mr. Recchia filed on behalf of her husband on June 24, 2004, was removed to
    federal court on November 30, 2005. *Dennis Pike v. Equifax*, 04 CC07828 is a
25  California Superior Court case filed on July 21, 2004, and involves Dennis Pike's
    claims arising from his joint Chapter 7 bankruptcy with Kathryn Pike. Recchia
26  dismissed the *Dennis Pike* case on November 22, 2005.
27  [7] Besides the *Acosta* and *Pike* cases, Mr. Recchia's class action experience appears
    to be limited to three class action cases in the Central District, all of which
    originated in state court and none of which were certified. (The following three
28  Recchia class action cases were identified through a PACER search: *Leesa*

580335.1                                    - 5 -

1    of Mr. Acosta only, tried to settle the case for $250,000 and for Trans Union's

2    "assurances" that it would comply with the California Civil Code in its "future

3    dealings with California consumers consistent with the injunctive relief prayed for

4    in Recchia's complaint."[8]  Two months later, on August 18, 2003, Mr. Recchia's

5    offer to abandon the class and reach an individual settlement went down to

6    $75,000.[9]

7         D.    **The Genesis of the *White/Hernandez* Cases.**

8         Beginning in 2004, New York City bankruptcy lawyer Charles Juntikka

9    began confronting the real world effects of the credit reporting agencies' systematic

10   erroneous reporting of debts discharged in bankruptcy.  Mr. Juntikka, whose

11   practice has involved the representation of tens of thousands of Chapter 7 debtors,

12   began bringing federal FCRA cases against the credit reporting agencies, seeking

13   damages for his clients.  Despite his bringing over 40 of such actions, the erroneous

14   reporting persisted and the management of the litigation proved burdensome.  Mr.

15   *Westwood, et al. v. Equifax*, et al., 03-CV-00720; *Sullivan v. The Ritz-Carlton

16   Hotel*, et al., 03-CV-01051; and *Sullivan v. Fair Isaac Corporation, et al.*, 06-CV-
     00207.)  In each of these three cases, Mr. Recchia named and promoted his own
     employees as adequate class representatives.  (One such employee was Gregory

17   Sullivan, who is a disbarred California attorney.)  All three of these cases were
     dismissed.  Mr. Recchia voluntarily dismissed one of them, a case against Ritz-

18   Carlton, case on January 25, 2006, ninety days after the Ritz-Carlton filed a
     counterclaim for abuse of process against both Mr. Recchia and one of his

19   employees who has served as class representative.  Though the Ritz-Carlton
     accused Mr. Recchia and Sullivan of, among other things, failing to have a

20   "recognizable claim" and having engaged in "extortion," Mr. Recchia declined to
     fight these charges or even file an answer.  Recchia also has experience as a class

21   action defendant.  On April 6, 2006, in *Ramnis v. Recchia*, ED CV 06-00373,
     Recchia and his business, Fair Credit Lawyers, Inc., were sued as defendants in a

22   class action case alleging that Recchia violated federal and state law concerning
     credit repair services.  (Mr. Recchia's advertisement in the San Bernardino "Penny

23   Saver" which stated "BAD CREDIT REPORT?....Improve Your Credit Score
     Now!  Don't Delay (800) 250-3252.")  On November 28, 2006, Recchia was

24   deposed in this litigation and confirmed that Jose Acosta and Kathryn Pike came to
     Recchia through his Fair Credit Lawyers advertisement.  As a result, at least these

25   named class representatives and maybe others in the *Acosta* case are members of a
     putative class in a class action against their own class action counsel, Peter Recchia.

26   [8] Attached as Exhibit C is the June 24, 2003 letter from Mr. Recchia to Trans

27   Union's counsel of record, Crowell & Moring LLP.

     [9] Attached as Exhibit D is an August 18, 2003 transcript of Recchia's voicemail to

28   Trans Union's counsel.

     580335.1                              - 6 -

Juntikka obtained over 1,500 credit reports for his clients (at his own expense) from each of the credit reporting agencies and determined that there were twice as many inaccurate reports as accurate ones.  Mr. Juntikka therefore sought class counsel to address the problem through the use of the more effective and superior class action mechanism.  Mr. Juntikka, and his colleague Daniel Wolf, associated with Lieff, Cabraser, Heimann & Bernstein, LLP.

In the meantime, a leading FCRA practitioner, Leonard Bennett, was also concerned with the ongoing effects of the credit reporting agencies continued failure to address the defective reporting of debts discharged in bankruptcy. Mr. Bennett associated with Caddell & Chapman, a leading Texas class action trial firm (and their colleague Mitchell Toups).

