ORIGINAL

Michael W. Sobol (State Bar No. 194857)
(msobol@lchb.com)
Paul A. Moore (State Bar No. 241157)
(pmoore@lchb.com)
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Michael A. Caddell (admitted *pro hac vice*)
(mac@caddellchapman.com)
Cynthia B. Chapman (State Bar No. 164471)
(cbc@caddellchapman.com)
George Y. Niño (State Bar No. 146623)
(gyn@caddellchapman.com)
CADDELL & CHAPMAN
1331 Lamar, Suite 1070
Houston, TX 77010
Telephone: (713) 751-0400
Facsimile: (713) 751-0906

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

(Southern Division)

| | |
|---|---|
| JOSE ACOSTA, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> TRANS UNION, LLC, <br><br> Defendant. | Case No. 06-CV-5060-DOC/MLG <br><br> **DECLARATION OF CHARLES JUNTIKKA IN SUPPORT OF OPPOSITION TO THE PLAINTIFFS' MOTION FOR AN ORDER GRANTING PRELIMINARY APPROVAL OF SETTLEMENT** <br><br> **Date:** January 22, 2007 <br> **Time:** 8:30 a.m. <br> **Place:** Courtroom 9D <br> **Judge:** Honorable David O. Carter |

581329.1

DECLARATION OF CHARLES JUNTIKKA
*Acosta v. Trans Union* – Case No.
CV 06-05060 DOC (MLGX)

I, Charles Juntikka, declare and state:

1. I am a member in good standing of the New York State Bar, have been admitted *pro hac vice* in this matter, am the principle in the law offices of Charles Juntikka & Associates. I am counsel for plaintiffs in this action. I have personal knowledge of the matters set forth herein, and could and would testify competently thereto if called upon to do so.

2. I am one of the attorneys representing plaintiffs Terri N. White, *et al.*, in actions pending in this Court against Trans Union, LLC ("Trans Union") and Equifax Information Services, LLC ("Equifax") which are consolidated with action brought by Jose Hernandez against those same defendants, (together, "*White/Hernandez*"), and which are related to the above-captioned action and another action pending against Equifax (together, "*Acosta/Pike*"). I submit this Declaration in support of *White/Hernandez* Plaintiffs' Memorandum In Support Of Opposition to *Acosta/Pike* Plaintiffs' Motion for an Order Granting Preliminary Approval of Settlement.

3. I am a 1982 graduate of New York Law School. I founded the bankruptcy firm bearing my name, Charles Juntikka & Associates, in 1984. Within a few years, my firm became the largest personal bankruptcy firm in the New York City area, representing over 20,000 Chapter 7 bankruptcy clients in New York and New Jersey. During the last ten years, I have become well-known for my consumer and community activism, as well as my volunteer work with students. I am a member of the National Association of Consumer Bankruptcy Attorneys, and have consulted on bankruptcy issues for media outlets such as the New York Times, Wall Street Journal, Washington Post, CBS, NBC, CNN and PBS's Frontline.

4. I have conducted an extensive investigation regarding the issue of the credit reporting agencies' chronic failure to accurately report the status of debts discharged in bankruptcy. In fact, as part of my bankruptcy practice, I have

lived closely with the issue on a day-to-day basis since the day I founded my firm.

5. Since the beginning of my personal bankruptcy practice in 1984, I have received complaints from clients about inaccurate credit reports after their bankruptcy cases were discharged and closed. As our practice grew to five attorneys filing between one thousand to two thousand Chapter 7 cases per year, the complaints about the credit reports increased to about half a dozen per week.

6. My clients would inform me that their credit reports still showed debts as due and owing even though the debts were discharged. They were fearful that the error ridden credit report meant that their bankruptcies had failed in some way. They stated that they were certain this was impeding them from rebuilding their credit. There were too many clients who stated that they had failed to obtain rental apartments, jobs or promotions, mortgages or car loans or even high interest credit cards because of the errors on their credit reports.

7. Our initial response to this problem was to provide our clients with instructions on how to correct their credit report errors by mailing a dispute letter to the credit reporting agencies.

