

FILED-SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

MAY 3 1 2007

CENTRAL DISTRICT OF CALIFORNIA
BY_____DEPUTY

"O"

___ Priority
✓ Send
___ Clsd
___ Enter
___ JS-5/JS-6
___ JS-2/JS-3

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSE L. ACOSTA, JR.; ROBERT RANDALL; BERTRAM ROBISON; et al., <br><br> Plaintiff(s), <br><br> v. <br><br> TRANS UNION, LLC, and DOES 1 through 10, <br><br> Defendant(s). <br><br>———————————————— <br> KATHRYN L. PIKE, et al., <br><br> Plaintiff(s), <br><br> v. <br><br> EQUIFAX INFORMATION SERVICES, LLC and DOES 1 through 1000, <br><br> Defendant(s). <br> ———————————————— | CASES NO.    CV 06-5060 DOC (MLGx), ~~SA CV 05-1172 DOC~~ ~~(MLGx)~~ <br><br><br> <u>O R D E R</u> DENYING APPROVAL OF THE STIPULATED PLAINTIFF CLASS AND DENYING PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT |

DOCKETED ON CM

MAY 3 1 2007

BY_____160

Before the Court is Plaintiffs' Motion for an Order Granting: (1) Approval of the

Stipulated Plaintiff Class; (2) Preliminary Approval of Class Action Settlement; (3) Appointment

of Class Representatives; (4) Appointment of Class Counsel; (5) Approval of Notice and Claim

1   Forms; (6) Scheduling of the Final Fairness Hearing; and (7) Consolidation of *Acosta* and *Pike*

2   for Settlement ("Motion").  After reviewing the moving, opposing, and replying papers[1], the

3   Court DENIES approval of the stipulated plaintiff class and DENIES preliminary approval of

4   the class action settlement.  Because each of the other requests in Plaintiffs' Motion is

5   conditional upon preliminary approval of the stipulated class or of the class settlement, the Court

6   also DENIES these remaining requests.

7   **I.    BACKGROUND**

8         These cases involve claims against consumer credit reporting agencies deriving from the

9   procedures by which these agencies produce credit reports for individuals with credit reports

10  discharged through Chapter 7 bankruptcy proceedings.  Defendants Trans Union, LLC ("Trans

11  Union") and Equifax Information Services, LLC's ("Equifax") are two of the nation's three

12  major repositories for consumer credit information.  Under the Fair Credit Reporting Act

13  ("FCRA"), 15 U.S.C. § 1681a(f), they are classified as "consumer credit reporting agencies,"

14  meaning that they engage in the business of assembling, evaluating, and disbursing credit

15  information on consumers for the purpose of furnishing consumer credit reports, as defined in 15

16  U.S.C. § 1681a(d), to third parties.  The FCRA governs the conduct of consumer credit reporting

17  agencies in an effort to preserve the integrity of the consumer banking system and to protect the

18  rights of consumers to fairness and accuracy in the reporting of their credit information.  Among

19  the obligations the FCRA imposes on a credit reporting agency is the requirement, for each

20  report it prepares, to follow "reasonable procedures to assure maximum possible accuracy of the

21  information concerning the individual about whom the report relates."  15 U.S.C. § 1681e(b).

22        Plaintiffs are individuals who had debts discharged through a Chapter 7 bankruptcy.

23  Each of them sought a "fresh start" after their respective bankruptcy discharges, but regarding

24  each, Trans Union and Equifax prepared credit reports inaccurately describing discharged debts

25  as "charged off" or with some other derogatory notation.  When preparing credit reports for

26

27

28  ───────────────
    [1]As a preliminary matter, the parties make a number of objections to evidence submitted.
    To the extent the Court relies on that evidence in this Order, these objections are OVERRULED.

1   individuals who have been the beneficiaries of Chapter 7 discharge orders, Trans Union and

2   Equifax rely solely on a debtor's creditors to voluntarily update the status of the accounts they

3   maintain.  These creditors have no statutory obligation to update their past reporting, and while

4   these creditors do have a duty to update future reporting, unlike credit reporting agencies they

5   face no liability under the FCRA should they be negligent in fulfilling that duty.  15 U.S.C. §

6   1681s-2(c).  Plaintiffs contend that relying on these creditors to voluntarily update the status of

7   discharged debts is not reasonable to ensure maximum possible accuracy.

8       **A.**    **The Litigation**

9           **1.**    *Jose L. Acosta, Jr., et al. v. Trans Union, LLC*

10      Plaintiff Jose L. Acosta, Jr. originally brought suit against Trans Union in Orange County

11   Superior Court on May 12, 2003, before filing the First Amended Complaint on May 14, 2004.

12   That suit alleged violations of California's Consumer Credit Reporting Agencies Act

13   ("CCRAA"), Cal. Civ. Code § 1785.1, *et seq.*, a California state analog to the FCRA, based on

14   Trans Union's reporting practices involving accounts legally discharged through Chapter 7

15   bankruptcy.  In that suit, Acosta sought actual damages pursuant to Cal. Civ. Code §

16   1785.31(a)(1), punitive damages pursuant Cal. Civ. Code §§ 1785.31(a)(2)(B) and 1785.31(c),

17   and an injunction pursuant to Cal. Civ. Code § 1785.31(b) ordering Trans Union to establish and

18   maintain reasonable procedures in its credit reporting practices to assure accounts included in

19   and discharged in bankruptcy are properly updated.

20      On October 27, 2005, Acosta filed a Motion for Class Certification.  Subsequent to the

21   filing of that motion, but before the motion was heard, counsel for Trans Union approached

22   Acosta to discuss settling the case.  The parties stipulated to extend the hearing for class

23   certification so as to allow for mediation.  They then held a series of three mediation sessions,

24   dating between March 2006 and May 2006, with Justice Trotter of JAMS in Anaheim,

25   California.  In the course of mediation, Trans Union indicated it would not settle the case unless

26   it could also settle related federal claims under the FCRA pending against it in other lawsuits.

27   Acosta agreed to accommodate this request.  To that effect, he stayed the state proceeding and

28   filed a new case in federal court, which included both the CCRAA and the FCRA claims, on

behalf of a purported nationwide class. That federal action, filed on August 14, 2006, is one of the cases now before the Court, *Jose L. Acosta, Jr., et al. v. Trans Union, LLC*, SA CV 06-5060 DOC (MLGx).

Following three additional mediation sessions with Justice Trotter during the first two weeks of August 2006, Acosta and Trans Union reached a settlement, memorialized in a Memorandum of Understanding ("MOU") dated August 11, 2006. As a condition of the parties' agreement to file a federal class action lawsuit so as to settle the full spectrum of claims pending against Trans Union, the MOU also provided, "[i]f the Settlement is not finally approved, the new claims asserted in the Federal Action will be dismissed without prejudice," whereupon the *Acosta* action would resume in state court and contain only California claims on behalf of a California class. MOU at 12-13.

### 2.     *Kathryn L. Pike, et al. v. Equifax Information Services*

Plaintiff Kathryn L. Pike originally brought suit against Equifax in California state court on October 14, 2005, alleging violations of California's CCRAA Sections 1785.15(b) and 1785.16, based on Equifax's reporting practices involving accounts legally discharged through Chapter 7 bankruptcy. Equifax removed this state action to federal court on November 30, 2005, where it became the other case now before the Court, *Kathryn L. Pike, et al. v. Equifax Information Services*, SA CV 05-1172 DOC (MLGx).

In early 2006, counsel for Pike approached Equifax with an interest in settling the case through mediation and resolving the case in conjunction with the *Acosta* matter. Pike and Equifax agreed to participate in mediation with the *Acosta* parties, and they began by attending a mediation session with Acosta, Trans Union, and Justice Trotter on August 1, 2006. Although subsequent mediation soon produced the MOU between Acosta and Trans Union on August 11, 2006, Equifax was unwilling to commit to the settlement at that time.

Counsel for Pike contacted Equifax on September 1, 2006 with a settlement demand based on certain alterations to the MOU between Acosta and Trans Union. Decl. of Michael W. Sobol Decl. Ex. L. On September 14, 2006, Justice Trotter conducted a final mediation session, which included Acosta, Trans Union, Pike, Equifax, and the parties to several related cases (the

4

1 "Global Mediation"). At this Global Mediation, Equifax formally acquiesced to Pike's

2 settlement demands. Acosta, Trans Union, Pike, and Equifax (collectively the "Proponents")

3 thereupon together agreed, based on the earlier executed MOU, to the proposed settlement now

4 before the Court (the "Settlement"). Subsequently, on September 29, 2006, Pike amended her

5 Complaint to include, for the first time, the federal FCRA claims and to represent a nationwide

6 class.

7     **B.   The Objectors**

8        In addition to the two cases at issue in this Motion, there are three related cases pending

9 before the Court that raise identical claims under the FCRA and CCRAA on behalf of the same

10 putative class members against Trans Union and Equifax: *White, et al. v. TransUnion, LLC*,

11 Case No. CV 05-1073 DOC (MLGx); *White, et al. v. Equifax Info. Servs., LLC*, Case No. CV

12 05-7821 DOC (MLGx); and *Hernandez v. Equifax Info. Servs., LLC, Experian Info. Solutions,*

13 *Inc., and TransUnion, LLC*, Case No. CV 06-3924 DOC (MLGx). The plaintiffs in these

14 lawsuits (collectively the "*White/Hernandez* Plaintiffs" or the "Objectors"[2]) did not participate

15 in, and were in fact never informed of, the mediation sessions with Justice Trotter that led to and

16 culminated in the August 2006 MOU between Acosta and Trans Union. Although the Objectors

17 did attend the Global Mediation, they declined to join the Settlement. Instead, they announced at

18 that session their reasons for rejecting the Settlement, and have now lodged with the Court a

19 formal opposition to the Motion.

20 \ \ \

21 \ \ \

22

23

24     [2]The Court is aware that as it has not yet granted, and in fact will not grant, conditional class certification or preliminary approval of the Settlement, the *White/Hernandez* Plaintiffs are not "objectors" as the phrase is commonly used within the context of Federal Rule of Civil Procedure 23(e)(4). Because the phrase "Objectors" is a convenient shorthand for those opposing the instant Motion, and because its use does not inject imprecision or confusion into these proceedings, the Court uses the phrase throughout this Order when referring to the *White/Hernandez* Plaintiffs. Likewise, it refers to the Plaintiffs, Trans Union, and Equifax collectively as the "Proponents."