The *Hernandez* case was filed on October 3, 2005, in the Northern District of California by the Caddell team.  The *White* matter was filed on November 2, 2005, directly in the Central District by the Lieff team.  Hernandez was transferred at the *White/Hernandez* plaintiffs' initiation to the Central District of California.  The cases are consolidated for pretrial and trial purposes before the Honorable David O. Carter who has noted in written decisions that the *White/Hernandez* plaintiffs' counsel have been "working cooperatively."

**E.    After the *White/Hernandez* Cases Are Filed, Trans Union Approaches Plaintiffs' Counsel in The State Court *Acosta* Case Requesting a Demand For Settlement In Order To Engineer A Reverse Auction Settlement In Which The *Acosta/Pike* Plaintiffs' Counsel Willingly Participate.**

In January 2006, after the *White/Hernandez* cases were filed, Trans Union requested a settlement demand from the *Acosta* plaintiffs.[10]  A declaration from one of the *Acosta* plaintiffs' counsel, Lee Sherman, describes what can only characterized as an unabashed effort by Trans Union to engineer a reverse auction. First, as mentioned, the defendant Trans Union requested the settlement demand.

---

[10] Declaration of Lee Sherman in Support of Plaintiffs' Opposition to Motion to Consolidate Related Cases ("Sherman Decl."), ¶ 9, attached hereto as Exhibit E.

1      Second, Mr. Sherman notes that counsel from Stroock & Stroock & Lavan

2  LLP, a firm which had not been involved at all in the *Acosta* case, but which had

3  appeared for Trans Union in *White/Hernandez*, approached him on behalf of Trans

4  Union expressly acknowledging the existence of the federal cases.[11]

5      Third, Mr. Sherman notes that the *White/Hernandez* cases "posed an obstacle

6  to the settlement of this matter in that Trans Union would not settle the *Acosta* case

7  unless it included a settlement of all claims including those based on the Federal

8  Fair Credit Reporting Act asserted in [*White/Hernandez*]."[12]

9      Fourth, Mr. Sherman describes the method by which this "obstacle" could be

10  overcome:

11          "During mediation, various options to deal with this issue
           were discussed and ultimately, Justice [John K.] Trotter
12          [Ret.] suggested that in order to facilitate settlement, the
           parties should consider a procedural framework for
13          settlement that included a settlement of all claims, a stay
           of the Acosta v. Trans Union, LLC California action and
14          the filing of a new Federal case that would be filed in
           conjunction with a notice of related cases to the existing
15          Federal cases, so that Judge Carter could oversee the
           approval process for this settlement since he was
16          presiding over the newly filed and consolidated similar
           Federal cases [*i.e.*, the *White/Hernandez* matters]."[13]
17

18      Justice Trotter instructed Mr. Sherman to file a declaration from Justice

19  Trotter correcting this statement.[14]  Justice Trotter clarified that the procedural

20  framework described above was not his suggestion, but rather an idea that

21  originated by Trans Union that he simply communicated to the *Acosta* plaintiffs.[15]

22  [11] Id., ¶ 10.

23  [12] Id., ¶ 16.

     [13] Id., ¶ 17.
24
     [14] Mr. Sherman did not file this declaration with the Court until October 4, 2006,
25  fifteen days after Judge Trotter signed his declaration and only after Judge Trotter
     insisted that Mr. Sherman file this declaration to correct the Court's record.  Even
26  then, Mr. Sherman filed the declaration without identifying for the Court the reason
     for it.
27  [15] Declaration of John K. Trotter, Ret. Regarding Motion to Consolidate Related
     Cases ("Trotter Decl."), ¶¶ 5-6, attached hereto as Exhibit F.  The Sherman
28  Declaration repeats the assertion that Justice Trotter devised this procedure in three

580335.1                                   - 8 -

Fifth, Mr. Sherman acknowledges that the filing of the federal *Acosta* case would be solely to effect a settlement of the federal claims that were an "obstacle" to settling the state court Acosta case.[16] In the event the Court does not approve the settlement, Mr. Sherman has agreed in advance to drop his federal claims and abandon his representation of the nationwide class.[17]