8. On or about February of 2004, I became much more alarmed about my clients' credit report problems when I attended a national conference held by the National Association of Consumer Bankruptcy Attorneys (NACBA). One of the seminars focused on the problems that debtors faced relating to post-bankruptcy credit report errors and the Fair Credit Reporting Act. It was only then that I realized the seriousness of this issue. I had yet to learn the truly staggering nature of this problem. I was very concerned that I was advising clients to mail complaints to credit reporting agencies when they were often simply ignored.

9. At that time, I speculated that this problem only existed for the half a dozen clients who complained to my firm per week or approximately 300

clients per year. I decided to ask those clients to bring in their credit reports for my firm to assist them with sending their complaints to the credit reporting agencies.

10. After just a few months, my firm concluded that everything I learned at the NACBA seminar had been true. The only way that I could be sure that all my clients would receive the "fresh start" that I and the Bankruptcy Code had promised them was to bring all my clients in and assist them in clearing their credit reports of their inaccuracies.

11. At the beginning of our project to correct our clients' credit reports, we made two fateful decisions. One, we would encourage every client to come to our office for our help **whether or not** the client had previously complained about their credit report. And two, we would not charge our clients for our assistance and services, including the cost of purchasing their credit reports which were not yet available for free.

12. In June of 2004, the attorneys of my firm began meeting with the clients to assist them in reviewing and if necessary obtaining their credit reports. From June of 2004 to August of 2005, over two thousand office visits occurred. If the reports contained inaccuracies that showed discharged debts as due and owing, my firm assisted clients at a second office visit. An official dispute letter was mailed to the credit reporting agency along with copies of their bankruptcy F schedules listing all of the debts and/or a bankruptcy court mailing matrix identifying all the creditors. Two full time paralegals were entrusted with the exclusive duty of managing this project.

13. After the first month of launching this project, I was astounded to discover that errors existed on over **sixty percent** of our clients' credit reports after their discharges were issued. I had expected an error rate of twenty to thirty percent based on the number of complaints we were receiving from clients regarding their credit reports. This assumption was false since the majority of my clients were

completely unaware that the errors even existed. Most clients either could not read the credit report or simply did not know that their discharged debts should no longer be listed with derogatory information such as "past due" or "account charged off".

14. When I learned of the true error rate, I was appalled. For twenty two years, I dedicated my legal career to giving my clients a fresh start by the use of the Bankruptcy Code. That fresh start had been rendered a sham by the credit reporting agencies. The majority of my clients–beset by financial struggles brought on by unemployment, medical problems, divorce, underemployment and a host of other reasons–had not received the full benefits of the bankruptcy discharge.

15. The credit reporting agencies denial of the benefits of the bankruptcy discharge was also a violation of the FCRA. However, it was clear that bringing individual FCRA lawsuits at the rate of one thousand or more per year was not a viable way for my small firm to correct this problem. Only a class action suit held out the possibility of giving my clients the bankruptcy relief they were entitled to, by stopping the illegal credit reporting practices of the credit reporting agencies.

16. Prior to the filing of the White class action suit, my firm filed approximately 40 individual FCRA cases in 2004 and 2005. The credit reporting agencies aggressively fought nearly every case. Each case settled. As the individual FCRA litigation multiplied, it confirmed my belief that only a class action suit held any hope of helping our clients.

17. The achievements of our year long class action project conducted by five attorneys, two full time paralegals and the part time efforts of at least four other members of my firm, are as follows: (1) initiating nearly 3,000 requests for consumer reports (incurring the cost of the reports plus the cost of certified mail); (2) reviewing the reports for accuracy on each of the nearly 3,000 odd reports that were submitted to my firm by the clients; (3) creating a database

identifying each client whose report contained errors, the number of such errors and the identification of the errors; (4) preparing approximately 800 requests for reinvestigation on behalf of those clients whose credit reports contained such errors; (5) reviewing their new reports for errors following such re-investigation; and (6) creating a database identifying each client whose reinvestigated report still contained errors, the number of such errors and the identification of the errors.

18.   The results of the my firm's investigation reveal an error rate that is "staggering and outrageous" for both Trans Union and Equifax. The investigation of approximately 960 Credit Reports issued by Trans Union reveals that in about **64 percent** of those reports, Trans Union erroneously listed one or more of my clients' discharged debts as due and owing. The average number of such falsely listed debts was between three and four per report and, in some cases, the number of such errors was ten or more. Indeed, over **17%** of my clients were never able to correct their Trans Union credit reports *even after* a written request seeking this relief was sent to Trans Union which included a copy of court records showing that the debts at issue had been discharged.