25

26

27

28

1    **C.    The Proposed Settlement**

2        Plaintiffs Acosta and Pike submitted the Settlement to the Court for approval on

3    November 17, 2006.

4            **1.    Class Structure**

5        The Settlement defines the "Settlement Class" as "all consumers, as defined by 15 U.S.C.

6    § 1681a(c), residing in the United States for whom Trans Union and/or Equifax maintain a File

7    who, between April 1, 1996 and the date of entry of the Preliminary Approval Order, received a

8    Chapter 7 bankruptcy discharge order from a United States Bankruptcy Court." Settlement §

9    1.31. Out of this class, it further prescribes two subclasses (collectively the "Economic Relief

10   Subclasses"). The "California Economic Relief Subclass" ("Subclass A") contains all class

11   members "whose discharge orders were entered after May 12, 2001, and who reside in

12   California." *Id.* § 1.6. The "Non-California Economic Relief Subclass" ("Subclass B") contain

13   all class members "whose discharge orders were entered after October 3, 2003, and who reside

14   outside California." *Id.* § 1.19.

15           **2.    Injunctive Relief Provisions**

16       The Settlement provides for a variety of injunctive relief. First, Trans Union and Equifax

17   agree to modify their procedures regarding the reporting of future Chapter 7 bankruptcy

18   discharge orders. Under the new procedures, Trans Union and Equifax will update the reporting

19   on all accounts identified as "Bankruptcy Qualifying Tradelines" ("BQT"), and will

20   automatically update the reporting on such accounts to remove the charge-off or collection

21   rating, delete any current and/or past due balances, and add a remark that the account was

22   included in a Chapter 7 bankruptcy. *Id.* §§ 4.2-4.3. The Settlement defines a BQT as a tradeline

23   that " (a) reflects an unsecured revolving loan; (b) appears as 'charged off' or 'placed on

24   collection' on a consumer's credit report (and not as 'unrated' or 'included in bankruptcy'); (c)

25   reflects a date 'opened' that predates the date the consumer filed his or her Chapter 7 bankruptcy

26   petition that later resulted in a general discharge; (d) was not reaffirmed; and (e) was not the

27   subject of a complaint for non-dischargeability" excluding "(i) tradelines reflecting student loans

28   or other loans obtained for educational purposes; (ii) tradelines reflecting loans secured by real

1 | or personal property (including without limitation mortgage and vehicle loans); and (iii)

2 | tradelines (regardless of the purpose of the loan or whether it is secured or unsecured) with the

3 | rating 'paid charge off,' 'paid collection' or a less derogatory rating." *Id.* § 1.5.

4 |       Second, Trans Union and Equifax will modify the reinvestigation procedures that they

5 | follow when a consumer challenges the accuracy of a tradeline he or she believes to have been

6 | discharged through Chapter 7 bankruptcy. The new procedure provides that Trans Union and

7 | Equifax will, without requiring the consumer to provide documentation and without first seeking

8 | verification from the creditor, change the reporting of any BQT that is the subject of a

9 | reinvestigation request to remove the derogatory information and add a remark indicating the

10 | account was included in bankruptcy. *Id.* §§ 4.4-4.5.

11 |       Finally, the Settlement outlines injunctive provisions whereby Trans Union and Equifax

12 | will update their existing data for consumers who have a Chapter 7 discharge on their file. This

13 | "scrubbing" procedure will identify all such consumers and, for each, update all BQTs to remove

14 | the charge-off or collection rating, delete any current and/or past due balance, and add a remark

15 | indicating that the account was included in the consumer's Chapter 7 bankruptcy. *Id.* §§ 4.6-4.7.

16 |       **3.**    **Economic Relief Provisions**

17 |       Economic relief is available under the Settlement to some class members meeting certain

18 | eligibility requirements. Only those class members belonging to Subclass A or Subclass B are

19 | eligible for economic relief, and they may only receive economic relief if they submit the

20 | appropriate Claim Form. The class administrator will then determine the amount of economic

21 | relief awarded after an evaluation of the class member's credit report according to a matrix

22 | defined in the Settlement (the "Matrix"). *Id.* §§ 5.1-5.5, Ex. A. The range of economic relief

23 | varies from a free credit report and score to $450.00 in addition to a free credit report and score.

24 | *Id.* Ex. A.

25 | \ \ \

26 | \ \ \

27 | \ \ \

28 | \ \ \

1

### 4. Fee Awards

2   While the Settlement correctly disclaims that awards of attorneys fees, costs, and

3   incentive awards are subject to the Court's discretion, it reflects suggestions for such awards

4   upon which the parties have agreed. Trans Union and Equifax have stipulated to an application

5   for Plaintiffs' attorneys fees totalling $5,485,000. *Id.* § 9.1. They also stipulate to the allowance

6   of incentive awards for the named plaintiffs not exceeding $55,000. *Id.* The Settlement further

7   provides that Trans Union and Equifax will not object to Plaintiffs' application for an additional

8   $70,000 in costs for the purpose of paying experts retained in connection with the settlement

9   approval proceedings. *Id.* § 9.2.

10

### 5. Notice to Class Members

11   Notice to class members of the Settlement's terms, the date and time of the Final Fairness

12   Hearing, and the rights of class members to opt out or object to the Settlement will be provided

13   by several mechanisms. First, a postcard will be mailed to the members of Subclasses A and B

14   ("Mailed Notice") at their most recent address as listed in either the Trans Union or Equifax

15   database. *Id.* § 3.2. Second, Trans Union and Equifax will notice the Settlement for 120 days on

16   all consumer disclosures requested by consumers for whom the bureau's records indicate a

17   Chapter 7 bankruptcy discharge ("Piggyback Notice"). *Id.* § 3.4. Third, the parties will publish

18   notice of the Settlement two times ("Published Notice"), once in each of two national

19   publications. *Id.* § 3.5. Finally, the parties will establish a Settlement Website setting forth the

20   Settlement's terms, the Claim Form, and contact information for Plaintiffs' counsel. *Id.* § 3.3.

21   The parties will publish this website via Google registration, a weblink posted on Trans Union

22   and Equifax's respective websites, and by reference contained in the Piggyback Notice,

23   Publication Notice, and Mailed Notice. *Id.*

24

### 6. Releases of Liability

25   Unless they affirmatively opt out of the Settlement, all members of the Settlement Class

26   will be deemed to have fully, finally, and forever released and discharged Trans Union and

27   Equifax from any and all of the "Released Claims." *Id.* §§ 7.1-7.2. The Settlement defines

28   "Released Claims" to include "any and all claims, actions, demands, causes of action, suits,

1   obligations, damages, rights or liabilities, of any nature and description whatsoever, known or

2   unknown, present or future, concealed or hidden, liquidated or unliquidated, fixed or contingent,

3   anticipated or unanticipated, whether in tort, contract, law, equity or otherwise, that have been,

4   could have been or might in the future be asserted by Plaintiffs or the Settlement Class members

5   . . . arising out of any claims asserted or that could have been asserted in the Acosta Action, the

6   State Acosta Action or the Pike Action based upon the facts and circumstances giving rise to the

7   Acosta Action, the State Acosta Action or the Pike Action." *Id.* § 1.27.  Class members who do

8   not affirmatively opt out will additionally be deemed to have waived all rights under California

9   Civil Code Section 1542, which provides that a general release does not extend to claims

10   unknown or unsuspected at the time that the release was executed. *Id.* § 7.2.  Because no

11   member of the class may opt out of the Settlement's injunctive relief provisions, all members of

12   the Settlement Class will be deemed to have released any potential claim for injunctive or

13   declaratory relief, regardless of whether such members purport to opt out of such claims. *Id.* §

14   7.3.

15   **II.   LEGAL STANDARD**

16        "[I]n the context of a case in which the parties reach a settlement agreement prior to class

17   certification, courts must peruse the proposed compromise to ratify both the propriety of the

18   certification and the fairness of the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th

19   Cir. 2003).   The first step is to assess whether a class exists. *Id.* (citing *Amchem Prods. Inc. v.

20   Windsor*, 521 U.S. 591, 620, 117 S. Ct. 2231 (1997)).   Second, district courts must evaluate

21   "whether a proposed settlement is fundamentally fair, adequate, and reasonable," and, in so

22   doing, "must pay undiluted, even heightened, attention to class certification requirements." *Id.*

23   (internal quotation marks and citations omitted).

24   **III.   CONDITIONAL CLASS CERTIFICATION**

25        Federal Rule of Civil Procedure 23 governs class actions and provides that a party

26   seeking class certification must demonstrate the following prerequisites: "(1) the class is so

27   numerous that joinder of all members is impracticable, (2) there are questions of law or fact

28   common to the class, (3) the claims or defenses of the representative parties are typical of the

1  claims or defenses of the class, and (4) the representative parties will fairly and adequately

2  protect the interests of the class." Fed. R. Civ. P. 23(a). A district court must engage in a

3  "rigorous analysis" to determine whether the party seeking certification has met the prerequisites

4  of Rule 23(a). *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1233 (9th Cir. 1996) (quoting *In*

5  *re Am. Med. Sys.*,75 F.3d 1069, 1079 (6th Cir. 1996)).

6      After satisfying the four prerequisites of numerosity, commonality, typicality, and

7  adequacy, a party must also demonstrate that either: (1) a risk that separate actions would create

8  incompatible standards of conduct for the defendant or prejudice individual class members not

9  parties to the action; (2) the defendant has treated the members of the class as a class, making

10  appropriate injunctive or declaratory relief with respect to the class as a whole; or (3) common

11  questions of law or fact predominate over questions affecting individual members and that a

12  class action is a superior method for fairly and efficiently adjudicating the action. Fed. R. Civ.

13  P. 23(b).

14      The decision to grant or deny a motion for class certification is ultimately committed to

15  the trial court's broad discretion. *E.g., Yamamoto v. Omiya*, 564 F.2d 1319, 1325 (9th Cir.

16  1977). In this case, the Court is not satisfied that this class meets the requirements of Rule 23.

17  There is no controversy regarding the first three of the Rule 23(a) requirements, namely

18  numerosity, commonality, and typicality, and were the Court to reach Rule 23(b), it would also

19  find that the purported class satisfies the Rule 23(b)(3) requirement because questions of law or

20  fact common to the members of the class predominate over individual concerns. Because the

21  purported class does not meet the adequacy of representation requirement Rule 23(a), however,

22  it is not fit to be certified.