Moreover, the *Acosta* plaintiffs and Trans Union proceeded to mediation to the deliberate exclusion of the *White/Hernandez* plaintiffs. Trans Union appeared for two status conferences in *White/Hernandez* while the *Acosta* mediation was pending, but never disclosed in Court, or during the negotiation of the *White/Hernandez* litigation schedules, the existence of the *Acosta* case or its mediation.[18] On the other hand, both *Acosta* plaintiffs' counsel and Trans Union's counsel discussed the status of the *White/Hernandez* cases. Mr. Recchia appeared at one of the *White v. Trans Union* status conferences during the time he was mediating with Trans Union, but failed to reveal to the Court or the *White* plaintiffs the existence of the ongoing settlement discussions. An email from Trans Union's counsel to Mr. Sherman that day, Trans Union's counsel, though acknowledging that Mr. Recchia may have already informed Mr. Sherman, reports on the status conference with Judge Carter (noting that the Court would set a comprehensive schedule at the next conference).[19] In reply, Mr. Sherman states:

separate paragraphs, concluding that regarding the August 7, 2006, mediation, the *Acosta* "parties adopted Justice Trotter's suggestion." Sherman Decl., ¶ 19. Justice Trotter's declaration states that this was not his suggestion.

[16] Sherman Decl., ¶ 20.

[17] Id.

[18] On April 3, 2006—two months after soliciting a settlement demand from *Acosta* plaintiffs' counsel, and one month after Trans Union's first mediation session, Trans Union's counsel, Julia B. Strickland, signed a *White* Rule 26(F) Joint Report which included a statement that "to date, no settlement discussions have taken place, and the parties believe that such discussions are premature...." *See* April 3, 2006, Rule 26(f) Joint Report, ¶ 10.

[19] Email dated April 24, 2006, from Stephen J. Newman (a lawyer for Trans Union) to Mr. Sherman within the April 28, 2006, email string, attached hereto as Exhibit G.

S80335.1                                    - 9 -

> . . , yes, Peter [Recchia] filled me in. . . . in discussing today's business [in *White*] with Peter [Recchia] a though occurred to me:  would it be better/easier for us to simply amend Pike to add T/U as a defendant there, rather than filing an entirely new Complaint?[20]

Again on June 6, 2006, Trans Union's counsel emails Mr. Sherman to inform him of the continuation of the *White* status conference.[21]  Mr. Sherman replies:

> I had not heard, but thank you for the update.  Clearly, this is good news to us and fits with our scheduling. However, I remain somewhat concerned about the No. Cal case [*i.e., Hernandez*].[22]

Mr. Newman responds to that concern by informing Mr. Sherman that *Hernandez* has been transferred from the Northern District to the Central District.[23]

In sum, Mr. Sherman's declaration reveals that Trans Union solicited a settlement demand from Acosta only after the *White/Hernandez* cases were filed, that Acosta's counsel was then approached by counsel for Trans Union in the *White/Hernandez* cases, that *Acosta* plaintiffs' counsel then willingly structured a settlement and procedure designed to resolve federal claims alleged in *White/Hernandez* that were never raised in *Acosta* and to resolve claims on behalf a consumers outside California who were not putatively included in *Acosta*.  All this was done to the exclusion of the *White/Hernandez* plaintiffs' counsel and kept secret from the Court until a Memorandum of Understanding was executed among counsel in *Acosta*.

**F.     The Evolution Of the *Acosta/Pike* Settlements.**

As mentioned above, in 2003, Trans Union rejected two settlement demands made by Mr. Recchia on behalf of the named plaintiffs in the state court Acosta case.[24]  At some point thereafter, Mr. Recchia associated with Mr. Sherman.

---

[20] Id.

[21] Email dated June 6, 2006, from Mr. Newman to Mr. Sherman, within the June 6, 2006, email string, attached hereto as Exhibit H.

[22] Id.

[23] Id.

[24] As noted above, Mr. Recchia's demands were first for $250,000 and then

On January 20, 2006, Mr. Sherman sent the first settlement demand in response to the invitation of Trans Union's counsel. The demand included a modification of Trans Union's practices[25] and an $800 payment to each class member who submitted a claim form. With regard to this demand, Mr. Sherman explained that:

> Any class member that does not opt out of the settlement and does not timely submit a valid claim form will be bound by the settlement and release agreement, but will not be eligible to receive the payment from Trans Union.[26]

Therefore, Mr. Sherman stated:

> As you are no doubt aware, the claims made element of this proposed resolution is a significant benefit to Trans Union and would likely allow Trans Union to resolve this matter for a small fraction of its total exposure.[27]

Indeed, Mr. Sherman stated at the outset that, "[c]ritically, Plaintiff is willing to allow the settlement to proceed on a claims made basis."[28]

For three years, Trans Union had rejected Acosta's settlement offers, which reached a low of $75,000, and no mediations were scheduled. However, after the *White/Hernandez* cases were filed, Trans Union and the *Acosta* plaintiffs proceeded to several mediation sessions.