19.   The results of the investigation for Equifax were equally distressing. The investigation of approximately 900 credit reports issued by Equifax reveals that in about **66 percent** of those reports, Equifax erroneously listed one or more of my clients' discharged debts as due and owing. The average number of such falsely listed debts was between three and four per report and, in some cases, the number of such errors was ten or more. Indeed, over **22%** of my clients were never able to correct their Equifax credit report *even after* a written request seeking this relief was sent to Equifax which included a copy of court records showing that the debts at issue had been discharged.

20.   My team has investigated the Acosta settlement using the credit reports from my database. After reviewing a total to date of approximately 1,127

Trans Union and Equifax credit reports, we have concluded that the Acosta Settlement would fail to correct in excess of **95%** of my clients' credit reports. This specific analysis of my client's credit reports was conducted with my assistance by the office of my co-counsel Leonard A. Bennett, Esq. of Consumer Litigation Associates, P.C., who directly oversaw the work of three paralegals who work exclusively in the area of consumer protection and FCRA litigation, and who are trained specifically in reading credit reports from Trans Union and Equifax.

21. The primary failure of the Acosta settlement is due to its narrow focus on one type of error. The Acosta settlement only requires Trans Union and Equifax to correct errors relating to credit card "revolving accounts" that are noted as "charged off" or "in collection" prior to the filing of the bankruptcy. The vast majority of the errors fall outside of this definition.

22. This failure is best explained by a breakdown of the errors that do not fit into the Acosta criteria. As for Trans Union, the Acosta settlement would fail to correct 545 credit reports out of a total of 576 reports or **95%** of the total number of reports. The breakdown of the credit reports with errors that would not be corrected are as follows:

(1) 174 credit reports with discharged consumer debts that are not reported as a credit card account or account "tradeline" and instead are reported as a separate "collection" entry in the report such as medical debts or collection agency debt;

(2) 91 credit reports with credit card debts that were incurred prior to the bankruptcy filing that were first noted with a "Chargeoff" or "Collection" status on the reports *after* the filing of the bankruptcy;

(3) 163 credit reports with credit account tradelines that were inaccurately reported in a derogatory status, but not as a credit card or "revolving account" but as a different type of debt such as installment loans, credit lines,

mortgage deficiencies, etc.;

(4) 223 credit reports with a discharged revolving account tradeline reported with a derogatory status *other* than "charged off" or "in collection" such as a notation stating "past due 30-days" or "repossession" or "foreclosure";

(5) 142 with credit reports that had dischargeable judgments not reported as "included in bankruptcy".

23. As for Equifax, the *Acosta* settlement would fail to correct 518 credit reports out of a total of 542 reports or **96%** of the total number of reports. The breakdown of the credit reports with errors that would not be corrected are as be corrected are as follows:

(1) 149 credit reports with discharged consumer debts that are not reported as a credit card account or account "tradeline" and instead are reported as a separate "collection" entry in the report such as medical debts or collection agency debt;

(2) 164 credit reports with credit card debts that were incurred prior to the bankruptcy filing that were first noted with a "Chargeoff" or "Collection" status on the reports *after* the filing of the bankruptcy;

(3) 200 credit reports with credit account tradelines that were inaccurately reported in a derogatory status, but not as a credit card or "revolving account" but as a different type of debt such as installment loans, credit lines, mortgage deficiencies, etc.;

(4) 288 credit reports with a discharged revolving account tradeline reported with a derogatory status *other* than "charged off" or "in collection" such as a notation stating "past due 30-days" or "repossession" or "foreclosure";

(5) 171 with credit reports that had dischargeable judgments not

reported as "included in bankruptcy".

24. In short, the *Acosta* settlement inadequately addresses a serious societal problem of which I am acutely aware.

25. Since my team's filing of the *White* class action suit more than one year ago, my office has reviewed hundreds and hundreds more credit reports with the exact sort of errors identified in our complaint. This willful misconduct has harmed thousands upon thousands of my clients over the last twenty years.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 14th day of December, 2006, New York, New York.

Charles Juntikka