23  **A.     Numerosity**

24      First, the class must be so numerous that joinder of members is impracticable. Rule

25  23(a)(1). In this case, Plaintiffs estimate the class would encompass approximately 4,000,000

26  persons. Where courts have consistently held that joinder is impracticable in cases involving

27  more than 35 parties, the numerosity requirement is certainly met in this case. *See, e.g., Gay v.*

28  *Waiters' & Dairy Lunchmen's Union*, 549 F.2d 1330 (9th Cir. 1997) (numerosity requirement

1  met with approximately 110 potential class members); *Mullen v. Treasure Chest Casino, LLC*,

2  186 F.3d 620 (5th Cir. 1999) (numerosity requirement met with between 100 and 150 potential

3  class members).

4  **B.   Commonality**

5  Second, a class has sufficient commonality "if there are questions of law or fact common

6  to the class." Rule 23(a)(2). Here, all members of the potential class derive their claims from

7  the same set of circumstances. Specifically, they each: (1) filed a Chapter 7 bankruptcy

8  subsequent to May 12, 1996; (2) had debts discharged in that bankruptcy; and (3) have Trans

9  Union and/or Equifax post-bankruptcy credit reports reporting the discharged non-reaffirmed

10 debts in an inaccurate status. The same alleged conduct of Defendants forms the basis of each of

11 the plaintiffs' claims, particularly that Trans Union and Equifax created standardized practices

12 and procedures for reporting accounts discharged in Chapter 7 bankruptcy; created standardized

13 practices and procedures for reinvestigating disputes regarding those accounts; trained their

14 employees to follow these procedures with each customer dispute; and ensured that their

15 employees actually followed these procedures. Finally, the same legal issues also govern the

16 Plaintiffs' claims, including whether Trans Union and Equifax maintain reasonable procedures

17 to assure maximum possible accuracy in reporting discharged accounts.

18 Accordingly, the proposed class meets this second requirement.

19 **C.   Typicality**

20 Third, the claims or defenses of the representative parties must be typical to the claims

21 and defenses of the class. Rule 23(a)(3). To be typical, the claims need not be identical.

22 *Hanlon v. Chrysler Corp.*, 150 F.3d 1011,1020 (9th Cir. 1998). In this case, the proposed class

23 representatives are individuals who, during the relevant time period, filed a Chapter 7

24 bankruptcy and received credit reports from Trans Union and/or Equifax reporting discharged,

25 non-reaffirmed debts in an inaccurate status.

26 The Court is cognizant that the named plaintiffs' credit scores may have been impacted

27 more or less dramatically than were those of other class members. The named plaintiffs' claims

28 are nevertheless typical of those of the remainder of the class in regards to the central legal issue,

1  namely whether Trans Union and Equifax maintain reasonable procedures to assure maximum

2  possible accuracy in reporting discharged accounts. Any legally relevant distinction between the

3  named plaintiffs' claims and those of the entire Plaintiff Class therefore speaks to the issue of

4  damages, which is immaterial here where the FCRA awards statutory damages. Where a class

5  action seeks statutory damages, "the district court [is] not obligated to require individual proof of

6  injury from each class member." *Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d

7  1301, 1306 (9th Cir. 1990) (citing *Montelongo v. Meese*, 803 F.2d 1341, 1351 (5th Cir. 1986).

8      Therefore, the claims and defenses of the named plaintiffs will be substantially similar to

9  the claims and defenses of the entire Plaintiff Class.

10     **D.     Adequacy of Representation**

11     Fourth, the representative parties must fairly and adequately protect the interests of the

12  class. Rule 23(a)(4). This factor "depends on the qualifications of counsel for the

13  representatives, an absence of antagonism, a sharing of interests between representatives and

14  absentees, and the unlikelihood that the suit is collusive." *Brown v. Ticor Title Ins.*, 982 F.2d

15  386, 390 (9th Cir. 1992) (citations omitted). Without speaking on the purported class counsels'

16  qualifications and the procedure through which the parties reached the proposed settlement,

17  there is significant cause to doubt that the named representatives are capable of fairly and

18  adequately protecting the interests of the Settlement Class.

19     Specifically, the Court is concerned that the proposed settlement creates antagonism with

20  the particular way it delineates the Economic Relief Subclasses. The Supreme Court has held

21  that such a potential conflict undermines the adequacy of representation:

22          Where differences among members of a class are such that

23          subclasses must be established, we know of no authority that permits

24          a court to approve a settlement without creating subclasses on the

25          basis of consents by members of a unitary class, some of whom

26          happen to be members of the distinct subgroups. The class

27          representatives may well have thought that the Settlement serves the

28          aggregate interests of the entire class. But the adversity among

12

1                    subgroups requires that the members of each subgroup cannot be

2                    bound to a settlement except by consents given by those who

3                    understand that their role is to represent solely the members of their

4                    respective subgroups.

5   *Amchem Prods. v. Windsor*, 521 U.S. 591, 627, 117 S. Ct. 2231 (1997) (quoting *In re Joint*

6   *Eastern and Southern Dist. Asbestos Litig.*, 982 F.2d 721, 742-743 (2d Cir. 1992), *modified on*

7   *reh'g sub nom. In re Joint E. & S. Dist. Asbestos Litig.*, 993 F.2d 7 (2d Cir. 1993).

8        All of the named plaintiffs in *Acosta* and *Pike* would be members of the California

9   Economic Relief Subclass, Subclass A. But there is no basis upon which to presume that these

10   named plaintiffs could adequately represent class members falling outside of Subclass A. This is

11   particularly critical given that the Settlement imposes a more restrictive cut-off date to determine

12   the membership of Subclass B and would render ineligible for any economic relief those class

13   members falling outside of both Economic Relief Subclasses. *See Molski v. Gleich*, 318 F.3d

14   937, 956 (9th Cir. 2003) (district court abused its discretion in finding named plaintiff and class

15   counsel "fairly and adequately protect[ed] the interested of the class" where settlement "waived

16   practically all of the class members' claims without compensation and allowed the defendants to

17   escape with little penalty").

18        Beyond this, all of the named plaintiffs are California residents. This is significant in

19   light of the Objectors' assertions that the named plaintiffs have memorialized an intention to

20   abandon the instant settlement if it is not approved, reverting instead to a state class action

21   without the federal claims common to a nationwide class. While there is no reason to quarrel

22   with the pursuit of state claims through a California state class action, Plaintiffs' willingness to

23   drop entirely the federal claims forming the basis of this purported nationwide class action calls

24   into question the named plaintiffs' commitment to the interests of those plaintiffs residing

25   outside of California. *See Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985).

26        Finally, none of the named plaintiffs have discharged debts inaccurately showing as "past

27   due" or with a balance owing. While this fact ostensibly would not affect the named plaintiffs'

28   ability to adequately represent the entire class, it assumes an added significance in light of the

1   fact that the injunctive provisions of the proposed settlement would only correct the reporting of
2   debts inaccurately showing as "placed for collection" or "charged off," leaving numerous other
3   inaccuracies in Trans Union and Equifax's reporting uncorrected. It is certainly plausible that
4   this aspect of the settlement's injunctive relief provisions is an artifact of the fact that none of
5   the named plaintiffs would feel its effects. Given the structure of the proposed settlement and its
6   specific terms regarding the potential abandonment of the federal claims and injunctive relief,
7   the Court is unconvinced that the named plaintiffs are able to adequately protect the interests of
8   the entire class.

9   **E.    Rule 23(b)(3)**

10   Finally, the proposed class must meet at least one of the requirements of Rule 23(b).
11   Here, Rule 23(b)(3) is met where the court finds that the questions of law or fact common to the
12   members of the class predominate over individual concerns, and the class action is the superior
13   method for the fair and efficient adjudication of the controversy. After reviewing the Motion,
14   the Court agrees that this requirement is met. Because the potential recovery to each individual
15   class member is trivial in light of the costs of litigating millions of individual claims, and
16   because of the danger of inconsistent results that would result from separate adjudication, a class
17   action is the most economical and efficient way to settle this dispute.

18   **IV.   PRELIMINARY ASSESSMENT OF THE PROPOSED SETTLEMENT**

19   Federal Rule of Civil Procedure 23(e) requires the Court to approve any settlement of
20   class claims and requires reasonable direct notice "to all class members who would be bound by
21   a proposed settlement, voluntary dismissal, or compromise." Fed. R. Civ. P. 23(e). In this
22   process, a reviewing court must evaluate "whether a proposed settlement is fundamentally fair,
23   adequate, and reasonable." *Staton*, 327 F.3d at 952 (internal quotation marks and citations
24   omitted). Courts should consider some or all of the following factors in determining if a
25   settlement is fair: (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and
26   duration of further litigation; (3) the risk of maintaining class certification; (4) the amount of
27   settlement; (5) investigation and discovery; (6) the experience and views of counsel; and (7) the
28   reaction of class members to the proposed settlement. *See, e.g., Hanlon*, 150 F.3d at 1027;

1   *Stanton*, 327 F.3d at 959.  To determine whether preliminary approval is appropriate, the

2   settlement need only be *potentially* fair, as the Court will make a final determination of its

3   adequacy at the hearing on Final Approval, after such time as any party has had a chance to

4   object and/or opt out.  *See Armstrong v. Bd. of Sch. Dirs. of the City of Milwaukee*, 616 F.2d

5   305, 314 (7th Cir. 1980), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th

6   Cir. 1998).

7        A number of defects inhere in the instant proposed settlement.  While cognizant that all

8   settlements invariably constitute only "rough justice," the unacceptable volume and degree of

9   deficiencies in this settlement compel the Court to conclude that it neither is nor retains the

10  potential to be fair.

11       **A.    Structural Defects Inhere in the Proposed Settlement**

12       In delineating the benefits available to various members of the Settlement Class, the

13  Settlement structures the class into two groups: those who fall into one of the Economic Relief

14  Subclasses and those who do not.  This division is fundamentally flawed, as it is both arbitrarily

15  drawn and would compromise the claims of a majority of the class.

16       **1.    The Dates Used to Define the Economic Relief Subclasses are Arbitrary**

17       The Settlement defines the Economic Relief Subclasses according to the dates on which

18  class members obtained their bankruptcy discharge orders.  Specifically, Subclass A contains

19  class members residing in California whose discharge orders were entered after May 12, 2001,

20  and Subclass B contain class members residing outside of California whose discharge orders

21  were entered after October 3, 2003.  These dates are arbitrary and bear no relationship to the

22  procedural or substantive limitations on the class members' claims.