Though there is some suggestion in the record that Equifax, the defendant in the *Kathryn Pike* case, may have begun discussing settlement with Acosta plaintiffs' counsel earlier,[29] on July 14, 2006, Mr. Sherman sent Equifax's counsel a $75,000.

[25] Eventually, the Sherman/Recchia team would enter into a memorandum of Understanding ("MOU") with Trans Union that provided no injunctive relief, other than Trans Union's promise to use its "best efforts."

[26] Letter dated January 20, 2006, from Lee Sherman to Trans Union, at 1, attached hereto as Exhibit I.

[27] Id., at 2.

[28] Id., at 1.

[29] For example, there are emails to and from counsel for Trans Union and Mr. Sherman during June 2006, inquiring as to whether Equifax will be appearing

580335.1                                        - 11 -

1    letter forwarding his PowerPoint presentation made during the Trans Union

2    mediation.[30] Apparently, Equifax did end up appearing at an August 1, 2006,

3    mediation session with the *Acosta* parties.

4         On August 14, 2006, Acosta plaintiffs' counsel (i.e., Mr. Recchia,

5    Mr. Sherman, and Gino Pietro) appeared at a *White/Hernandez* status conference

6    and announced that plaintiffs in *Acosta* had entered into a Memorandum of

7    Understanding ("MOU")[31] with Trans Union in which they had settled all of the

8    class-wide claims being asserted in the *White/Hernandez* cases against that

9    defendant.  At the status conference, the Sherman/Recchia Team stated that, at

10   Trans Union's request and to effect the settlement, plaintiffs in *Acosta* had

11   (1) prepared a federal complaint on behalf of a nationwide class which they

12   intended (and did) to file later in the day; and (2) included additional federal claims

13   in their federal complaint, to facilitate a forced disposition of all pending federal

14   claims.  Mr. Sherman made an oral motion to stay *White/Hernandez*, which was

15   denied.  Until this August 14, 2006, status conference, *White/Hernandez* plaintiffs'

16   counsel was unaware of the *Acosta* case.

17        The MOU provides for virtually no injunctive relief at all.  First, it provides

18   no injunctive relief whatsoever to the members of the class, *e.g.*, it did not require

19   Trans Union to correct errors in the existing credit files of the class members.

20   Instead, the MOU provided for just future injunctive measures, but even there,

21   Trans Union gave only a vague commitment to use its "best efforts."[32]  The

22   economic relief provided for in the MOU arbitrarily excluded approximately 70%

23   of the class, and for the others entitled to economic relief, most would receive only

24   _____

25   at one of the upcoming mediation sessions.
     [30] Letter dated July 14, 2006, from Mr. Sherman to Kali Wilson Beyah (an attorney
26   for Equifax), attached as Exhibit J.

27   [31] See MOU provided to *White/Hernandez* plaintiffs' counsel, attached as
     Exhibit K.
28   [32] Id. at

1    a free credit report (to which they are already entitled as a matter of law).[33]  In

2    return, Trans Union would obtain a complete release and the Sherman/Recchia

3    team would be entitled to $3.485 million in fees.

4        In the MOU, the Sherman/Recchia team expressly disclaims any intention to

5    represent the nationwide class unless it is for purposes of effecting the settlement.

6    The MOU provides on page 12 that in the event "Settlement is not finally approved,

7    the new claims asserted in the Federal Action will be dismissed without

8    prejudice."[34]  It also provides on page 2 for a return to the "*status quo ante*,"

9    whereby the federal case is to be dismissed, and the state court *Acosta* action will

10    be resumed in its original California-only claims, California-only class state.

11        At the August 14, 2006, status conference, after the Sherman/Recchia team

12    had circulated the MOU, the Court suggested that all parties in *White/Hernandez*

13    and *Acosta/Pike* proceed to a further mediation before Justice Trotter as a process

14    for pursuing a global settlement.   The parties agreed, and soon thereafter scheduled

15    a mediation with Justice Trotter for September 14, 2006.