23       The Settlement defines eligibility for economic relief based on an individual's date of

24  discharge.  But a violation of the FCRA occurs when a credit report containing erroneous

25  information about pre-bankruptcy debts is published and hence cannot be circumscribed solely

26  by the date on which a consumer obtains a bankruptcy discharge order.  *Id.* § 1681e.  Debts

27  included in a Chapter 7 bankruptcy are not automatically purged from a consumer's credit file

28  until seven years after discharge, while consumers typically are the subject of at least one

1  published credit report each year.  Decl. of John Ulzheimer ¶ 16.  This suggests that the majority

2  of consumers about whom Trans Union and Equifax maintain inaccurate credit data incur

3  violations of the FCRA well after the entry of their bankruptcy discharge orders, and may in fact

4  suffer such violations for up to seven years from their discharge dates.

5          Historically, the statute of limitations on an FCRA claim was two years after the date of

6  the violation forming the basis of liability, regardless of when discovery of that violation

7  occurred.  *TRW, Inc. v. Andrews*, 534 U.S. 19, 28-29 (2001).  Pursuant to a March 31, 2004

8  amendment, the FCRA now allows any action brought after the earlier of "2 years after the date

9  of discovery by the plaintiff of the violation" or "5 years after the date on which the violation . . .

10  occurs."  15 U.S.C. § 1681p.  Credit reports are generally prepared and published to third parties

11  without a consumer being made aware of them, signifying that the vast majority of violations

12  would fall subject to the longer of these two periods.  Because a limitations period cannot be

13  construed retroactively to resurrect stale claims "absen[t] a clear statutory expression of

14  congressional intent," however, the limitations period in this case would run from no earlier than

15  March 31, 2002, two years prior to the passage of the amendment modifying the FCRA's statute

16  of limitations.  *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 951-52

17  (1997).

18          Thus, any of the millions of class members who obtained their discharge orders between

19  April 1, 1996 and October 3, 2003 (or, for California residents, May 12, 2001) may have, and in

20  fact are likely to have, unknowingly been the subject of an inaccurate credit report prepared by

21  Trans Union or Equifax after March 31, 2002.  Because the Settlement inexplicably limits

22  eligibility for economic relief based on the date of bankruptcy discharge order, none of them will

23  receive any such relief for these unexpired claims.  While partitioning the Plaintiff Class into

24  subclasses is certainly permissible, and may even be necessary given the size of this class, the

25  parties are not free to do so in a manner that sacrifices the claims of some plaintiffs for the sake

26  of others.

27  \ \ \

28  \ \ \

16

1        **2.      The Settlement Compromises the Claims of those Falling Outside of the**
2              **Economic Relief Subclasses**

3        Compounding this arbitrary structural division of class members is the fact that the

4    Settlement wantonly compromises the claims of those falling outside of the Economic Relief

5    Subclasses.  The Proponents estimate that the Economic Relief Subclasses would constitute

6    roughly 4 million out of approximately 14 million total class members.  Sobol Decl. Ex. B.  The

7    Objectors correctly note that these numbers are inflated, as they include all individuals recording

8    Chapter 7 bankruptcy over the relevant periods whose credit reports have contained no

9    inaccuracies and hence cannot possibly have a claim, which they estimate to comprise about

10   35% of each of those populations.  Nonetheless, this data is significant in illustrating that over

11   two-thirds of the Settlement Class, and up to 10 million class members, will be completely

12   ineligible for any economic relief under the Settlement.  In order to avoid having their rights to

13   recover under the FCRA extinguished in exchange for zero economic relief, the Settlement

14   requires these class members to affirmatively opt out lest their claims be permanently

15   relinquished under the Settlement's sweeping and indiscriminate release provisions.  Moreover,

16   those class members ineligible for economic relief are precisely those who are least likely to

17   receive notice of the Settlement because the Settlement denies them its most effective notice

18   mechanism, that of Mailed Notice.  *See Molski*, 318 F.3d at 952-53 (failure to provide

19   individualized notice to members of opt out Rule 23(b)(3) class who are identifiable through

20   reasonable efforts violates Due Process Clause and Rule 23(c)(2)).

21       Making matters worse is the reality that a majority of those class members ineligible for

22   economic relief will also receive no benefit under the Settlement's injunctive relief provisions.

23   Under the FCRA, most adverse information on credit reports must be expunged after seven

24   years, including that regarding past due debts and accounts that have been placed for collection

25   or charged off.  15 U.S.C. § 1681c(e).  Because the Settlement does not require Trans Union and

26   Equifax to complete the correction of their credit databases until up to 12 months after the

27   Settlement becomes final, and because the Settlement could not realistically be finalized until

28   mid-2007 under even the most optimistic forecast, those class members who obtained discharged

1  orders prior to mid-2001 will not benefit at all from the Settlement's injunctive relief provisions.

2  For these millions of class members, the Settlement therefore provides zero opportunity for any

3  relief whatsoever.  The Settlement nevertheless would absolve them of all possible claims unless

4  they have both the good fortune to receive notice of the Settlement and the sagacity to take

5  affirmative opt out action in order to protect claims of which they may be unaware.

6      This compromise is unacceptable.  The Court is aware of no case in which a settlement

7  was allowed that partitioned a class so as to provide relief to one segment and to deny it

8  completely to another.  *Cf. Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 785-786 (7th Cir.

9  2003) (rejecting settlement providing no relief to entire subclass having valid legal claims);

10  *Petruzzi's, Inc. v. Darling-Delaware Co.*, 880 F. Supp. 292, 299-300 (M.D. Pa. 1995) (rejecting

11  settlement providing settlement to only 50% of class).  The wholesale sacrifice of those class

12  members obtaining discharges prior to mid-2001 is especially egregious because as to these

13  individuals "only damages matter, yet all the settlement does for (to?) them is cut them off at the

14  knees.  They gain nothing, yet lose the right to the benefits of aggregation in a class."  *Crawford*

15  *v. Equifax Payment Servs.*, 201 F.3d 877, 882 (7th Cir. 2000).

16      The Proponents make much of the option class members would have to opt out of the

17  Settlement.  While the Proponents correctly identify this opt out mechanism as the Settlement's

18  only potential saving grace, common sense and empirical study admonish that any belief that a

19  significant number of class members would do so is ill-founded.  Theodore Eisenberg &

20  Geoffrey P. Miller, *The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical*

21  *and Empirical Issues*, 57 Vand. L. Rev. 1529, 1532-33 (2004) ("Opt-outs from class

22  participation and objections to class action resolutions are rare: on average, less than 1 percent of

23  class members opt-out . . . .  The overall impression across the range of cases in the study is that

24  opt-outs and objections are extremely uncommon."); Thomas E. Willging, Laura L. Hooper &

25  Robert J. Niemic, *An Empirical Analysis of Rule 23 to Address the Rulemaking Challenges*, 71

26  N.Y.U. L. Rev. 74, 135 (1996) ("[Across the entire study] the median percentage of members

27  who opted out was either 0.1% or 0.2% of the total membership of the class, and 75% of the opt-

28  out cases had 1.2% or fewer class members opt out.").  This contention is particularly farcical

1   where, as here, a considerable number of class members are likely unaware, through no fault of

2   their own, that they even have viable claims because Trans Union and Equifax prepared and then

3   distributed inaccurate reports directly to third parties without the consumers' knowledge. Even

4   if these consumers possessed the uncommon legal sophistication to correctly interpret their

5   credit reports, identify discharged debts showing inaccurately, and to realize that their

6   creditworthiness suffered not only due to the profound effects of a Chapter 7 bankruptcy but also

7   due to inaccurate reporting, they have no hope of doing so with regard to credit reports that they

8   have never received.

9          These inherent structural deficiencies, by themselves, doom the Settlement and would

10  require its rejection.

11  **B.     The Proposed Settlement Delivers Insufficient Relief to the Class**

12         **1.     Economic Relief Provisions**

13         "Basic to [the process of deciding whether a proposed compromise is fair and equitable]

14  in every instance, of course, is the need to compare the terms of the compromise with the likely

15  rewards of litigation." *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.*

16  *Anderson*, 390 U.S. 414, 424-25, 88 S. Ct. 1157 (1968). In so doing, a court must "apprise

17  [itself] of all facts necessary for an intelligent and objective opinion of the probabilities of

18  ultimate success should the claim be litigated." *Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d

19  Cir. 1982) (quoting *Protective Comm.*, 390 U.S. at 424); *see also Reynolds v. Beneficial Nat'l*

20  *Bank*, 288 F.3d 277, 285 (7th Cir. 2002) ("Determining [the net expected value of continued

21  litigation to the class" would require estimating the range of possible outcomes and ascribing a

22  probability to each point on the range.") (citing *In re Gen. Motors Corp. Engine Interchange*

23  *Litig.*, 594 F.2d 1106, 1132-33 n.44 (7th Cir. 1985)). "Ultimately, the district court's

24  determination is nothing more than 'an amalgam of delicate balancing, gross approximations and

25  rough justice.'" *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982)

26  (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 468 (2d Cir. 1974)).

27                 i.     *The Potential Value of Plaintiffs' Claims in Litigation*

28         The litigation value of the plaintiffs' claims is tremendous. Even ignoring the punitive

1   damages, attorneys fees, and injunctive relief Plaintiffs seek, and without considering any
2   monetary damages potentially available under the CCRAA, Plaintiffs' damage claims under the
3   FCRA alone range well into billions of dollars. The FCRA provides statutory damages "of not
4   less than $100 and not more than $1,000" to any person regarding whom a consumer credit
5   reporting agency willfully violates the FCRA's requirements in preparing a credit report. As the
6   Court has already explained, given the FCRA's statute of limitations, such a claim is available to
7   any class member who has been the subject of an inaccurate credit report prepared by Trans
8   Union or Equifax since two years prior to the filing dates of the instant law suits or who was
9   unknowingly such a subject of a report prepared after March 31, 2002. A claim for statutory
10  damages would thus be available to the vast majority of the plaintiff class, which the parties
11  estimate to exceed ten million people, and certainly would be available as to several million
12  individuals against each defendant. Assuming the bare minimum $100 statutory damages for
13  each plaintiff, and considering only the FCRA claims for willful noncompliance, Trans Union
14  and Equifax each face approximately $1 billion in civil liability.

15              ii.    *The Value of the Settlement's Economic Relief Provisions*

16          In contrast, the Settlement makes economic relief available to only a select group of class
17  members, and likely limits Plaintiffs' total recovery against Trans Union and Equifax combined
18  to less than one percent of their individual liability exposures. Only members of Subclass A and
19  Subclass B are eligible for any economic relief. For these class members, the Matrix dictates the
20  amount recoverable, based on an evaluation of each individual's credit report, ranging from a
21  free credit report and score to $450.00 in addition to a free credit report and score. Any attempt
22  to quantify the value of the Settlement's economic relief provisions must therefore begin with a
23  valuation of the free credit report and score.