16        On August 23, 2006, prior to the mediation, Mr. Sherman offered to the

17    Lieff/Caddell team that the lawyers split, 50/50, their interests in the litigations

18    against the three credit reporting agencies (even though the Sherman/Recchia team

19    had no case on file against Experian).  Mr. Sherman told Mr. Sobol that in return

20    for the Lieff/Caddell team not disputing the terms of the Trans Union settlement,

21    the Sherman/Recchia team would retain the Trans Union case (and fees), permit the

22    Lieff/Caddell team to pursue their case against Experian, and the teams would split

23    the Equifax case. (Mr. Sherman later repeated this offer to both Mr. Caddell and

24    Mr. Sobol.)  Mr. Sherman's fee split proposal was made without regard to how

25    relief among the credit reporting agencies would be obtained in the necessary,

26    meaningful, standardized manner.  In any event, the Lieff/Caddell team rejected the

27    [33] Id. at

28    [34] Id. at ¶ 4, p. 12.

1   offer outright because they would not countenance the defective Trans Union

2   settlement.

3        On September 1, 2006, prior to the global mediation, the Sherman/Recchia

4   Team, independently and without apprising the Lieff/Caddell team, contacted

5   Equifax and provided it with a settlement demand.[35]  By September 6, 2006,

6   Sherman informed his expert, Prof. Ronald Mann, that Sherman appeared to have a

7   settlement "possibly [with] Equifax, though that is not finalized yet."[36]  As a result,

8   it appears that the Sherman/Recchia team reached a settlement in principle with

9   Equifax in advance of the global mediation, disabling any possibility of a global

10  settlement as urged by the Court.

11       The Sherman/Recchia team's September 1, 2006, demand to Equifax was

12  silent with respect to injunctive relief terms, but increased the dollar amounts

13  available under the claim matrix by 50 percent.  This settlement demand contained

14  more than just the terms of relief to the class, it also included a demand for $5.985

15  million in attorneys' fees (i.e., an additional $2.5 million in attorneys' fees from

16  Equifax, boosting the Sherman/Recchia team's total attorney fees by 72%).[37]

17       Unaware of the apparent deal between the Sherman/Recchia team and

18  Equifax, the Lieff/Caddell team attended the September 14th mediation with Justice

19  Trotter.  During the mediation, the Lieff/Caddell team informed the

20  Sherman/Recchia team of certain serious defects in the proposed settlement and

21  suggested that the two teams work together to come up with a better solution for the

22  putative class.  The Sherman/Recchia Team rejected that proposal.

23       Nonetheless, as a result of the Lieff/Caddell team's contribution at the

24  mediation, the terms of the MOU were improved (though they remain fatally

25  _____

26  [35] Email dated September 1, 2006, Lee Sherman to Equifax's counsel, attached as Exhibit L.

27  [36] Email dated September 6, 2006, from Mr. Sherman to Prof. Ronald Mann, attached as Exhibit M.

28  [37] Exhibit L, the September 1, 2006 email from Sherman to Equifax's counsel.

1   flawed). The Lieff/Caddell team demonstrated how all injunctive relief under the

2   MOU was prospective, and thus failed to provide automatic review of the data

3   collected for the class members' credit files. This relief, dubbed "scrubbing the

4   files," during the mediation, was central to providing a true benefit to class

5   members. The Sherman/Recchia team publicly stated that they disagreed that the

6   MOU failed to provide such relief, revealing their own misunderstanding of the

7   very MOU they had negotiated. Defendants Trans Union and Equifax, on the other

8   hand, recognized how this shortcoming could pose a formidable barrier to court

9   approval of the settlement. As a result of the Lieff/Caddell team pointing out this

10  deficiency, ultimately Trans Union and Equifax supplemented the MOU to include

11  injunctive relief that would correct existing data used in assembling the actual class

12  members' credit files.[38]

13          During the course of the September 14th mediation, Equifax announced that

14  it reached an agreement with the Sherman/Recchia team. Equifax essentially

15  agreed to the demand contained in the Sherman/Recchia team's September 1, 2006,

16  demand, except that it agreed a lesser amount of attorneys' fees totaling $2,015,000

17  (the Sherman/Recchia team had included a $2.5 million fee demand within the

18  substantive demand). This raised the total fee award to the Sherman/Recchia team

19  to $5.5 million.

20          Ultimately, the economic relief agreed to in the supplemental MOU is less

21  advantageous for the class than that provided in the original MOU. Although by

22  definition, each defendant has injured a separate, identifiable class of consumers,[39]

23  the supplemental MOU and the final Settlement Agreement treats, for purposes of

24

25  [38] *See* Exhibit L, the September 1, 2006 email from Sherman to Equifax's counsel.
    *See also* the September 14, 2006 Supplement to the MOU with the revision to the
26  injunctive relief described in paragraph 1(b), attached as Exhibit N.