24          Trans Union and Equifax sell credit reports through their websites for $9.95 and $10.00,
25  respectively. This is not a legitimate representation of the value a free credit report and score
26  would have to an individual class member, however, as courts widely recognize that
27  "compensation in kind is worth less than cash of the same nominal value." *In re Mexico Money*
28  *Transfer Litig.*, 267 F.3d 743, 748 (7th Cir. 2001); *see also, e.g., In re Domestic Air Transp.*

1   *Antitrust Litig.*, 148 F.R.D. 297, 321 (N.D. Ga. 1993) ("the economic value of the certificates to

2   the class is [not] the same as the face value of the certificates").  In assessing the actual value of

3   this non-cash payment, it is first pertinent that few class members are likely to have any use for

4   an additional free credit report, given that each class member is already entitled to at least one

5   free credit report per year from each of the credit reporting bureaus and that fewer than 10% of

6   consumers take advantage of their right to even one free credit report in any given year.  *See In*

7   *re Mexico Money*, 267 F.3d at 748 (calculating value of coupons as function of how frequently

8   the plaintiff class members were likely to use them); *In re Compact Disc Minimum Advertised*

9   *Price Antitrust Litig.*, 292 F. Supp. 2d 184, 187 (D. Me. 2003) ("The total value of the voucher

10  program will be equal to the value of the voucher multiplied by the number of vouchers actually

11  used."); *In re Domestic Air Transp.*, 148 F.R.D. at 322 ("[T]he true value of the certificates to

12  the class depends on when the certificates will be used, how they will be used, and who will be

13  using them.").  It is also significant that the credit reports offered have little to no value on the

14  secondary market either, even if they would be transferable, given the idiosyncratic nature of the

15  product and the reality that a credit report is available at no cost to any person who wants one

16  from each of the three credit bureaus.  *Cf. Clement v. Am. Honda Fin. Corp.*, 176 F.R.D. 15, 27

17  (distinguishing cases where compensation in kind was "transferrable to third parties and thus had

18  some potential cash value" from those where it was "not transferrable to third parties and thus

19  [has] no cash value").  Finally, it is worth noting that the cost to Trans Union and Equifax of

20  providing this free report is negligible.  While it is true that the Settlement would allow

21  qualifying class members to obtain a free credit score in addition to a free credit report, the retail

22  cost of this score is approximately $3.00, and would again provide this value only to those

23  individuals who are otherwise inclined to pay for such a service.  In total, the free credit report

24  and score component of the Settlement's economic relief is of very marginal, if any, value.  *See*

25  *also Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 654 (7th Cir. 2006) ("Our

26  confidence in the fairness of the settlement is further undermined by the agreement's bias toward

27  compensating class members with pre-paid Letter Express envelopes instead of cash.").

28          Because the free credit report and score component has little to no cash value, the value

1    of the Settlement's economic relief provisions depends on the worth of its cash component.  At

2    first blush, the matrix allows for cash payments of up to $450.00 to qualifying class members

3    whose credit improves from subprime to prime as a result of the "scrubbing" procedures Trans

4    Union and Equifax promise to implement.  Given the reality that virtually no one who is just

5    three years out of bankruptcy is able to obtain prime credit, the probability of more than a

6    handful of individuals qualifying for this maximum award is nil.  Ulzheimer Decl. ¶ 20.  The

7    largest cash awards realistically available to plaintiffs are thus a $187.50 award for anyone

8    whose score would rise from 101 to 200 points and a $225.00 award for anyone whose score

9    would rise by over 200 points.  Very few class members would qualify for these awards as well,

10   as score increases of over 100 points would be very rare.  Id. ¶ 22.  This effectively leaves the

11   $75.00 cash award for anyone whose score increases between 51 and 100 points as the only cash

12   component available to the overwhelming majority of members of the Economic Relief

13   Subclasses.  Because the "scrubbing" procedures promised in the Settlement will not correct

14   inaccuracies falling outside of its narrow definition for a BQT, only about 1-3% of the class, or

15   fewer than 100,000 individuals, would qualify for even this $75.00 award.  Id. ¶ 21.

16          Even those individuals ultimately qualifying for a cash award may not receive such an

17   award unless they previously mailed the appropriate Claims Form to the settlement administrator

18   within 45 days of the mailing of Mailed Notice.  Settlement § 5.1.  As it relates to the relief

19   available to those qualifying under the Matrix, the Claims Form requires class members to state

20   that they obtained a general Chapter 7 bankruptcy discharge and to provide their names, social

21   security numbers, current addresses, any prior names, and any former addresses dating back for

22   two years.  Trans Union and Equifax already maintain all of this information, however, causing

23   one to question the necessity of this claims-made procedure.  The procedure could be designed,

24   as Plaintiffs' counsel suggested when it proposed the use of a Claims Form to Trans Union

25   during the course of settlement, to "allow [Defendants] to resolve this matter for a small fraction

26   of [their] total exposure."  Sobol Decl. Ex. I (Letter from Lee A. Sherman to Donald E. Bradley

27   (Jan. 20, 2006)).  Whether this was the deliberate rationale of adopting the claims-made

28   procedure or not it will undoubtedly be its effect, serving to further dramatically limit the

1  Settlement Class's potential cash recovery. *See Sylvester v. Cigna Corp.*, 369 F. Supp. 2d 34, 52

2  ("'claims made' settlements regularly yield response rates of 10 percent or less").

3        While Plaintiffs' counsel at oral argument represented confidence that the aggregate

4  recovery would range "into eight figures," none of the Proponents offer any support for this

5  extemporaneous figure or a principled basis upon which to estimate Plaintiffs' likely recovery.

6  In reality, the bulk of the economic relief hypothetically available under the Settlement is merely

7  illusory due to its strict eligibility conditions, while much of what is attainable will go unpaid as

8  a result of the claims-made process. The Court concludes that a better estimate of the

9  Settlement's cash value is less than $1 million, or not even one-fifth of one percent of the

10  litigation value of these claims as set forth above.

11                      iii.    *The Strength of Plaintiffs' Case*

12        Were Plaintiffs' claims against Trans Union and Equifax grounded in such a tenuous

13  basis that they were hopelessly doomed to fail in court, such a colossal discrepancy between

14  their apparent litigation value and the value of the Settlement may be acceptable. That is not

15  true here.

16        Trans Union and Equifax identify what they consider to be several insurmountable

17  hurdles Plaintiffs would face in litigating their claim for statutory damages under the FCRA.

18  While the Court cannot and need not determine the merits of the contested facts and legal issues

19  at this juncture, *see Officers for Justice v. Civil Serv. Comm.*, 688 F.2d 615, 625 (9th Cir. 1982),

20  it nonetheless has an obligation to "consider and weigh the nature of the claim[s], the possible

21  defenses, [and] the situation of the parties . . . ." *Young v. Katz*, 447 F.2d 431, 433 (5th Cir.

22  1971) (citations omitted).

23        First, Trans Union and Equifax argue that Plaintiffs would be unable to establish a

24  violation of the FCRA's reasonableness standard because through their reporting procedures

25  they merely rely on creditors whom they reasonably believe to be reputable. *See Smith v. Auto*

26  *Mashers, Inc.*, 85 F. Supp. 2d 638, 641 (W.D. Va. 2000) ("If a consumer reporting agency

27  accurately transcribes, stores, and communicates consumer information received from a source

28  that it reasonably believes to be reputable, and which is credible on its face, the agency does not

1  violate [the FCRA] simply by reporting an item of information that turns out to be inaccurate.")

2  (quoting 16 C.F.R. Part 600, 391). This reasonableness inquiry resides in the trier of fact, and

3  involves weighing the potential harm from inaccuracy against the burden of safeguarding against

4  inaccuracy. *Stewart v. Credit Bureau, Inc.*, 734 F.2d 47, 51 (D.C. Cir. 1984). It therefore

5  remains ultimately for a jury to decide whether procedures reasonably designed to ensure

6  maximum possible accuracy include Defendants' presumption that all consumer debts included

7  in Chapter 7 bankruptcy are undischarged, despite the fact that the majority of such debts are

8  discharged, and their reliance on a consumer's past creditors to proactively volunteer

9  information regarding discharged debts. Given that the only data now before the Court suggests

10  that nearly two thirds of the credits reports that Trans Union and Equifax issue involving debts

11  discharged through Chapter 7 bankruptcy proceedings contain the same type of error[3], Plaintiffs'

12  allegation that these procedures are unreasonable is certainly colorable.

13      Second, Defendants contend that they are shielded from liability because, even though a

14  consumer debt is discharged, it is still "technically accurate" to report a balance owed on that

15  debt. *See Irby v. Fashion Bug (In re Irby)*, 337 B.R. 293, 295 (Bankr. N.D. Ohio 2005)

16  (reporting of debt discharged in bankruptcy does not violate discharge injunction because "[a]ll

17  that is being reported is the truth"). Already, several federal courts have rejected this argument.

18  *See, e.g., Turner v. J.V.D.B. & Assocs., Inc.*, 330 F.3d 991, 995 (7th Cir. 2003) (assertion that

19  person "owed a [discharged] debt that no longer existed" is "on its face . . . false"); *Diprinzio v.*

20

21  ───────────────

22      [3]This data comes by way of a statistical sampling performed by bankruptcy lawyer
    Charles Juntikka of the Trans Union credit reports of approximately 960 of his clients and

23  the Equifax credit reports of approximately 900 of his clients. Decl. of Charles Juntikka
    ¶¶ 18-19. According to this survey, about 64% of the Trans Union reports and 66% of the

24  Equifax reports erroneously list one or more discharged debts as due and owing. *Id.* The
    Settlement Proponents vigorously object to this data as not based on a proper scientific

25  sampling and not subject to expert examination, while simultaneously failing to provide
    any alternative sampling or error rate estimate of their own. At this juncture, the Court

26  does not draw any conclusions of fact or of law from the Juntikka study, but merely notes

27  that based on the only data the parties have produced on this issue, it is eminently feasible

28  that a jury could conclude Defendants' procedures were unreasonable.

1  *MBNA America Bank, N.A.*, 2005 U.S. Dist. LEXIS 18002, at *10 (E.D. Pa. Aug. 4, 2005)

2  (representation of discharged debt as due and owing is "actionable [under the FCRA] because it

3  is misleading or materially incomplete").

4       Third, Trans Union and Equifax assert that Plaintiffs cannot prove Defendants willfully

5  violated the FCRA. The question of willfulness is also one for the trier of fact, and hence a

6  difficult one to handicap. *Cushman v. Trans Union Corp.*, 115 F.3d 220, 227 (3d Cir. 1997).