27  [39] The "Settlement Class" as defined in the ultimate Settlement Agreement includes
    two separate classes with two separate claims—"all consumers...for whom Trans
    Union and/or Equifax maintain a file." *See* Settlement Agreement at ¶ 1.31,
28  attached hereto as Exhibit O.

580335.1                                    - 15 -

1   providing relief, the two separate classes as a single class.  With the addition of

2   Equifax to the settlement, the MOU was supplemented to "enhance by 50%" the

3   "total economic relief" to the class (as reflected in the damage matrix), rather than

4   *doubling* the relief.  Thus, the Trans Union class actually receives less from Trans

5   Union under the supplemented MOU than it did under the original MOU.  Not only

6   is the settlement enhanced by only one-half the potential economic relief as

7   originally committed by Trans Union, but Equifax and Trans Union each pay *less* in

8   potential economic relief than Trans Union agreed to pay under the original

9   MOU.[40]  As the original MOU presumably already reflected heavy discounting for

10  litigation risk, there appears absolutely no basis for this further discounting.

11      Trans Union, not surprisingly, accepted these less costly settlement terms

12  along with Equifax, as reflected in the Settlement Agreement submitted for

13  preliminary approval.  In addition, both Equifax and Trans Union also agreed to the

14  augmented injunctive relief negotiated by the Lieff/Caddell team.  On

15  September 29, 2006, the Sherman/Recchia team sought to effectuate settlement

16  under these terms by amending their complaint in the *Kathryn Pike* case to include,

17  for the first time, federal claims and a nationwide class.

18      The record indicates that all during the mediation process and through to the

19  time of producing the MOU in open Court, the Sherman/Recchia team neglected to

20  involve or seek consultation with any experts.  From what the record indicates, no

21  expert assisted in drafting Mr. Sherman's January 20, 2006 settlement demand, nor

22  did any experts attend the Sherman/Recchia team's mediation sessions with Trans

23  Union.  Rather, the Sherman/Recchia team sought only to retain experts after two

24  events occurred: (1) the MOU was in hand and needed a rubber-stamp of approval;

25  and (2) the Sherman/Recchia team had received Trans Union's commitment to pay

26  [40] For example, under the MOU, Trans Union agreed to provide a free credit report,
    score and $50 for a score increase between 51 and 100 points in the Subprime to
27  Subprime category.  Under the new damage matrix, a Trans Union/Equifax class
    member in this category receives $75, so Trans Union now will only pay this class
28  member $37.50.

1   up to $40,000 of the *Acosta* plaintiffs' experts' fees.[41]

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   _____

[41] This $40,000 commitment by Trans Union to pay the Sherman/Recchia team's
27   expert fees was originally in paragraph 9(a) of the MOU and now has been raised to
     $70,000 and included in paragraph 9.2 of the Settlement Stipulation. Trans Union
28   also agreed to advance the Sherman/Recchia team's mediation fees.

**EXHIBIT LIST**

| Exhibit | Document |
|---|---|
| A. | Second Amended Consolidated Complaint against Trans Union. |
| B. | Defendants' November 22, 2006 CAFA Notice to Federal and State Officials. |
| C. | Letter dated June 24, 2003, from Peter L. Recchia to Trans Union's counsel. |
| D. | Transcription of voicemail message from Peter L. Recchia to Trans Union's counsel. |
| E. | Declaration of Lee Sherman in Support of Plaintiffs' Opposition to Motion to Consolidate Cases. |
| F. | Declaration of John K. Trotter, Ret. Regarding Motion to Consolidate Related Cases. |
| G. | April 24, 2006, email string between Lee Sherman and Stephen J. Newman. |
| H. | June 6, 2006, email string between Lee Sherman and Stephen J. Newman. |
| I. | Letter dated January 20, 2006, from Lee Sherman to Trans Union's counsel. |
| J. | Letter dated July 14, 2006, from Lee Sherman to Equifax's counsel. |
| K. | Memorandum of Understanding provided to Lieff/Caddell team in court on August 14, 2006. |
| L. | Email dated September 1, 2006, from Lee Sherman to Equifax's counsel. |
| M. | Email dated September 6, 2006, from Mr. Sherman to Prof. Ronald Mann. |
| N. | September 14, 2006, Supplement to the Memorandum of Understanding. |
| O. | Settlement Agreement |

580335.1

- 18 -