7  This difficulty is apparently exacerbated here by the fact that the Ninth Circuit's current

8  willfulness standard, that the defendant acted "either knowing that the action violates the rights

9  of consumers [under the FCRA] or in reckless disregard of those rights," is currently under

10 review before the Supreme Court on a writ of certiorari and may thus have changed before trial

11 in this action begins. *Reynolds v. Hartford Financial Servs. Group, Inc.*, 435 F.3d 1081, 1099

12 (9th Cir. 2006); *GEICO Gen. Ins. Co. v. Edo*, 127 S. Ct. 36 (2006) (granting certiorari to review

13 *Reynolds* standard). The *Reynolds* standard remains the law of this circuit until such time as the

14 Supreme Court rules otherwise and the Court therefore is bound to proceed accordingly.

15 Moreover, even if the "reckless disregard" component that is the focus of the current challenge

16 is obviated, Plaintiffs possess evidence upon which a jury could reasonably conclude that Trans

17 Union and Equifax acted knowingly. *E.g.*, Ulzheimer Decl. ¶ 15 (testimony of former assistant

18 manager at Equifax that "we became aware that relying on the data furnisher to report

19 [accounted included in bankruptcy] as being discharged as part of the bankruptcy was unreliable

20 and, as such, credit files with a Chapter 7 bankruptcy having incorrectly reported pre-bankruptcy

21 debts was an extremely frequent and reoccuring problem"); Acosta's Reply Br. 22:14-16 (citing

22 testimony of former Trans Union employee that "Trans Union would, if instructed by the

23 creditors, routinely allow inaccurate information to remain on post-bankruptcy credit reports

24 until a lawsuit was filed by the consumer").

25       Fourth, Defendants cite the perils of obtaining and maintaining class certification in

26 derogating Plaintiffs' case. The value of a class action "depends largely on the certification of

27 the class," and this class certification undeniably represents a serious risk for plaintiffs in any

28 class action lawsuit. *In re GMC Pick-Up*, 55 F.3d at 817. This risk is particularly palpable

1   where a putative class population is as numerous as it is here.  *See Sorensen v. Household Fin.*
2   *Corp.*, 2006 Cal. App. Unpub. LEXIS 10091, at \*26-28 (Cal. Ct. App. 2006) (common issues of
3   fact and law did not predominate in putative class action due to difficulty in ascertaining
4   damages flowing from inaccurate credit reporting on individual class members).  With respect to
5   the instant class, Defendants identify the need for all class members to establish that they were
6   the subjects of inaccurate reporting and that these inaccuracies flowed from Defendants' failure
7   to follow reasonable procedures.  *See Washington v. CSC Credit Servs., Inc.*, 199 F.3d 263 (5th
8   Cir. 2000).  These issues, Trans Union and Equifax contend, would render the class
9   unmanageable.

10       Without committing itself to certify a class of any sort in this litigation, the Court is
11  unconvinced that a properly circumscribed class would be unallowable.  There is no dispute that
12  the question of Defendants' liability for having violated the obligation to employ reasonable
13  reporting procedures is common to the class and is the central issue in this case.  And despite
14  Defendants' protestations to the contrary, with respect to at least the FCRA's statutory damages
15  remedy, Plaintiffs would not be required to prove causation or actual damages in order to
16  prevail.  *See, e.g., Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 953 (7th Cir. 2006) ("a
17  representative plaintiff must be allowed to forego claims for compensatory damages in order to
18  achieve class certification"); *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d
19  1301, 1306 (9th Cir. 1990) ("the district court was not obligated to require individual proof of
20  injury from each class member [in suit seeking statutory damages]").  The fact that a federal
21  district court in South Carolina recently granted certification, over the same objections, to a
22  similar class of consumers asserting a claim against a credit reporting agency under the identical
23  provision of the FCRA further demonstrates that the existence of certifiable class is a very real
24  possibility here.  *Cf. Clark v. Experian Info. Solutions, Inc.*, 2002 U.S. Dist. LEXIS 20410, at
25  \*10-13 (D. S.C. 2002) (finding common issues predominate over individual issues despite
26  defendants' objections that "each member will have to demonstrate his or her own proof of
27  inaccuracy, causation and damages, and willfulness") (citations omitted).
28       Finally, Trans Union and Equifax cite to their collectively willingness to engage in

1  protracted litigation to encourage approval of the Settlement, warning that "Defendants

2  undoubtedly would engage numerous experts, discovery would be lengthy and contentious,

3  numerous depositions would be required . . . [,] and motion practice would be expensive and

4  complicated." Reply of Defs. in Supp. of Mot. 14:9-13. During oral argument, for instance,

5  counsel for Trans Union promised, "the [Defendant] bureaus are not afraid to litigate cases, and

6  have an excellent record on appeal." While the Court deeply appreciates the ability and

7  enthusiasm of counsel on all sides of this matter, the parties' willingness to thoroughly litigate a

8  case is simply not a compelling justification to discount the value of Plaintiffs' claims. As the

9  Court made clear at oral argument, it welcomes the parties efforts to resolve their dispute by

10  whatever means they should choose, whether that means be motion practice, trial, or a

11  reasonable settlement.

12               iv.    *The Settlement's Economic Relief Provisions are Unreasonable*

13          In light of the foregoing analysis, the instant settlement is not reasonable. The economic

14  value of the Settlement pales in comparison to Plaintiffs' potential recovery through litigation.

15  Moreover, Plaintiffs' prospects for prevailing in this litigation are not so bleak as to render this

16  a "good value for a relatively weak case." *Livingston v. Toyota Motor Sales USA*, 1995 U.S.

17  Dist. LEXIS 21757 (N.D. Cal. 1995).

18          Unlike the class members, Plaintiffs' counsel, Trans Union, and Equifax would be

19  generously compensated under the Settlement. Counsel for Acosta negotiated an attorney's few

20  award of $3,485,000 in their original MOU with Trans Union. A little over one month and a few

21  mediation sessions later, the parties tacked an additional $2,000,000 onto this fee award based

22  on the addition of the Pike Plaintiffs to the settlement, bringing the total application for a fee

23  award to $5,485,000. Settlement § 9.1 This total is so grossly out of proportion to the class

24  members' probable aggregate recovery as to suggest a strong possibility of impropriety. *See also*

25  *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 802 (3d Cir. 1995) ("At

26  its worst, the settlement process may amount to a covert exchange of a cheap settlement for a

27  high award of attorneys fees.") (quoting John C. Coffee, Jr., *Understanding the Plaintiff's*

28  *Attorney: The Implications of Economic Theory for Private Enforcement of Law through Class*

27

1 | *and Derivative Actions*, 86 Colum. L. Rev. 669, 714 n.121 (1986)).

2 |      Trans Union and Equifax also would receive handsome compensation under the

3 | Settlement by way of its release provisions. These release provisions dictates a wholesale

4 | release of all claims, known and unknown, by all class members that fail to assert their opt out

5 | rights. By this mechanism, Trans Union and Equifax reap the best of both worlds: class

6 | members wishing to preserve any valid claims against them must affirmatively opt out, while

7 | class members wishing to forego those claims and recover whatever monetary relief the

8 | Settlement allows must affirmatively opt in via the mandatory Claims Made process. Given the

9 | absence of direct notice to the majority of class members and the previously mentioned

10 | likelihood that many class members, through no fault of their own, will be unaware of valid

11 | claims against Defendants, there are likely to be a considerable number of such individuals who

12 | fail to act for reasons wholly unrelated to apathy or a conscious choice to abstain. For these

13 | individuals, the Settlement presents an unforgiving whipsaw, releasing Trans Union and Equifax

14 | from all conceivable claims while granting nothing of monetary value in return.

15 |      Given these incentives, it is no surprise that Plaintiffs' counsel, Trans Union, and Equifax

16 | are such strong proponents of the Settlement. Their collective zeal in lobbying for its approval,

17 | however, hardly compensates for the paltry monetary value the Settlement would deliver to the

18 | Settlement Class in exchange for the sacrifice of its claims.

19 |      **2.**    **Injunctive Relief Provisions**

20 |      Much of the injunctive relief the Settlement promises is very encouraging. The new

21 | reinvestigation procedures will give a consumer the ability to lodge disputes that will quickly

22 | and effectively correct inaccurate BQTs and certain non-BQTs, based solely on the consumer's

23 | affirmative representation that the disputed account was included in a Chapter 7 bankruptcy.

24 | Impressively, Trans Union and Equifax will also modify their practices going forward by

25 | identifying all BQTs included in a Chapter 7 bankruptcy and reversing their current presumption

26 | that the debts on these accounts were not discharged. Trans Union and Equifax will now

27 | automatically update the reporting on each of these accounts to remove the negative history, will

28 | add a remark that the account was included in bankruptcy, and will perform these updates

1   without relying on the creditors to first instruct them to do so.  These changes promise to

2   significantly reduce the number of inaccuracies inhering in the credit reports that Trans Union

3   and Equifax prepare in the future.

4          On the other hand, aspects of the Settlement's provision for updating current consumer

5   data raise serious concerns.  As the Objectors point out, the Settlement's restrictions on what

6   qualifies as a BQT mean that Trans Union and Equifax will not be required to correct existing

7   tradelines involving medical bills, utility bills, phone bills, car notes, mortgages, installment

8   loans, accounts placed with a collection agency, judgments, or any other non-credit card debts

9   inaccurately reported as "charged off" or "in collection."  Decl. of David A. Szwak ¶ 20.  Trans

10  Union and Equifax also will not be required to correct any discharged debts, including credit

11  card debts, that are inaccurately reported as late or not late, but with a balance due.  *Id.* ¶¶ 22-25.

12  Finally, the Settlement's injunctive relief provisions will not correct inaccuracies in the reporting

13  of any pre-bankruptcy credit card debts noted as "charged-off" or "in collection" until after the

14  bankruptcy filing.  *Id.* ¶ 24.

15         These limitations on the scope of the "scrubbing" Trans Union and Equifax will perform

16  are especially significant since, under the Settlement's release provisions, all members of the

17  Settlement Class will be deemed to have forever relinquished all claims for injunctive and

18  declaratory relief without the ability to opt out.  The Settlement's injunctive provisions therefore

19  deserve careful scrutiny, for should Trans Union and Equifax's revamped procedures fail to

20  comport with the FCRA's mandate of "reasonable procedures to assure maximum possible

21  accuracy," the Settlement's approval would be completely barred whether or not such injunctive

22  relief would be available to private litigants as a remedy.  *Schering Corp. v. Illinois Antibiotics*

23  *Co.*, 62 F.3d 903, 907 (7th Cir. 1995) ("Judges are not authorized to disobey the law in issuing

24  an injunction, let alone to issue injunctions that authorize or direct people to violate valid federal

25  statutes.") (citations omitted); *see also Local No. 93, Int'l Assoc. of Firefighters v. City of*

26  *Cleveland*, 478 U.S. 501, 526 (1986) (parties to settlement may not "agree to take action that

27  conflicts with or violates the statute upon which the complaint was based").

28         The Court is very concerned about the possibility that ratifying these provisions would

1  effectively bless illegal conduct.  The only argument the Proponents have offered to suggest that
2  the limitations on the "scrubbing" injunctive relief are even logical is Trans Union's
3  representation that the Settlement's exclusive focus on credit card debt is correct because
4  consumers typically roll many miscellaneous debts onto their credit cards in an effort to stave off
5  bankruptcy.  Depo. of Ronald Mann 32:6, 33:3-34:1.  This suggestion that the limited
6  "scrubbing" may correct a majority of the current reporting errors, however, hardly guarantees
7  that these measures comply with the FCRA's proscriptions.  Correcting tradelines falling outside
8  the scope of the Settlement's limited definition of a BQT would indisputably enhance the
9  accuracy of the reports prepared, and the Settlement's proponents have yet to provide the Court
10  with an explanation as to why taking this step would be unreasonable.

11       Another problem related to the injunctive relief provided for in the Settlement is that it is
12  overwhelmingly the primary, and for most class members the only, relief the Settlement will
13  deliver.  "A number of commentators have identified settlements that afford only nonpecuiary
14  relief to the class as prime suspects of [collusive] settlements."  *In re GMC Pick-Up Truck*, 55
15  F.3d at 802 (citing Coffee, 86 Colum. L. Rev. at 716 n.129; Jonathan R. Macey & Geoffrey P.
16  Miller, *The Plaintiffs' Attorneys Role in Class Action and Derivative Litigation: Economic*
17  *Analysis and Recommendations for Reform*, 58 U. Chi. L. Rev. 1, 45 n.10 (1991); Nancy
18  Morawetz, *Bargaining, Class Representation, and Fairness*, 54 Ohio St. L.J. 1, 5 n.40 (1993)).
19  Courts, too, are highly skeptical of such settlements.  *See, e.g., In re Mexico Money Transfer*
20  *Litig.*, 267 F.3d 743, 748 (7th Cir. 2001); *In re IKON Office Solutions Secs. Litig.*, 209 F.R.D.
21  94, 99 (E.D. Pa. 2002).  As one district court has observed:

22            The classic manifestation of the [agency] problem in a class action
23            involves a non-pecuniary settlement (e.g., injunctive relief) . . .
24            together with arrangements to pay plaintiffs' lawyers their fees.  The
25            defendants thus get off cheaply, the plaintiffs' (and [the]
26            defendants') lawyers get the only real money that changes hands and
27            the court, which approves the settlement, clears its docket of
28            troublesome litigation.  Little wonder that 'all the dynamics conduce

30

1   to judicial approval of such settlements.'

2   *In re Oracle Sec. Litig.*, 132 F.R.D. 538, 544-45 (N.D. Cal. 1990).  For this reason, a primarily

3   non-cash settlement, such as this one, "merits particularly close scrutiny to determine whether it

4   represents a verifiably fair and adequate settlement of plaintiffs' claims against the

5   [defendants]."  *In re MicroStrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d 654, 662 (E.D. Va. 2001).

6         The ability of the Settlement's injunctive relief to redeem an unsatisfactory settlement is

7   even further crippled by the possibility that these changes to Trans Union and Equifax's

8   reporting procedures are inevitable.  To the extent Trans Union and Equifax's reporting

9   procedures may actually violate the FCRA, these injunctive relief provisions are of no value.

10   *Levell v. Monsanto Research Corp.*, 191 F.R.D. 543, 544-45 (S.D. Ohio 2000) ("[A] defendant's

11   promise to do that which the law already requires is not a valuable benefit.") (citing *Franks v.*

12   *Kroger Co.*, 649 F.2d 1216, 1224 (6th Cir. 1981) (finding little benefit to class members from

13   settlement agreement provisions that obligated defendant "to do what the law generally

14   requires"); *Reich v. Walter W. King Plumbing & Heating Contractor, Inc.*, 98 F.3d 147, 150 (4th

15   Cir. 1996) (defendant not the "prevailing party" under a settlement that merely obligated

16   plaintiff to do that which the law already required); *In re Ford Motor Co. Bronco II Prods. Liab.*

17   *Litig.*, 1995 U.S. Dist. LEXIS 3507 (E.D. La. 1995) ("The proposed settlement . . . merely

18   provides plaintiffs with information to which they were already entitled and confers no

19   additional value in consideration for release of plaintiffs' claims.")).

20         For these reasons, while the Court appreciates the effort that went into negotiating the

21   injunctive provisions and the value these provisions offer in reducing the number of inaccuracies

22   inhering in credit reports Trans Union and Equifax will prepare going forward, this relief does

23   not make the Settlement fair, adequate, and reasonable.

24       **C.**    **The Process by which the Parties Reached Proposed Settlement was Flawed**

25           **1.**    **Plaintiffs' Efforts in Investigating their Case**

26         For Plaintiffs to have brokered a fair settlement, they must have been armed with

27   sufficient information about the case to have been able to reasonably assess its strengths and

28   value.  Similarly, for a court to approve a proposed settlement, [t]he parties must . . . have

1   engaged in sufficient investigation of the facts to enable the court to 'intelligently make . . . an
2   appraisal' of the settlement." *Polar Int'l Brokerage Corp. v. Reeve*, 187 F.R.D. 108, 114
3   (S.D.N.Y. 1999) (quoting *Plummer v. Chem. Bank*, 668 F.2d 654, 660 (2d Cir. 1982)); *see also,*
4   *e.g.*, *Carnegie v. Household Int'l, Inc.*, 371 F. Supp. 2d 954, 957 (N.D. Ill. 2005).   In
5   considering a proposed settlement, a court therefore bears an obligation to evaluate the scope
6   and effectiveness of the investigation plaintiffs' counsel conducted prior to reaching an
7   agreement. *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000).  "No one
8   can tell whether a compromise found to be 'fair' might not have been 'fairer' had the negotiating
9   (attorney) possessed better information or been animated by undivided loyalty to the cause of the
10  class." *In re GMC Engine*, 594 F.2d at 1125 n.24; *see also Reynolds v. Beneficial Nat'l Bank*,
11  260 F. Supp. 2d 680, 695 (N.D. Ill. 2003) ("Without adequate representation by plaintiffs'
12  counsel, it is impossible to evaluate the chances of plaintiffs obtaining a greater recovery than
13  under [the proposed] settlement . . . .").
14         Counsel for Pike conducted no discovery before settling with Equifax.  Plaintiffs' counsel
15  now offers that, although there was no discovery in this case, they benefitted from a "discovery
16  bank of information" that *Pike* attorney Peter Recchia collected in several other cases against
17  Equifax.  This "discovery bank" is of little value, however, because it consists almost entirely of
18  records specific to unrelated litigation, disclosures irrelevant to the inaccurate reporting of
19  discharged debts, or documents containing information that is outdated.  Decl. of David A.
20  Szwak ¶ 42.  In fact, the only document among this material that pertains to the reporting
21  procedures at issue in this case is the Equifax Indicating Manual, a manual describing Equifax's
22  rules for handling consumer disputes, which has been so extensively redacted as to be worthless.
23  Supplemental Decl. of Lee Sherman Ex. 33.
24         While counsel did pursue discovery in *Acosta*, that discovery was deficient.  Counsel for
25  Acosta missed the deadline to file a motion to compel, but nevertheless served 172 special
26  interrogatories and 143 requests for the production of documents on Trans Union.  Acosta's
27  Reply Br. 21:16-22.  In response, it received 14 substantive answers to its interrogatories, most
28  of which were repetitive, and 5 substantive responses to its document requests.  The documents

1   produced total 79 pages, none of which relate to Trans Union's procedures or practices regarding

2   the reporting of debts discharged through bankruptcy. Szwak Decl. ¶¶ 32, 41. Counsel for

3   Acosta noticed the depositions of 13 Trans Union employees, but ultimately conducted 3 of

4   them, only one of whom was taken of an employee having knowledge of Trans Union's practices

5   relating to the reporting of consumer credit information. Finally, Acosta's attorneys prepared 26

6   declarations in support of its class certification, only one of which was from a person other than

7   counsel or one of the plaintiffs.

8        For litigation involving claims for liability of the magnitude of those here, this is scant

9   discovery indeed, and understandably did little to bestow upon Plaintiffs a thorough

10  understanding of the credit reporting process. This makes all the more baffling Plaintiffs' failure

11  to consult any expert regarding the case until August 15, 2006, four days after they reached an

12  MOU with Trans Union in mediation. Sobol Decl. Ex. T. *See In re GMC Pick-Up*, 55 F.3d at

13  814 (insufficient information available upon which to evaluate settlement where there was no

14  evidence that class counsel retained its own experts or deposed a significant number of potential

15  witnesses).

16       As an artifact of this incomplete investigation into their case, Plaintiffs are now unable (1)

17  to quantify the frequency of the erroneous reporting upon which their claims were based; (2) to

18  discern approximately how costly it would be for Trans Union and Equifax to correct their

19  reporting procedures; (3) to apprise the extent to which the "scrubbing" included in the

20  Settlement's injunctive procedures would eliminate current inaccuracies in Plaintiffs' credit

21  histories; or (4) to objectively estimate how much Trans Union and Equifax would be required to

22  pay class members under the Settlement's economic relief provisions. Although Trans Union

23  and Equifax possess the data upon which all of these determinations depend, they also have

24  declined to produce this information. As a result, the only concrete estimates now before the

25  Court are those of the Objectors, and all of these estimates advise against approving the

26  Settlement.

27       Of course, the Court's role in assessing the merits of a proposed class settlement is not to

28  express its preference from among a set of potential class representatives. The fact that an

1    alternative set of plaintiffs capable of delivering more benefit to the class may hypothetically, or

2    actually, exist must not control a court's decision in evaluating the fairness of a particular

3    proposal. *Cf. In re GMC Engine*, 594 F.2d at 1125 n.24 ("The court can reject a settlement that

4    is inadequate; it cannot undertake the partisan task of bargaining for better terms.").

5    Nonetheless, the stark contrast between the depth of Plaintiffs' investigation and that conducted

6    by the Objectors casts considerable doubt on the sufficiency of the effort the *Acosta/Pike*

7    plaintiffs have invested in this litigation.  In this respect, while the Objectors' preparation of

8    their case is irrelevant in determining whether Plaintiffs conducted sufficient discovery prior to

9    settling, it does vividly accentuate the myriad areas in which Plaintiffs' investigative efforts are

10   deficient.

11          Federal courts are inherently skeptical of pre-certification settlements, precisely because

12   such settlements tend to be reached quickly before the plaintiffs' counsel has had the benefit of

13   the discovery necessary to make an informed evaluation of the case and, accordingly, to strike a

14   fair and adequate settlement. *See, e.g., In re GMC Pick-Up*, 55 F.3d 788; *Weinberger v.*

15   *Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982); *Polar Int'l Brokerage Corp.*, 187 F.R.D. 108, 113

16   (S.D.N.Y. 1999) ("An early settlement will find the court and class counsel less informed than if

17   substantial discovery had occurred.  As a result, the court will find it more difficult to access the

18   strengths and weaknesses of the parties' claims and defenses, determine the appropriate

19   membership of the class, and consider how class members will benefit from settlement.")

20   (quoting Manual for Complex Litigation 2d § 30.45 (3d Ed. 1995)).  This case exemplifies that

21   skepticism.

22                   **2.       The Simultaneous Negotiation of Attorneys Fees and Class Relief**

23          After reaching an agreement with Trans Union, Plaintiffs' counsel sought to enlarge this

24   settlement by expanding it to include the claims asserted in *Pike v. Equifax*.  Plaintiffs' counsel

25   thereby devised an arrangement through which Equifax would join the settlement, and

26   communicated this proposal via e-mail to counsel for Equifax on September 1, 2006.  In material

27   part, it requested:

28                   2) . . . the same injunctive relief - practice changes as [Trans Union]

. . .

4) . . . agreement to pay monetary relief as set forth in the matrix and
the alternative economic relief based on prior disputes . . . the
monetary figures should each be raised by 50% . . . which would
allow for a 25% savings to each [of Trans Union and Equifax] from
the total original amount that [Trans Union] agreed to . . .

. . .

8) Attorneys' Fees - the current amount in the Term Sheet is
[$]3,485,000.00. We would ask that Equifax's involvement in this
settlement result in an increase in that amount to $5,985,000.00. . . .

Sobol Decl. Ex. L (E-mail from Lee A. Sherman to Craig Bertschi (Sept. 1, 2006)) (the
"September 1 E-mail"). Trans Union and Equifax agreed to each of these terms, save for a
reduction in the total amount of attorneys fees by $500,000, from $5,985,000 to $5,485,000.

While the merits of the substantive revisions to the economic relief provisions of the prior
settlement are themselves questionable, the process through which Plaintiffs' counsel negotiated
its own attorneys fees simultaneously with the negotiation of class relief is highly suspicious.
"Attorneys fees are subsidiary to the issue of settlement and should be considered subsequent to
reaching a tentative settlement by the parties." *Munoz v. Ariz. State Univ.*, 80 F.R.D. 670, 671-
72 (D. Ariz. 1978) (citing *Prandini v. Nat'l Tea Co.*, 557 F.2d 1015 (3d Cir. 1977); *see also*
Federal Judicial Center, Manual for Complex Litigation Fourth § 21.7 (2004) ("[T]he
simultaneous negotiation of class relief and attorney fees creates a potential conflict." ). To be
certain, there are limited circumstances in which contemporaneous negotiation of fees and class
relief may be appropriate. *See Evans v. Jeff D.*, 475 U.S. 717, 734-35, 106 S. Ct. 1531 (1986).
But those circumstances do not exist here, where the fees sought are not based on hours actually
billed, and where those fees represent a trivial portion of Defendants' overall exposure to
liability yet a significant fraction of the total they are expected to pay out under the Settlement.
*See Staton*, 327 F.3d at 972; *see also Evans*, 475 U.S. at 734-35. The simultaneous negotiation
of attorneys fees and class relief is thus an additional and damning indictment of Plaintiffs'

35

1  counsel's commitment to pursuing a fair, arms-length settlement on behalf of the plaintiff class.

2

3          **3.    The Addition of "Scrubbing" Injunctive Relief to the Settlement**

4        The simultaneous negotiation of attorneys fees and class relief is not even the most

5  vexing aspect of the process by which the Settlement was reached. That distinction belongs to

6  the suspicious circumstances around which the parties negotiated for the "scrubbing" component

7  of the Settlement's injunctive relief provisions.

8        During the negotiations with Trans Union, Plaintiffs' counsel repeatedly requested that

9  any injunctive relief apply to all files in Trans Union's system through a retroactive "scrub" of

10  old files. Decl. of Justice John K. Trotter, Ret. ¶ 13. Trans Union never ceded to this demand,

11  "citing various technical, logistical and expense concerns, as well as concerns with how such a

12  major change might be perceived by lenders who used Trans Union credit reports." *Id.* The

13  parties instead compromised, commemorating their agreement in the MOU whereby Trans

14  Union would not perform a full retroactive scrub, but that it would instead adopt certain

15  presumptions to be employed in response to certain reinvestigation requests. *Id.*

16        As the terms of the September 1 E-mail reveal, Plaintiffs' counsel never reasserted its

17  request for a retroactive scrub when seeking to expand the agreement with Trans Union so as to

18  include Equifax. September 1 E-mail (seeking "the same injunctive relief - practice changes as

19  [Trans Union]"). By as early as September 6, Equifax had "possibly" agreed to this proposal.

20  Sobol Decl. Ex. M (E-mail from Lee A. Sherman to Ronald Mann (Sept. 6, 2006)) ("We have

21  reached what I believe to be an important settlement with [Trans Union] (and possibly Equifax,

22  though that is not finalized yet)."). Meanwhile, Trans Union outlined its "straightforward"

23  position to settlement officer Justice Trotter in a letter explaining, "[Trans Union] has settled all

24  of [the claims against it,] [i]t will offer no more money, and it will not expand the scope of

25  injunctive relief." Sobol Decl. Ex. X (Letter from Julia B. Strickland to the Hon. John K. Trotter

26  (Ret.) (Sept. 12, 2006)). It is then against this backdrop that all of the parties convened for the

27  Global Mediation on September 14, 2006.

28        At the Global Mediation, the Objectors informed Plaintiffs' counsel of a variety of

1  defects in the proposed settlement, including the fact that its injunctive relief provisions would

2  fail to perform the "scrubbing" necessary to correct any of the erroneous entries in Defendants'

3  files relating to existing class members. Opp'n 18:21-19:1.  Plaintiffs, Trans Union, and Equifax

4  nevertheless persisted in modifying the terms of the MOU so as to join Equifax in the settlement,

5  as Plaintiffs Counsel suggested in the September 1 E-mail.  Curiously, despite the fact that

6  Plaintiffs did not request any changes to the injunctive relief available under the MOU, and

7  despite Trans Union's declaration that it would "not expand the scope of injunctive relief," the

8  parties did just that and emerged with a settlement including what the Proponents now laud as its

9  greatest achievement: the "scrubbing" injunctive relief.

10        It is difficult to escape the coincidence that Plaintiffs repeatedly sought and failed to

11  obtain a "scrubbing" provision, then subsequently abandoned the request when seeking to join

12  Equifax to the settlement, and only ultimately secured this "scrubbing" relief after the Objectors

13  identified the Settlement's several inadequacies and likely failure to procure approval.  It is even

14  more difficult to accept the notion that Trans Union and Equifax would reach terms on an

15  agreement not including "scrubbing" relief, and then agree to sweeten the pot so as to include

16  such a term, without receiving any consideration in exchange.  The Court is hesitant to classify

17  the Settlement as the product of a "reverse auction," but cannot avoid the conclusion that the

18  process by which it was reached is strikingly similar.  *See Reynolds*, 288 F.3d at 282 (explaining

19  a "reverse auction" as the "practice whereby the defendant in a series of class actions picks the

20  most ineffectual class lawyers to negotiate a settlement with in the hope that the district court

21  will approve a weak settlement that will preclude other claims against the defendant") (citations

22  omitted); *see also In re GMC Pick-Up*, 55 F.3d at 788 ("[A]ttorneys jockeying for position might

23  attempt to cut a deal with the defendants by underselling the plaintiffs' claims relative to other

24  attorneys.").

25        Against this suspicion stand the representations of Justice Trotter.  The Court deeply

26  appreciates the efforts of Justice Trotter in brokering this Settlement, and likewise puts great

27  stock in his belief that "the process by which the settlement was negotiated was procedurally

28  fair."  Trotter Decl. ¶ 2.  There is no reason to believe, however, that Justice Trotter was ever

1   aware of the September 1 e-mail that now gives rise to an inference of impropriety or of any

2   communications forging a deal between Plaintiffs and Equifax that occurred prior to the Global

3   Mediation. *See generally id.* (making no mention of September 1 E-mail). In fact, Justice

4   Trotter's declaration indicates that he believed that Plaintiffs obtained the "scrubbing" relief in

5   exchange for a reduced financial cost to Trans Union and Equifax. *Id.* ¶ 21 ("In return for this

6   reduced financial cost, the Acosta team was able to obtain a key component of the injunctive

7   relief it originally demanded in the early mediation sessions with Trans Union alone: a full

8   retroactive scrub of the relevant databases."). In reality, however, this could not have been the

9   actual consideration given for the "scrubbing" relief, as Plaintiffs' counsel had already granted

10  this concession in the September 1 e-mail.

11        Standing alone, these dubious circumstances would likely not compel the Court to reject

12  an otherwise reasonable and reasonably negotiated class settlement. In conjunction with the

13  deficient nature of the pre-settlement discovery Plaintiffs conducted and the willingness of

14  Plaintiffs' counsel to simultaneously negotiate attorneys fees with class relief, however, the

15  Court has grave doubts that this settlement is the result of a process that was sufficiently

16  adversarial or conducted at arm's-length. In conjunction with the serious structural defects

17  inhering in the Settlement and the fact that the Settlement delivers grossly insufficient relief to

18  the class, the Court is unequivocal in concluding that it cannot be approved.

19  **IV.   DISPOSITION**

20        For the reasons set forth above, the Court DENIES the Motion.

21

22  IT IS SO ORDERED.

23  DATED: May 31, 2007

24

25

26                                              DAVID O. CARTER
                                                United States District Judge
27

28